

Exhibit B

Condensed Transcript

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

METSO PAPER, USA, INC.,

        Plaintiff

vs.

GENERAL ELECTRIC
COMPANY,

        Defendant

CIVIL ACTION NO.

3:CV-08-47

~~~~~~~~~~~~~~~~~~~~~

### DEPOSITION OF

### DAVID KUZMICK

February 11, 2009
10:47 a.m.

Metso Paper
987 Griffin Pond Road
Clarks Summit, Pennsylvania

Reported by: Andrea L. Malkin, Professional Reporter



EXHIBIT

70

11/17/10 JMn



ESQUIRE

Toll Free: 888.486.4044
Telephone:

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmi...                                                    February 11, 2009

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

METSO PAPER, USA, INC.,      : CIVIL ACTION NO.
Plaintiff                    :
                             : 3:CV-08-47
        vs.                  :
                             :
GENERAL ELECTRIC             :
COMPANY,                     :
Defendant                    :

DEPOSITION OF DAVID KUZMICK
Taken in the offices of Metso Paper,
997 Griffin Pond Road, Clarks Summit,
Pennsylvania, on Wednesday, February 11,
2009, commencing at 10:47 a.m. before
Andrea L. Malkin, Professional Reporter

---

**2**

1  APPEARANCES:
2
3    CLAUSEN MILLER, PC
4    By: DANIELLE SULLIVAN KAMINSKI, ESQUIRE
5    One Chase Manhattan Plaza
6    39th Floor
7    New York, NY 10005
8    (212) 805-3948
9      -- For the Plaintiff
10
11   SMITH & DUGGAN LLP
12   By: THOMAS G. COOPER, ESQUIRE
13   Lincoln North
14   55 Old Bedford Road
15   Lincoln, MA 01773-1125
16   (617) 228-4446
17     -- For the Defendant
18
19
20
21
22
23
24
25

---

**3**

1              INDEX TO WITNESSES
2
3    WITNESS                    PAGE
4
5    DAVID KUZMICK
6
7      By Mr. Cooper              4
8
9      By Ms. Kaminsky            64
10
11
12              INDEX TO EXHIBITS
13
14                        PAGE
15   EXHIBIT    DESCRIPTION        MARKED
16   8          Photograph    14
17   9          Photograph    14
18   10         Photograph    14
19   11         Photograph    14
20   12         Photograph    14
21   13         Photograph    14
22   14         Photograph    14
23
24
25

---

**4**

1         DAVID KUZMICK, having first been
2    duly sworn, testified as follows:
3
4              EXAMINATION
5
6    BY MR. COOPER:
7      Q.  Could you state your name for the record,
8    sir.
9      A.  Dave Kuzmick.
10     Q.  Mr. Kuzmick, my name is Tom Cooper.  I'm an
11   attorney for General Electric.  And we're here
12   today to find out what you know about the fire and
13   other things related to the claims that have been
14   made against GE in connection with the fire.
15         The court reporter here is making a
16   verbatim record of each of the questions that I ask
17   and each of the answers that you give in the
18   deposition.  So you need to wait until I completely
19   finish asking the question before you start your
20   answer.  And I'll try to make sure you finish
21   answering before I start the next question.
22         Where do you live, Mr. Kuzmick?
23     A.  Clarks Summit, Pennsylvania.
24     Q.  What's your address there?
25     A.  121 South Abington Township.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

5

1   Q.  Okay.  What's your job here at Metso Paper?
2   A.  Plant maintenance.
3   Q.  How long have you had that job?
4   A.  Seven years.
5   Q.  Do you remember the day that I came here
6   after the fire?  Do you remember that?
7   A.  Yes.
8   Q.  I was here with a photographer.  I think
9   they had already started cleaning up the
10  compounding room.  Here's one of the photos that we
11  took.  I just marked it as Exhibit 8.  I'll just
12  tell you that it was taken in the room where the
13  fire occurred.  I don't know if you can recognize
14  it.
15  A.  I do.
16  Q.  They had started painting I think already
17  when we were there.  Some of the fixtures or at
18  least one of the fixtures in that picture has a
19  lens on it.  Do you see that?
20  A.  Yes.
21  Q.  There's one fixture where the bulb is not
22  burning; correct?
23  A.  Right.
24  Q.  Can you tell whether these other two that
25  are burning that you -- the bulbs are lit in this

6

1   photo, can you tell if they have lenses on them?
2   A.  I can't no.
3   Q.  Is it correct that in that room some of the
4   fixtures have lenses of them and some of them did
5   not?
6   A.  Yes.
7   Q.  Why was that?
8   A.  When we purchased lamps for the main bay of
9   the building, we purchased a few lamps for this
10  side.
11  Q.  Okay.  When you say, "lamps," what do you
12  mean by that?
13  A.  Lamps, fixtures.
14  Q.  Okay.  I usually use the term lamp to mean
15  a light bulb.  Maybe we should -- and I use fixture
16  to mean the fixture, not use lamp to mean that.
17  But just so we're using the same terminology, why
18  don't we call these fixtures, the things you put
19  the light bulbs into, and we can call them light
20  bulbs, if you want.  Would you call it a light
21  bulb, one of the metal halide bulbs or a bulb?
22  A.  I'd call it a lamp.
23  Q.  You'd call it a lamp.  You're really going
24  to mix us up, now.  Let's go back to your last
25  answer.  I was asking you why did you have some of

7

1   the fixtures in the rubber compounding room with
2   lenses and some without lenses.  Could you just say
3   that again and explain what the reason was.  Now
4   that I've taken us off on that little bit of --
5   A.  Well when we relit the entire main bay we
6   looked at this side of the building and we looked
7   at a few areas that we thought needed more
8   lighting.  So we put in I think it was three 750
9   watt lamps.
10  Q.  Okay.  So you had the old fixtures in there
11  and you had three new ones in that room?
12  A.  Right.
13  Q.  Three was your memory, roughly?
14  A.  This room, I'm not sure.  I think there was
15  only one honestly.
16  Q.  Oh, okay.
17  A.  I cannot remember that.
18  Q.  There was at least one and possibly more
19  than one in that particular room of the new
20  fixtures?
21  A.  Yes.
22  Q.  And that was around 2002?
23  A.  Yes.
24  Q.  Were you here on the day of the fire?
25  A.  I came up.  I was called.

8

1   Q.  Okay.
2   A.  When it was in progress.
3   Q.  Did you come into the building when the
4   fire was burning?
5   A.  No.
6   Q.  The fire department was already here when
7   you got here?
8   A.  Yes.
9   Q.  How long did it take them roughly to put
10  the fire before they allowed you to enter the
11  building?
12  A.  I'd have to say a good hour before we were
13  allowed to enter the building.  Maybe a little
14  longer than that.  It was mainly smoke.
15  Q.  Mainly smoke that was keeping you from
16  getting back in?
17  A.  Yes.
18  Q.  What did you do when you were able to enter
19  the building?
20  A.  Evaluated the damage.
21  Q.  Where did the damage occur?
22  A.  Just under the lamp on a holding rack,
23  materials rack.
24  Q.  When you came back into the building, were
25  the lights still on?



David Kuzmich                                           February 11, 2009

9

1    A.  No.
2    Q.  Why were they not on?  How did they end up
3  being off?
4    A.  The power company cut the lighting.
5    Q.  They cut all the power to the building?
6    A.  I can't remember.
7    Q.  But at any rate, there was no lights on in
8  the mill compounding room when you first got back
9  into the building; is that right?
10   A.  Correct.
11   Q.  And was there any natural light that was
12 able to get into that room?  I don't know if there
13 are other skylights or exterior doors or something
14 that went up to the ceiling.
15   A.  The door may have been open.
16   Q.  Is there an exterior door in that room?
17   A.  Yes.
18   Q.  Was that your only light source when you
19 were examining the damage initially?
20   A.  Yes.
21   Q.  And describe for me the damage.  Other than
22 smoke damage, that is the damage caused directly by
23 the fire burning, direct fire damage, what did you
24 find both then and later on when you had lights
25 again?

10

1    A.  It looked like a few pallets of material,
2  compounding material was charred and burned.
3    Q.  I have a blow up of a section of the
4  photograph we took of the floor plan when we were
5  here.  And earlier witnesses have identified this
6  Exhibit 3, the first page as the rubber compounding
7  room; does that look correct to you where the fire
8  occurred?
9    A.  Yes.
10   Q.  Do you use that term also, rubber
11 compounding room?  That's what one person say they
12 called it.
13   A.  Yes.
14   Q.  Okay.  Where do you remember the actual
15 fire damage being located within this room?
16   A.  Right in the middle of that.  (Indicating.)
17   Q.  You're pointing to the middle section of an
18 illustration of a three-rack system; correct?
19   A.  Yes.
20   Q.  And you remember it being in the middle
21 rack?
22   A.  Yes.
23   Q.  Do you remember it also being in the rack
24 section closer to the training room?
25   A.  Yes.

11

1    Q.  Do you think it was in both racks then?
2    A.  Yes.
3    Q.  What about the end one?
4    A.  I can't remember.
5    Q.  Did you do an inventory of the material
6  that was damaged?
7    A.  I didn't.
8    Q.  Who did that?
9    A.  Kevin Kalmanowicz.
10   Q.  What was the material on the rack that was
11 damaged?
12   A.  Various rubbers and compounding material,
13 powders, chemicals.
14   Q.  Are those materials that were on the
15 section of the rack that was burned are they in
16 some kind of containers?
17   A.  No.  They're on open skid, rubber.
18   Q.  The rubber would just be blocks of rubber
19 piled up on a pallet, for example?
20   A.  Yes.
21   Q.  And the compounding materials, is that true
22 for them also, they were just open materials
23 sitting on a pallet?
24   A.  Most of that stuff is in bags.
25   Q.  It's in bags and is it a powder-type

12

1  material mostly?
2    A.  Mostly.
3    Q.  Is any of it in cardboard boxes?
4    A.  It may be.
5    Q.  Is any of it in metal containers?
6    A.  There may be something there.
7    Q.  How many levels did the rack system have
8  here where the fire occurred?
9    A.  I can't remember actually.
10   Q.  Do you still have racks in that room now?
11   A.  Yes.
12   Q.  Was it the same type of system now that you
13 had before?
14   A.  No.  It was replaced after the fire.
15   Q.  But is it the same sort of configuration as
16 it was before?
17   A.  Yes.
18   Q.  You're not sure how many levels it has,
19 though?
20   A.  I think there's three.
21   Q.  So, your best memory?
22   A.  Yes.
23   Q.  What was on the top level of the rack on
24 the day of the fire?
25   A.  I don't know.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmick                                                February 11, 2009

13

1    Q.   Is there somebody that would know that?
2    A.   There may be.
3    Q.   Do you know who would?
4    A.   Well, maybe looking at a picture.
5    Q.   Well, nobody has given me any pictures.
6  Did you take any pictures?
7    A.   Yes.
8    Q.   Did you take pictures in the rubber
9  compounding area that showed the fire damage?
10   A.   Yes.
11   Q.   Did you use a digital camera, or film
12  camera, or what?
13   A.   Digital.
14   Q.   Do you still have the pictures?
15   A.   Yes.
16   Q.   Has anyone asked you to give them a copy?
17   A.   Not that I can recall.
18
19        MR. COOPER:  Off the record.
20
21      (A discussion was held off the record.)
22
23  BY MR. COOPER:
24   Q.   Mr. Kuzmick, we took a break for a few
25  minutes so you could get some of the photos that

14

1  you have on your computer, some of which you took.
2  Did you take all of them?
3    A.   I didn't take any of them.
4    Q.   Okay.  Who took the photos, do you know?
5    A.   Jim Kopp.
6    Q.   He works here or worked here at the time?
7    A.   Yes.  He works here.
8    Q.   Did he take all of them as far as you know?
9    A.   As far as I know.
10   Q.   Did you ask him to take pictures for you?
11   A.   He's the safety officer.
12   Q.   He did it on his own?
13   A.   Yes.
14
15      (Exhibits 8 through 14 were marked
16      for identification.)
17
18  BY MR. COOPER:
19   Q.   And I just put some exhibit sticker numbers
20  on here.  Let me show you some of these and ask you
21  about them.  Exhibit 9, is that the rack where the
22  fire occurred?
23   A.   Yes.
24   Q.   And could you describe for me what you're
25  seeing in the photo?

15

1    A.   A lot of burnt material.
2    Q.   Can you see the training room in that
3  photo?
4    A.   Yes.
5    Q.   And could you just point it out for me?
6    A.   Right there.  (Pointing.)
7    Q.   That wall that looks like an air
8  conditioning unit?
9    A.   Yes.
10   Q.   That's in the training room wall?
11   A.   Yes.
12   Q.   If you looked at Exhibit 3, could you tell
13  me where the photographer was standing on that
14  exhibit?
15   A.   In the aisle way.
16   Q.   I see in the photo there's what look to me
17  like drums that are standing here in front of the
18  training room; is that what I'm seeing?
19   A.   Yes.
20   Q.   Those are metal drums that have some type
21  of material?
22   A.   Yes.
23   Q.   That's part of the compounding materials of
24  one sort or another?
25   A.   Apparently.

16

1    Q.   Are you not sure about that?
2    A.   I couldn't be totally sure what was in
3  those drums.
4    Q.   Did the rack system abut right up against
5  the training room or within a few inches of it?
6    A.   I can't remember the actual distance.
7    Q.   The reason I ask, in the drawing we have in
8  this floor plan, Exhibit 3, it looks like go when
9  they are very close to the wall.  In the photo, it
10  looks to me like there's drums between the end of
11  the rack and the training room wall.  Does that
12  sound correct to you?
13   A.   It does.  That's correct.
14   Q.   So it might have been two or three feet, at
15  least?
16   A.   I think so.
17   Q.   And looking at Exhibit 10, another one of
18  the photos you retrieved, over in the far right
19  side we're seeing some piece of equipment.  Is that
20  a lift or something?
21   A.   Yes.  It's a type of boom?
22   Q.   A boom?  Is that something that somebody
23  can ride in and get up to a higher level?
24   A.   Yes.
25   Q.   Was that where it was located at the time



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Davi Kuzmi                                              February 11, 2009

## 17

1  of the fire or do you think that was moved there
2  after the fire?
3      A.  That was moved there after the fire.
4      Q.  All right.  Looking at Exhibit 10 in the
5  racks that are closest, the section that is closest
6  to the training room, down on the floor it appears
7  there's a pallet with some material sitting on it;
8  is that right?
9      A.  Yes.
10     Q.  Do you know what the material is that's
11 sitting there on the pallet on the floor?
12     A.  Looks like rubber.
13
14         MS. KAMINSKY:  Is that photo of the
15     same perspective?
16         MR. COOPER:  No, it's the other
17     side.
18         MS. KAMINSKY:  Okay.
19
20 BY MR. COOPER:
21     Q.  And above that area with the rubber, again
22 in the section of racks that's closest to the
23 training room on the rack above the floor level it
24 looks -- well the only one that you can see in this
25 photo -- it looks like there is a pallet at that

## 18

1  location also; right?
2      A.  Yes.
3      Q.  And what material was on that pallet?
4      A.  I don't know.
5      Q.  Was there material stored at any of the
6  higher level than what we can see in Exhibit 10 in
7  this first section, or is that the highest level
8  you know?
9      A.  It looks like the rack has three layers
10 there.
11     Q.  Well, some of them have three levels.
12 Would you agree the sections are not all identical?
13     A.  Right.
14     Q.  Am I correct that if we went through these
15 photos, if I asked you in detail about 9, 10 and
16 11, other than the rubber you identified, would you
17 be able to identify what material was on this rack
18 system where the actual burning occurred prior to
19 the fire?
20     A.  No.
21     Q.  Exhibit 11 also shows a photo of the rack
22 system, actually taken from the same side, but it's
23 a little different view than Exhibit 10; correct?
24     A.  Correct.
25

## 19

1         MS. KAMINSKY:  It does look like it
2     goes higher.
3
4  BY MR. COOPER:
5      Q.  Let me show you Exhibit 12, another one of
6  the photos you retrieved.  What's shown in that
7  photo?
8      A.  I think they are mainly looking at the soot
9  on the ceiling here.
10     Q.  I see there is a light shown in that
11 picture or a fixture shown in that picture;
12 correct?
13     A.  Correct.
14     Q.  And that has a lens cover on it; correct?
15     A.  Correct.
16     Q.  What's the purpose of having a lens cover
17 on those fixtures?
18     A.  They were low boy fixtures.
19     Q.  Low bay fixtures?
20     A.  Yes.
21     Q.  So what's the purpose of the cover on them?
22     A.  Just the design of that particular fixture.
23     Q.  Okay.  So you're not sure why they actually
24 have one on there.  The other ones were open.
25     A.  The open ones were new ones that were

## 20

1  installed.
2      Q.  What I'm getting at is, if you know why
3  some fixtures have lenses on them and some don't.
4  Do you know why?
5      A.  They're recommended for that particular
6  fixture.
7      Q.  Okay.  Looking at Exhibit 13, that's also
8  one of the photos that you retrieved.  And it look
9  it we're looking at the hole in the roof; correct?
10     A.  Yes.
11     Q.  And that was put there by the fire
12 department?
13     A.  Yes, it was.
14     Q.  As part of their firefighting efforts; is
15 that right?
16     A.  Yes.
17     Q.  They just didn't show up one day and start
18 cutting apart your building?
19     A.  Correct.
20     Q.  If you look at Exhibit 3 that shows the
21 floor plan for that room -- let me back up.  Is the
22 hole in the rubber compounding room area, the roof
23 hole?
24     A.  Yes.
25     Q.  Why don't you take your pen and draw a



ESQUIRE
an Alexander Gallo Company

David Kuzmick                                                    February 11, :

---

21

1  rectangle where the roof hole is located, the roof
2  hole on Exhibit 3.
3      A.  (Drawing.)
4      Q.  It looks to me like one of the fixtures --
5  well, how many fixtures can you see in Exhibit 13
6  suspended from the ceiling?
7      A.  Three.
8      Q.  And how many of them have lenses and how
9  many are open?
10     A.  One is open, two have lenses.
11     Q.  So it's the one on the right that's an open
12 fixture there?
13     A.  Yes.
14     Q.  And where would that be located on Exhibit
15 3.
16     A.  Right there.  (Pointing.)
17     Q.  Was that directly above the racks then or
18 was it a little bit offset?
19     A.  It was offset.
20     Q.  Can you draw on Exhibit 3 a circle
21 indicating where that open fixture we see in
22 Exhibit 13 was located.
23     A.  (Drawing.)
24     Q.  Okay.  Why don't you put your initials
25 right next to that circle.

---

22

1      A.  (Witness complies.)
2      Q.  Okay.  What are we looking at in that
3  photo?
4      A.  That's a calibration room.
5      Q.  Where is that in relationship to the
6  compounding room?  It looks like we're looking
7  through a doorway into it; is that right?
8      A.  Yeah.  There's a doorway right here.
9  (Pointing.)
10     Q.  Let's use this one.  We've got another
11 picture here, number 14.  It's another view of the
12 rack system.  I think we can see a little -- on the
13 rack that's closest to the training room wall down
14 in the area where you identified rubber down on the
15 floor, that first section, it looks like there's
16 three levels to the rack system; correct?
17     A.  Correct.
18     Q.  Was there material stored in all three
19 levels at the time of the fire?
20     A.  Yes.
21     Q.  Do you know what was on the top level of
22 this first rack closest to the training room in
23 Exhibit 14?
24     A.  No.
25     Q.  Was there material stored on the floor next

---

23

1  to the racks prior to the fire, immediately prior
2  to the fire?
3      A.  I don't know.
4      Q.  Was there any rule or practice or custom
5  here that said you should not store material on the
6  floor outside of the racks and immediately around
7  them?
8      A.  I'm not sure if that's written --
9  documented.
10     Q.  Do you think there is an unwritten rule to
11 that effect?
12     A.  I couldn't tell you.
13     Q.  Okay.  Who is the person basically in
14 charge of running and operating the compounding
15 room or was at the time?
16     A.  Kevin Kalmanowicz.
17     Q.  Okay.  Let's go back to 2002.  And from
18 looking at the various documents that we've gotten
19 it looks like there was some reason why the company
20 in 2002 decided to review its lighting system in a
21 portion of the building; is that true?
22     A.  Yes.
23     Q.  And is that something you were responsible
24 for doing on behalf of the company?
25     A.  Yes.

---

24

1      Q.  What was the reason for undertaking the
2  review?
3      A.  Well, the system up there was antiquated,
4  old.  We were looking at improvement of efficiency.
5      Q.  What kind of lighting system existed in the
6  plant before the upgrade, let's say in the main bay
7  and in the training room -- or excuse me, in the
8  mill compounding area?
9      A.  Well, in the main bay I think there was 450
10 watt metal halide lamps, bulbs.
11     Q.  Had you had any problems with them?
12     A.  Yeah.  They were old and wearing out.
13     Q.  What do you mean they were wearing out?
14 What would happen?
15     A.  They were starting to make noise.
16     Q.  Had any of the fixtures failed so that they
17 didn't work any more?
18     A.  I'm sure there was.
19     Q.  Was that part of your reason for wanting to
20 upgrade the lighting system or replace some of
21 them?
22     A.  Yes.
23     Q.  Were the -- on the old lights in some of
24 the pictures we've seen some that have these
25 plastic lenses on the bottom, the light fixtures.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmick                                                February 11, 2009

25

1    Was that true for all of the light fixtures in the
2    main bay and in the compounding room before the
3    change?
4        A.   In the main bay they were all open lamps.
5        Q.   Oh, they were open in the main bay?
6        A.   Yes.
7        Q.   In the compounding room were they all
8    enclosed prior to the upgrade?
9        A.   No.
10       Q.   Let's go back to Exhibit 8.  You identified
11   one lamp here that was an enclosed fixture.  And
12   that has a lens on it; correct?
13       A.   Correct.
14       Q.   And that's in the compounding room?
15       A.   Correct.
16       Q.   And so when I say enclosed, I'm talking
17   about these fixtures that have a lens on the bottom
18   of them.  Do you understand that?
19       A.   Yes.
20       Q.   And prior to your upgrade in 2002, were all
21   of the fixtures in the compounding room enclosed
22   like the one we see in Exhibit 8?
23       A.   No.
24       Q.   Some of them were open fixtures?
25       A.   Yes.

26

1        Q.   And did those also use 400 watt metal
2    halide lamps?
3        A.   I'm not sure of the wattage.
4        Q.   Did all of them use metal halide lamps?
5    Before you answer let me remind you of something.
6    I also see in a reference somewhere that you had
7    high pressured sodium in some of the fixtures.
8        A.   That's what I -- there may have been some
9    sodium mixed in possibly.  We're talking four years
10   now.  There may have been one or two sodiums.
11       Q.   Of the ones that were metal halide, were
12   they all in closed fixtures?
13       A.   No.
14       Q.   Why was there a mixture of these different
15   types of fixtures in that one area; do you know?
16       A.   No.
17       Q.   Just over the years people put in different
18   fixtures?
19       A.   Yes.
20       Q.   Had you been at the company or involved in
21   the decision to put in any of the old fixtures that
22   were there prior to the 2002 changes?
23       A.   No.
24       Q.   Prior to the 2002 changes, did you have a
25   schedule in which you replaced the lamps in the

27

1    plant in which you did group re-lamping, as opposed
2    to go change it when it burns out?
3        A.   I wasn't in the departments at that time.
4        Q.   What were you doing at that time?
5        A.   I was supervising the finishing department.
6        Q.   Okay.  When did you start in the
7    maintenance department?
8        A.   2002.
9        Q.   So right around the time you started is
10   when you reviewed the light fixture situation?
11       A.   Yes.
12       Q.   And when you started, did you learn or
13   become aware of whether there was a schedule by
14   which lamps were changed out?
15       A.   Yes.
16       Q.   And was there a schedule?
17       A.   For this particular part of the building,
18   no.  I'd have to say no.
19       Q.   There was in other parts, though?
20       A.   Yes.
21       Q.   Can you describe to me what was the
22   schedule that was in place?
23       A.   I don't think it was a documented schedule.
24   I don't remember right now.
25       Q.   Well you said there was some kind of

28

1    schedule, that's what you recall, is that right,
2    when you first started the maintenance job?
3        A.   Not documented.
4        Q.   Well, okay.  I'm not necessarily talking
5    about documented.  But I thought you said there was
6    a schedule, whether documented or it was just a
7    custom and practice here.
8        A.   What I can remember, the lumens of a light
9    bulb was measured.
10       Q.   Right.
11       A.   And that's when we decided on changing it.
12       Q.   Changing to the new fixtures?
13       A.   No.  Doing the complete re-lamping.
14       Q.   Okay.  The light level got too low then you
15   would re-lamp?
16       A.   And we only did that one part of the
17   building.
18       Q.   Which part of the building was that?
19       A.   The mechanical repair area.
20       Q.   Did you measure the lumen levels in other
21   parts of the building at the same time?
22       A.   Not that I can recall.  I was not involved
23   in it.
24       Q.   How did you go about evaluating what to do
25   with your lighting system when you started that



29

1  project back in 2002?
2      A.  Through Friedman Electric conversation.
3  Working up a quotation or a system for our plant.
4      Q.  So you contacted Friedman Electric and
5  asked for help?
6      A.  Yes.
7      Q.  And you have a relative that works there;
8  true?
9      A.  True.
10     Q.  And who is that?
11     A.  Andy Kuzmick.
12     Q.  Is he the guy you called?
13     A.  I think so.  He may have called on me.  I
14  can't remember.
15     Q.  And then so you started talking to Andy
16  about the possibility of changing or adding light
17  fixtures in your building?
18     A.  Yes.
19     Q.  Let me just show you what we marked as
20  Exhibit 1.  You'll notice also -- in case you're
21  wondering -- that there's, down in the lower right,
22  there's Metso followed by numbers, which my office
23  added these numbers.  So each page has it's own
24  individual number.  So we can refer to the page
25  numbers if we want to by the individual pages.  And

30

1  this is just the order I received them.  I can't
2  say for sure whether anything else goes with them
3  or not.  I don't think so.
4          Exhibit 1. are you familiar with that
5  document?
6      A.  Yes.
7      Q.  Explain to me what it is.
8      A.  That's the main bay of our shop.
9      Q.  What are all these dots on there?
10     A.  They were the lamps, the old lamps.
11     Q.  Did somebody at Metso go through the
12  building and make this little diagram showing where
13  all the fixtures were located?
14     A.  Yeah.  I had one of my maintenance guys do
15  this.
16     Q.  What's on page two of Exhibit 1?
17     A.  That's an area down in the back of the shop
18  to the right of the main bay.
19     Q.  Okay.  So if you're the guy who did the
20  survey, the first page shows the main area and then
21  the second page is another in the building?
22     A.  Yes.
23     Q.  What's the third page?
24     A.  A vulcanizing area.
25     Q.  Also showing the fixtures in that area?

31

1      A.  Yes.
2      Q.  Go back to page two if you would for a
3  second.  It looks like some of them I see a circle
4  around the dot and then I see some of them have the
5  word, "out," next to them.  Do you know what the
6  circle was for?
7      A.  No.
8      Q.  What does out mean?
9      A.  Apparently the lamp was out.
10     Q.  And then on some of them also on page two I
11  see the letters MH next to the fixture.  What does
12  that indicate to you?
13     A.  Metal halide.
14     Q.  Do you think that the ones where it doesn't
15  say, MH were something other than metal halide?
16     A.  Possibly.
17     Q.  Maybe the old sodium lamps?
18     A.  Possibly.
19     Q.  Does that seem consistent with what you can
20  remember about the lighting in that area?
21     A.  Yes.
22     Q.  On page two also down near the lower left
23  of the diagram the word transformer appears.  Do
24  you know what that indicates?
25     A.  Yes.  That's a main power transformer for

32

1  that portion of the plant.
2      Q.  And I see numbers by many, but not all of
3  the fixtures.  What do the numbers indicate?
4      A.  I think that was the tally of how many
5  lamps were in that area.
6      Q.  Is page four the same thing?
7
8      MS. KAMINSKY:  The numbers are
9  different on the second page.
10     MR. COOPER:  Oh, yeah.  Somebody
11  added numbers.  Good point.
12     MS. KAMINSKY:  Can I just ask, when
13  was this prepared?
14     THE WITNESS:  A long time ago.
15     MS. KAMINSKY:  Before the lamps were
16  changed in 2002?
17     THE WITNESS:  Yes.
18
19  BY MR. COOPER:
20     Q.  This was sort of a data gathering that you
21  did in order to assess what your needs were?
22     A.  Yes.
23     Q.  And the very last page is the metal repair
24  area portion of the plant; is that right?
25     A.  Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

33

1    Q.   Was there a diagram prepared for the
2  compounding room?
3    A.   Yes.
4    Q.   Where is that shown?
5    A.   Mill room.
6    Q.   So, that's on page number Metso 51?
7    A.   51, yes.
8    Q.   And also 52.
9    A.   Yes.
10   Q.   It looks like on page 51 this was divided
11 into three sections.  Which section is the area
12 where the fire occurred?
13   A.   Where it says, storage and mixing.
14   Q.   Where is the training room?  It doesn't
15 seem to be shown on here?
16   A.   It's on the left-hand side up against this
17 wall.
18   Q.   Okay.  So that room actually would have
19 been constructed sticking out into the room?
20   A.   Yes.
21   Q.   And the storage really should be pushed
22 over a little bit to the right from where it is
23 shown on the diagram; correct?
24   A.   Yes.
25   Q.   After this was prepared, what did you do

34

1  with it?  What did you do with this exhibit or
2  document after it was prepared?
3    A.   I gave this to the vendor and they did an
4  energy study.
5    Q.   Meaning, you gave it to Andy Kuzmick at
6  Friedman Electric?
7    A.   Yes.
8    Q.   And he did some kind of analysis of your
9  lighting system?
10   A.   Yes.
11   Q.   Let me show you Exhibit 2.  Have you seen
12 that document before?
13   A.   Yes.
14   Q.   What is that document?
15   A.   It's a lighting alternative program.
16   Q.   Where did you get it?
17   A.   From Andy Kuzmick.
18   Q.   Is this essentially the study that he did
19 and gave back to you?
20   A.   Yes.
21   Q.   Did he come over here to the plant to see
22 it in connection with preparing his analysis?
23   A.   Yes.
24   Q.   How many visits did he make?
25   A.   I can't remember.

35

1    Q.   Did he walk around the whole plant?
2    A.   Yes.
3    Q.   Did he go into the mill compounding room
4  during his visit?
5    A.   Yes.
6    Q.   Did he take notes on what he was observing?
7    A.   Yes.
8    Q.   Did he take photographs?
9    A.   I can't remember.
10   Q.   And you said you give him a copy of Exhibit
11 1; right?
12   A.   Yes.
13   Q.   Did you give him anything else?
14   A.   I can't remember anything else that was
15 given to him.
16   Q.   So one of your purposes was to see if you
17 could save money on your lighting energy cost; is
18 that right?
19   A.   Correct.
20   Q.   So part of what he was doing was trying to
21 give an analysis of how much electricity was
22 costing you for your lighting system and compare it
23 to what he could offer you?
24   A.   Yes.
25   Q.   And he came back with a recommendation that

36

1  is basically contained in Exhibit 2?
2    A.   Yes.
3    Q.   Did you have a meeting with him at which he
4  presented this and sort of explained what all this
5  meant?
6    A.   Yes.
7    Q.   How many meetings did you have?
8    A.   I can't remember.
9    Q.   Do you remember there being more than one
10 of which he sort of made his presentation?
11   A.   I can't remember.
12   Q.   Did you take notes at the meetings?
13   A.   I can't remember that either.
14   Q.   Do you still have some kind of file in
15 connection with the lighting change from 2002?  And
16 I ask that because I mean, apparently you came up
17 with these documents.  Somebody asked you to find
18 these, and you came up with these.
19   A.   Yes.
20   Q.   Did you have a file or folder on the
21 subject?
22   A.   Yes.
23   Q.   And did you give everything in that file
24 over to the lawyers in this case?
25   A.   I think so.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmick                                                    February 11, 2009

---

37

1
2    MR. COOPER:  Okay.  I'm just asking
3    if you would verify that too, along with
4    you giving me the photos.
5    MS. KAMINSKY:  Just to be clear, you
6    want verification that all of the
7    documents related to the 2002 light change
8    were provided?
9    MR. COOPER:  Yes.  The photos, if
10   there were any.  Any notes -- anything
11   like that.
12
13   BY MR. COOPER:
14   Q.  So what did Andy Kuzmick recommend that
15   Metso do to improve its lighting system?
16   A.  He recommended this 750 watt pulse starting
17   system.
18   Q.  And he recommended a specific fixture in a
19   specific light bulb that you use in that fixture
20   for your needs; is that true?
21   A.  I don't see it here on this proposal.  I
22   see the Hubbell High Bay.
23   Q.  The proposal A, right, has the Hubbell
24   Sonar 50 watt pulse start high bay fixtures?
25   A.  Yes.

---

38

1    Q.  That was his recommendation to you; is that
2    correct?
3    A.  Yes.
4    Q.  And he did sort of the economic analysis of
5    what it would cost to buy it and put it in and what
6    it would cost for your lighting needs after you put
7    it in?
8    A.  Yes.
9    Q.  Did you also -- part of this system assume
10   that you were going to remove some of the existing
11   fixtures?
12   A.  Yes.
13   Q.  How many existing fixtures did you remove
14   in connection with this work?
15   A.  I don't have the total in my head.
16   Q.  Can you give me an estimate?
17   A.  Over 100.
18   Q.  Did that include metal halide fixtures he
19   removed?
20   A.  Metal halide, yes.
21   Q.  Did it include sodium?
22   A.  It may have included some sodium scattered
23   throughout the plant.
24   Q.  Was there a predominant lamp type before
25   this upgrade in the mix between metal halide and

---

39

1    sodium?
2    A.  The metal halide was predominant.
3    Q.  Just in terms of the quantity, there were
4    more of them than there were of the sodium?
5    A.  Yes.
6    Q.  Were you interested in getting rid of the
7    sodium entirely?
8    A.  Yes.
9    Q.  Why was that?
10   A.  The color actually.  Like yellow.
11   Q.  So the metal halide had a better color for
12   what you were doing?
13   A.  Yes.
14   Q.  And for some people who needed to have good
15   color recognition in their jobs, is that an
16   improvement then?
17   A.  Yes.
18   Q.  So at some point after Andy Kuzmick made
19   his presentation to you, you thought this would be
20   a good idea to make the changes, and you
21   recommended a new lighting system?
22   A.  Yes.
23   Q.  Let me show you Exhibit 4.  Do recognize
24   that document?
25   A.  Yes.

---

40

1    Q.  Explain to me what this document is.
2    A.  It's a requisition.
3    Q.  Who prepared this?
4    A.  I did.
5    Q.  And if you -- this is an order for you to
6    get approval for the expenditure to buy the new
7    lighting system?
8    A.  Yes.
9    Q.  Who did you submit it to?
10   A.  To the product manager.
11   Q.  At Metso Paper?
12   A.  At Metso Paper.
13   Q.  And that person had the authority to decide
14   whether to authorize the expenditure?
15   A.  Then we had to go through the plant
16   manager.
17   Q.  Okay.  Did he have the final say then?
18   A.  I'm not sure.
19   Q.  But it went to the plant manager and either
20   he decided or he got whatever approval he needed?
21   A.  It had to go through the proper approval
22   process.
23   Q.  So it went through the approval process at
24   Metso Paper and eventually you got approval for
25   this expenditure?

---



ESQUIRE
an Alexander Gallo Company

David Kuzmick

---

41

1    A.  Yes.
2    Q.  Now, I stapled these documents together.
3  Do you see they are numbered 55, 56, 57, and 58?
4  Do you recall was all this part of the package that
5  went with the requisition or did I erroneously
6  staple them together?
7    A.  I can't say this went with the requisition.
8  I think the first two pages went with it.
9    Q.  And the last two pages -- well, explain to
10  me what the last two pages are, they are numbered
11  Metso Paper 57 and 58.
12    A.  Just diagrams of the lamp that was actually
13  sold.
14    Q.  The fixture, you mean?
15    A.  Yes.
16    Q.  So this was the Hubbell catalog pages for
17  the fixture that Andy was recommending to you?
18    A.  Yes.
19    Q.  And I'm looking specifically at the last
20  page.  It looks like somebody either wrote on it or
21  there was a Post It on it before it was copied.  It
22  says, to Andy, and then there's the word or name,
23  bell underneath that, re:  Metso Paper.  Do you
24  know whose handwriting that is?
25    A.  No.

---

42

1    Q.  There is a fax line up at the top of the
2  pages.  Do you know whose fax number that is?
3    A.  No.
4    Q.  It's not the Metso Paper fax line number,
5  though?
6    A.  No.
7    Q.  I see that some of the options on this page
8  are circled.  Over on the left side it says,
9  CH, circled.  And then it looks like a trade name,
10  Tri Bay; do you see that?
11    A.  Yes.
12    Q.  And then down below it has a wattage, 75,
13  which apparently indicates a 75 watt Pulse Start
14  metal halide only; do you see that?
15    A.  Yes.
16    Q.  And the ballast -- apparently that's an
17  option to choose the ballast type; is that right?
18    A.  Apparently.
19    Q.  Let's go over to the right-hand side under
20  optics.  It's got circled the letters OU.  Open
21  high bay reflector is the implication; do you see
22  that?
23    A.  Yes.
24    Q.  Did Andy Kuzmick give you this document in
25  connection with this project?

---

43

1    A.  I can't remember.
2    Q.  Well, it was in your file.  Is there
3  anywhere else you would have gotten it?
4    A.  Yes.
5    Q.  Pardon me.
6    A.  Apparently he did.
7    Q.  Okay.  That's the only source you would
8  have for this document?
9    A.  Yes.
10    Q.  And looking at this now is in fact the
11  fixture you end up purchasing on his recommendation
12  the one that's indicated under options selected on
13  this page?
14    A.  Yes.
15    Q.  So he recommended to you that you get an
16  optic with an open high bay reflector?
17    A.  Yes.
18    Q.  Did you ever, yourself, ever look at or go
19  through the Hubbell lighting catalog and look at
20  fixtures?
21    A.  I can't remember.
22    Q.  Did you ever look at any of the literature
23  from any of the lamp companies, whether it was GE,
24  Sylvania, Phillips, about the lamp he was
25  recommending, that is, a 750 watt Pulse Start type

---

44

1  lamp?  Did you go look it up and read about it?
2    A.  The information he gave me.
3    Q.  Was there other information we don't --
4  that I just showed you about the lamp specifically?
5    A.  Yes, there was one.
6    Q.  What do you recall seeing about the lamp,
7  in particular?  The lamp, I'm talking about the
8  bulb.  Not the fixture, the bulb itself?
9    A.  I can't remember seeing anything about the
10  bulb.
11    Q.  Let me just make this -- Hubbell was the
12  company that he's recommending the fixtures come
13  from, Hubbell Lighting.  Do you understand that?
14    A.  Yes.
15    Q.  And there are different companies that make
16  bulbs that can go in these including General
17  Electric, Sylvania, Phillips, are three of the main
18  ones.  So you do not recall looking at any of the
19  literature from -- let's just limit it to GE.  You
20  didn't look at any literature from GE about this
21  type of light bulb?
22    A.  I may have looked at -- the particulars on
23  the bulb.
24    Q.  What do you remember looking at?
25    A.  Some type of brochure.

---



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

45

1    Q.  Okay.  In your meetings and/or phone calls,
2  any conversations you had with Andy Kuzmick, did he
3  discuss with you the question of whether you should
4  use an open fixture or enclosed fixture?
5    A.  I can't remember.
6    Q.  As far as you can remember, you didn't have
7  a discussion like that?
8    A.  No.  I can't remember if we did or we
9  didn't.
10    Q.  Okay.  You don't recall having one at any
11  rate?
12    A.  No.
13    Q.  I know these questions are not going to
14  sound good on the record.  I'm going to ask you
15  again because I asked you a bad question.  Do you
16  remember having a discussion with Andy Kuzmick
17  about whether you should use an open or enclosed
18  fixture in connection with the 750 watt metal
19  halide lamps you were about to buy?
20    A.  I can't remember discussing that with Andy
21  Kuzmick.
22    Q.  Okay.  Let's look at Exhibit 5 now.  Do you
23  remember seeing Exhibit 5 before?
24    A.  Yes.
25    Q.  What is Exhibit 5?

46

1    A.  This is a purchase order.
2    Q.  So when you gotten the approval for the
3  expenditure, the company issued a purchase order to
4  Friedman for the fixtures and the lamps that you
5  were ended up installing?
6    A.  Yes.
7    Q.  And this is the purchase order for that?
8    A.  Yes.
9    Q.  And your selection and the fixture that you
10  chose and the lamp that you chose was based on the
11  advice that Andy Kuzmick gave you?
12    A.  Yes.
13    Q.  Did you understand back at the time you
14  were buying this fixture that the lamp from GE had
15  a warning on it that said that the lamp could
16  rupture at end of the life?
17    A.  No.
18    Q.  Did you understand that this lamp had a
19  warning on it that there was a danger of fire if
20  you use this lamp where a ruptured bulb could land
21  on combustible material?
22    A.  No.
23    Q.  If you had understood that, would you have
24  put an open fixture in your mill compounding room
25  above your storage rack?

47

1
2    MS. KAMINSKY:  Objection.
3    THE WITNESS:  Could you say that
4  again?
5
6  BY MR. COOPER:
7    Q.  If you had understood back in 2002, when
8  you were considering this installation that the
9  lamp included a warning that said, this lamp can
10  rupture, and hot pieces can come out and can ignite
11  something, would you have used an open fixture
12  above your storage rack?
13
14    MS. KAMINSKY:  Objection.
15    THE WITNESS:  No.
16
17  BY MR. COOPER:
18    Q.  Let me show you Exhibit 6.  When I was here
19  after the fire, along with a photographer that came
20  with me, you showed me many things.  I think you
21  were the one that hosted us and led us around,
22  weren't you; do you recall that?
23    A.  Yes.
24    Q.  You showed me several things.  Including
25  one of them was a cardboard box that had this lamp

48

1  sleeve.  I call it a sleeve or a wrapper that we
2  see in the photo on Exhibit 6.  So this is a
3  picture of what you showed us when we arrived.
4    A.  Yes.
5    Q.  And, I don't know, maybe it was a couple
6  weeks after the fire, something like that.
7    A.  Yes.
8    Q.  Why was this lamp placed in a box for us
9  and other people to see after the fire?
10    A.  Just for record.
11    Q.  For a record of information about the lamps
12  that were in place in the new fixtures?
13    A.  Yes.
14    Q.  And you'll see we took pictures, I believe,
15  of all of the printing that was on the sleeve.  But
16  the part that I'm really interested in asking about
17  is on the last page.  And this particular lamp that
18  you showed us, this is one that was already in your
19  stock; is that true?  In your storage room as a
20  stair lamp?
21    A.  Can you ask that question again?
22    Q.  Well the sleeve that's in this picture,
23  assuming this is one that was in the box the day me
24  and the photographer came to look at them, is this
25  a sleeve that was in your stock before the fire, as



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmic                                                                    February 11, 2009

49

1  opposed to, did you go out and buy it in order to
2  get a sample after the fire?
3      A.  I can't remember.
4      Q.  Who put the sleeve in the box; do you know?
5  Was that something you did or did somebody else?
6      A.  I didn't do it.  I can't remember exactly.
7      Q.  Okay.  If you would look at the last page,
8  the fourth page of this Exhibit 6, do you see there
9  is a list of warnings on there?
10     A.  Yes.
11     Q.  Do you see about halfway down it says, an
12 unexpected lamp rupture may cause injury, fire or
13 property damage?
14     A.  Yes.
15     Q.  And then there is a whole list of
16 recommendations about the lamp; correct?
17     A.  Yes.
18     Q.  One of which says, use an enclosed fixture
19 rated for this product, see instructions.  Do you
20 see that?
21     A.  Yes.
22     Q.  Do you agree that the use of this
23 particular lamp in an open fixture would be
24 inconsistent with that warning?
25     A.  I see that statement?

51

1      A.  Yes.
2      Q.  And did you understand there was a
3  recommendation that you replace the lamps, all the
4  lamps, before they reached their rated life?
5      A.  I --
6
7          MS. KAMINSKY:  I'm going to object.
8  Can you clarify the question?
9          MR. COOPER:  No.  If he understands
10 it, he can answer it.
11         MS. KAMINSKY:  Who is making the
12 recommendation?
13         THE WITNESS:  The recommendation is
14 made by the outside contractor actually.
15
16 BY MR. COOPER:
17     Q.  Andy Kuzmick?
18     A.  No.  I have another outside contractor that
19 would recommend doing a total change of the bulbs.
20     Q.  And did someone make that recommendation to
21 you?
22     A.  No.
23     Q.  At the time of the fire, no one had made
24 that recommendation?
25     A.  No.

50

1      Q.  Had you read that before the fire?
2      A.  No.
3      Q.  Who in the company was responsible for
4  replacing lamps when they burnt out?
5      A.  The maintenance department.
6      Q.  So that would be something your department
7  would handle?
8      A.  Yes.
9      Q.  And so if there was a lamp burned out, you
10 would assign a guy to do a replacement if there
11 needed to be?
12     A.  Yes.
13     Q.  After you put in the new system, did you
14 have a schedule for replacing lamps?
15     A.  They were only in a short time, so we
16 didn't.
17     Q.  Well, the lamps -- you understood these
18 lamps have a certain rated life assigned to them?
19     A.  Yes.
20     Q.  And did you understand that these
21 particular lamps the 750 watt Pulse Start lamp has
22 a 16,000 hour rated life?
23     A.  I didn't know that for sure.
24     Q.  You knew there was a number, you just don't
25 remember that was exactly it; is that right?

52

1      Q.  Am I correct, that at the time of fire, no
2  one had made that recommendation?
3      A.  Correct.
4      Q.  All right.  Approximately when were these
5  fixtures and lamps installed?  And if you want to
6  look at these documents that will help you pin down
7  the date.  What was the date of the purchase order?
8      A.  11/7/02.
9      Q.  Does that help you to give me an estimate
10 of when the fixtures were installed?
11     A.  I think February 2003.
12     Q.  How long were the lamps burned each week?
13 When were they on, when were they off?
14     A.  Roughly five days a week, 24 hours a day.
15 Shut down over the weekend.
16     Q.  So that would be 120 hours a week?
17     A.  Yes.
18     Q.  So the lamps would reach rated life -- I
19 just did it, you can check it if you want to -- 133
20 weeks.  Does that sound right?
21     A.  Correct.
22     Q.  How many weekends a year were there people
23 working during that -- after February 2003?
24     A.  I don't know.
25     Q.  Do you have any sense of generally was it



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmick                                                    February 11, 2009

53

1    most weekends? It was a rare event? It was almost
2    every weekend? Do you have any estimate of that?
3        A.   That's hard to say. It was up and down.
4    Slow times, busy times.
5        Q.   Okay. You would agree that after February
6    2003, there was some weekends in which people were
7    in here working?
8        A.   Yes.
9        Q.   And so the lights would be on during those
10   times?
11       A.   Not in the whole plant.
12       Q.   It would be on in the areas where people
13   were working, at least?
14       A.   Yes.
15       Q.   Would there ever be people working in the
16   mill compounding area on weekends after February
17   2003?
18       A.   Yes.
19       Q.   So 133 weeks from February 2003, do you
20   know when that would take us to back? The two
21   years plus 29 weeks. So, about two and a half
22   years, roughly. Would you agree?
23       A.   I would agree.
24       Q.   The rated life would be reached in roughly
25   two and a half years or less, depending on the

54

1    weekend work. So if you put them in in February of
2    2003, and you were going to re-lamp before rated
3    life then your last day for re-lamping would have
4    been August of 2005, that would be two and a half
5    years; right?
6        A.   Yes.
7        Q.   And the fire was in January of 2006;
8    correct?
9        A.   Yes.
10       Q.   Okay. So you had already passed rated life
11   for all of the original Pulse Start lamps that you
12   had installed, correct, before the fire?
13       A.   Yes.
14       Q.   And by that time, though, you hadn't set up
15   a re-lamping schedule?
16       A.   No.
17       Q.   Did Andy Kuzmick recommend that you set up
18   a re-lamping schedule to do group re-lamping?
19       A.   Not that I can remember.
20       Q.   If you had understood that you were
21   increasing your risk of a fire by burning them that
22   long, would you have changed the lamps earlier?
23
24            MS. KAMINSKY: Objection.
25            THE WITNESS: Yes.

55

1
2    BY MR. COOPER:
3        Q.   At any time prior to the fire had you read
4    any of the warning labels on any of the metal
5    halide lamps that were being used here at the
6    facility?
7        A.   I can't remember.
8        Q.   Is there anyone else here that you think
9    would have been responsible for reading warning
10   labels like that?
11       A.   No.
12       Q.   Would you agree with me that if you're
13   using a product in your department, say your
14   department uses something in the plant, and it
15   comes with a warning on it, that somebody in the
16   company ought to read the warning and pay attention
17   to it and follow its directions if it warns of a
18   fire hazard?
19       A.   Yes.
20       Q.   Have there been any changes made by Metso
21   Paper since this fire occurred in order to reduce
22   the risk of fire?
23       A.   We did shield the 750 watt lamps.
24       Q.   Why did you do that?
25       A.   That was recommended through Corporate

56

1    Safety.
2        Q.   Where is Corporate Safety located?
3        A.   Atlanta, Georgia.
4        Q.   Who is the individual there that was
5    involved in making that recommendation?
6        A.   Leonard Vima.
7        Q.   How did Mr. Vima get involved with this
8    issue? How did that come about?
9        A.   Just through the report, the incident
10   reports.
11       Q.   So he learned there was a fire in the
12   plant?
13       A.   Yes.
14       Q.   Because you had to send in a report to
15   corporate?
16       A.   Yes.
17       Q.   Anyone reprimanded in any way as a result
18   of the fire?
19       A.   No.
20       Q.   Was there anyone else in Atlanta who had,
21   to your knowledge, any involvement with reviewing
22   the fire and the cause of it and steps to take
23   afterwards?
24       A.   No.
25       Q.   Just Mr. Vima is the only one you know?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmic

February 11, 2009

57

1    A.   Yes.
2    Q.   Does he still work for the company?
3    A.   Yes.
4    Q.   Does he come up here and visit your
5  facility periodically?
6    A.   No.
7    Q.   Has he ever been here?
8    A.   Yes.
9    Q.   Was he ever here before this fire occurred?
10   A.   I can't remember that.
11   Q.   Do you have any record of his visits here?
12   A.   No.
13   Q.   Do you know if anyone has a record of his
14  visits here?
15   A.   I couldn't tell you.
16   Q.   Did Mr. Vima's recommendation to you come
17  in writing?
18   A.   I think so.
19   Q.   Is that a document that you provided to
20  your attorneys in connection with the case?
21   A.   It may have been an e-mail.
22   Q.   You're not sure if you gave it to them or
23  not?
24   A.   I can't remember giving it to them.  I
25  don't have it on file anymore.

58

1    Q.   Why not?
2    A.   Because I didn't save it.
3    Q.   When you read an e-mail doesn't it get
4  copied under your computer and to into your e-mail
5  folder?
6    A.   Yes.
7    Q.   Well won't it just be saved automatically
8  then?
9    A.   Well you have to delete the purchase system
10  every now and then.  I didn't like separately save
11  it out of the system.
12   Q.   Okay.  So it got deleted as part of your
13  routine deletion of e-mails?
14   A.   Yes.
15   Q.   What did Mr. Vima say in his e-mail to you?
16   A.   They recommended shielding.
17   Q.   Did he explain why?
18   A.   I can't remember.
19   Q.   Did he send you any attachments along with
20  the e-mail?
21   A.   I don't think so.  I can't remember that.
22   Q.   Was this recommendation in the form of,
23  gee, it would be a good idea or here, I want you to
24  do this?  Was it a requirement or a suggestion?
25  That was a bad question.  I'm going to try again.

59

1        Did Mr. Vima order you to make this change?
2    A.   Yes.
3    Q.   You didn't feel you were free to say, no,
4  we're not going to bother with that?
5    A.   I did it.
6    Q.   You did what?
7    A.   I made the change.
8    Q.   Because of Mr. Vima's e-mail?
9    A.   Yes.
10   Q.   Who actually acquired and installed the
11  lens covers for you?
12   A.   Maghran Electric.
13   Q.   All right.  Are they the ones that had
14  recommended the re-lamping program also?
15   A.   Yes.
16   Q.   Who is the individual there that made the
17  recommendation for re-lamping?
18   A.   Walter Maghran.
19   Q.   He does work around here regularly?
20   A.   Yes.
21   Q.   When you need an electrician, he's one that
22  you'll call?
23   A.   Yes.
24   Q.   Who decided where the new 750 watt fixtures
25  were going to go?

60

1
2        MS. KAMINSKY:  In 2002?
3        MR. COOPER:  Yes.
4
5  BY MR. COOPER:
6    Q.   Somebody came up with a plan where I think
7  you bought 53 of them -- I think from the
8  documents -- who decided where these were going to
9  go
10   A.   In the compounding room or in the mill
11  room?
12   Q.   Well, just overall who made the decision?
13  Was that something you decided?  Was that something
14  Andy Kuzmick recommended?
15   A.   We both looked at it.
16   Q.   Okay.
17   A.   We thought it would be a good idea.
18   Q.   It was sort of a joint decision and you
19  figured out where they needed to go?
20   A.   Yeah.
21   Q.   And you figured out the number you needed
22  to order to do that?
23   A.   Yes.
24   Q.   Okay.  And the reason you put one in the
25  compounding room was what?



# ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmick                                                    February 11, 2009

61

1      A.   Just to gain some more light in there.
2      Q.   All right.  Did you remove any fixtures
3   from that room?
4      A.   No.  Just the fixture that was replaced.
5      Q.   There was one in that specific location
6   that was replaced?
7      A.   Yes.
8      Q.   You didn't take any others out because now
9   you had a brighter light bulb in there?
10     A.   No.
11     Q.   Do you remember actually going in the
12  compounding room with Andy Kuzmick to talk about
13  replacing one of the new fixtures in there?
14     A.   Yes.
15     Q.   Did he look at it and say, you can't put an
16  open fixture there or something to that effect?
17
18        MS. KAMINSKY:  Objection.
19        MR. COOPER:  What's the objection?
20        MS. KAMINSKY:  Hypothetical
21  question.
22        MR. COOPER:  No, I didn't ask a
23  hypothetical.  I asked if he said that.
24        THE WITNESS:  No, he didn't say
25  anything.

62

1
2   BY MR. COOPER:
3      Q.   Did he say anything like that?
4      A.   No.
5      Q.   He didn't say to you that was a bad spot
6   for an open fixture?
7      A.   No.
8      Q.   Who was involved in investigating the cause
9   of the fire?
10     A.   The fire marshall.
11     Q.   Do you remember the name of the fire
12  marshall?
13     A.   No.
14     Q.   How about from the insurance company, was
15  somebody involved from the insurance company?
16     A.   Yes.
17     Q.   Do you remember who came from the insurance
18  company?  I don't mean to work on the damages part
19  or it -- specifically to figure out what caused it.
20     A.   Zurich Risk Engineering.
21     Q.   What did they do when you were here that
22  you saw?
23     A.   Evaluated the scene and the compounding
24  room.
25     Q.   They went in there and took photos?

63

1      A.   Yes.
2      Q.   Did they take notes?
3      A.   Yes.
4      Q.   Did they collect any evidence?
5      A.   I can't remember.
6      Q.   Did they tell you to collect or save
7   anything, specifically?
8      A.   I can't remember.
9      Q.   Somewhere up above this rack system -- the
10  fixture you indicated on the drawing, which is a
11  little bit offset from the rack, was there a broken
12  lamp in there after the fire?
13     A.   Yes.
14     Q.   Did anyone try and find the pieces from the
15  lamp?
16     A.   To gather as much of it as possible.
17     Q.   When I came the fixture was there and
18  portions of the lamp were still in the fixture.
19  The bulb was still screwed in the socket, and there
20  was some pieces dangling from it, and that was
21  saved; correct?
22     A.   Yes.
23     Q.   Did anybody go down to the floor level and
24  sweep up the fire debris and look through it and
25  say, I want to find the pieces from this?

64

1      A.   I can't remember.
2      Q.   All right.  Do you remember the name of the
3   person that did the investigation in the
4   compounding room as to the fire's cause?
5      A.   The fire marshall?
6      Q.   No, the guy from Zurich.  Was it a man?
7      A.   A man and a woman.
8      Q.   Two people, okay.
9
10        MR. COOPER:  Do you know their
11  names?
12        MS. KAMINSKY:  That has to be Scott
13  Hopkins and the trainee, Valerie Miller.
14        THE WITNESS:  That sounds familiar.
15        MR. COOPER:  Thank you.  Okay.  I've
16  seen those names and I just wasn't quite
17  sure who did what.  That's all the
18  questions I have.  Thank you.
19
20        EXAMINATION
21
22  BY MS. KAMINSKY:
23     Q.   I just wanted to ask you two quick
24  questions.  You stated that generally the lights
25  are on Monday through Friday and off on the



ESQUIRE
an Alexander Gallo Company

David Guzmick                                    February 11, 2009

65

1    weekends?
2        A.   Yes.
3        Q.   When someone comes in to work on Saturday,
4    would they turn the light back on?
5        A.   Yes.
6        Q.   Okay.  And then would they turn it off when
7    they leave that day?
8        A.   Yes.
9
10           (Whereupon, the proceedings were
11       concluded at 12:51 p.m.)
12                 • • •
13
14
15
16
17
18
19
20
21
22
23
24
25

66

1              REPORTER'S CERTIFICATE
2
3        I hereby certify that the proceedings and
4    evidence are contained fully and accurately in the
5    notes taken by me and that this copy is a correct
6    transcript of the same.
7
8
9
10
11
12
13       Andrea L. Malkin
14       Professional Reporter
15       Notary Public in and for the
16       Commonwealth of Pennsylvania
17
18   My Commission expires:  July 10, 2010
19
20
21
22
23
24
25



# ESQUIRE
an Alexander Gallo Company

David Kuzmick

February 11, 2009

67

| A | | | | |
|---|---|---|---|---|
| **Abington** | **advice** | 53:1 | 24:3 | 37:2 48:16 |
| 4:25 | 46:11 | **along** | **anybody** | **assess** |
| **able** | **after** | 37:3 47:19 | 63:23 | 32:21 |
| 8:18 9:12 | 5:6 12:14 | 58:19 | **anymore** | **assign** |
| 18:17 | 17:2,3 | **already** | 57:25 | 50:10 |
| **about** | 33:25 34:2 | 5:9,16 8:6 | **anywhere** | **assigned** |
| 4:12 11:3 | 38:6 39:18 | 48:18 54:10 | 43:3 | 50:18 |
| 14:21 16:1 | 47:19 48:6 | **also** | **apart** | **assume** |
| 18:15 25:17 | 48:9 49:2 | 10:10,23 | 20:18 | 38:9 |
| 28:5,24 | 50:13 52:23 | 11:22 18:1 | **apparently** | **assuming** |
| 29:16 31:20 | 53:5,16 | 18:21 20:7 | 15:25 31:9 | 48:23 |
| 43:24 44:1 | 63:12 | 26:1,6 | 36:16 42:13 | **Atlanta** |
| 44:4,6,7,9 | **afterwards** | 29:20 30:25 | 42:16,18 | 56:3,20 |
| 44:20 45:17 | 56:23 | 31:10,22 | 43:6 | **attachments** |
| 45:19 48:11 | **again** | 33:8 38:9 | **APPEARANCES** | 58:19 |
| 48:16 49:11 | 7:3 9:25 | 59:14 | 2:1 | **attention** |
| 49:16 53:21 | 17:21 45:15 | **alternative** | **appears** | 55:16 |
| 56:8 61:12 | 47:4 48:21 | 34:15 | 17:6 31:23 | **attorney** |
| 62:14 | 58:25 | **analysis** | **approval** | 4:11 |
| **above** | **against** | 34:8,22 | 40:6,20,21 | **attorneys** |
| 17:21,23 | 4:14 16:4 | 35:21 38:4 | 40:23,24 | 57:20 |
| 21:17 46:25 | 33:16 | **Andrea** | 46:2 | **August** |
| 47:12 63:9 | **ago** | 1:13 66:13 | **Approxima...** | 54:4 |
| **abut** | 32:14 | **Andy** | 52:4 | **authority** |
| 16:4 | **agree** | 29:11,15 | **area** | 40:13 |
| **accurately** | 18:12 49:22 | 34:5,17 | 13:9 17:21 | **authorize** |
| 66:4 | 53:5,22,23 | 37:14 39:18 | 20:22 22:14 | 40:14 |
| **acquired** | 55:12 | 41:17,22 | 24:8 26:15 | **automatic...** |
| 59:10 | **air** | 42:24 45:2 | 28:19 30:17 | 58:7 |
| **ACTION** | 15:7 | 45:16,20 | 30:20,24,25 | **aware** |
| 1:3 | **aisle** | 46:11 51:17 | 31:20 32:5 | 27:13 |
| **actual** | 15:15 | 54:17 60:14 | 32:24 33:11 | **a.m** |
| 10:14 16:6 | **all** | 61:12 | 53:16 | 1:12 |
| 18:18 | 9:5 14:2,8 | **and/or** | **areas** | |
| **actually** | 17:4 18:12 | 45:1 | 7:7 53:12 | _____ |
| 12:9 18:22 | 22:18 25:1 | **another** | **around** | B |
| 19:23 33:18 | 25:4,7,20 | 15:24 16:17 | 7:22 23:6 | **back** |
| 39:10 41:12 | 26:4,12 | 19:5 22:10 | 27:9 31:4 | 6:24 8:16,24 |
| 51:14 59:10 | 30:9,13 | 22:11 30:21 | 35:1 47:21 | 9:8 20:21 |
| 61:11 | 32:2 36:4 | 51:18 | 59:19 | 23:17 25:10 |
| **added** | 37:6 41:4 | **answer** | **arrived** | 29:1 30:17 |
| 29:23 32:11 | 48:15 51:3 | 4:20 6:25 | 48:3 | 31:2 34:19 |
| **adding** | 52:4 54:11 | 26:5 51:10 | **asked** | 35:25 46:13 |
| 29:16 | 59:13 61:2 | **answering** | 13:16 18:15 | 47:7 53:20 |
| **address** | 64:2,17 | 4:21 | 29:5 36:17 | 65:4 |
| 4:24 | **allowed** | **answers** | 45:15 61:23 | **bad** |
| | 8:10,13 | 4:17 | **asking** | 45:15 58:25 |
| | **almost** | **antiquated** | 4:19 6:25 | 62:5 |



ESQUIRE
An Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmick

February 11, 2009

68

| | | | | |
|---|---|---|---|---|
| bags<br>11:24,25<br>ballast<br>42:16,17<br>based<br>46:10<br>basically<br>23:13 36:1<br>bay<br>6:8 7:5<br>19:19 24:6<br>24:9 25:2,4<br>25:5 30:8<br>30:18 37:22<br>37:24 42:10<br>42:21 43:16<br>because<br>36:16 45:15<br>56:14 58:2<br>59:8 61:8<br>become<br>27:13<br>Bedford<br>2:14<br>before<br>1:12 4:19,21<br>8:10,12<br>12:13,16<br>24:6 25:2<br>26:5 32:15<br>34:12 38:24<br>41:21 45:23<br>48:25 50:1<br>51:4 54:2<br>54:12 57:9<br>behalf<br>23:24<br>being<br>9:3 10:15,20<br>10:23 36:9<br>55:5<br>believe<br>48:14<br>bell<br>41:23<br>below<br>42:12<br>best | 12:21<br>better<br>39:11<br>between<br>16:10 38:25<br>bit<br>7:4 21:18<br>33:22 63:11<br>blocks<br>11:18<br>blow<br>10:3<br>boom<br>16:21,22<br>both<br>9:24 11:1<br>60:15<br>bother<br>59:4<br>bottom<br>24:25 25:17<br>bought<br>60:7<br>box<br>47:25 48:8<br>48:23 49:4<br>boxes<br>12:3<br>boy<br>19:18<br>break<br>13:24<br>brighter<br>61:9<br>brochure<br>44:25<br>broken<br>63:11<br>building<br>6:9 7:6 8:3<br>8:11,13,19<br>8:24 9:5,9<br>20:18 23:21<br>27:17 28:17<br>28:18,21<br>29:17 30:12<br>30:21 | bulb<br>5:21 6:15,21<br>6:21 28:9<br>37:19 44:8<br>44:8,10,21<br>44:23 46:20<br>61:9 63:19<br>bulbs<br>5:25 6:19,20<br>6:21 24:10<br>44:16 51:19<br>burned<br>10:2 11:15<br>50:9 52:12<br>burning<br>5:22,25 8:4<br>9:23 18:18<br>54:21<br>burns<br>27:2<br>burnt<br>15:1 50:4<br>busy<br>53:4<br>buy<br>38:5 40:6<br>45:19 49:1<br>buying<br>46:14<br>—————————<br>C<br>—————————<br>calibration<br>22:4<br>call<br>6:18,19,20<br>6:22,23<br>48:1 59:22<br>called<br>7:25 10:12<br>29:12,13<br>calls<br>45:1<br>came<br>5:5 7:25<br>8:24 35:25<br>36:16,18<br>47:19 48:24<br>60:6 62:17 | 63:17<br>camera<br>13:11,12<br>cannot<br>7:17<br>cardboard<br>12:3 47:25<br>case<br>29:20 36:24<br>57:20<br>catalog<br>41:16 43:19<br>cause<br>49:12 56:22<br>62:8 64:4<br>caused<br>9:22 62:19<br>ceiling<br>9:14 19:9<br>21:6<br>certain<br>50:18<br>CERTIFICATE<br>66:1<br>certify<br>66:3<br>CH<br>42:9<br>change<br>25:3 27:2<br>36:15 37:7<br>51:19 59:1<br>59:7<br>changed<br>27:14 32:16<br>54:22<br>changes<br>26:22,24<br>39:20 55:20<br>changing<br>28:11,12<br>29:16<br>charge<br>23:14<br>charred<br>10:2<br>Chase | 2:5<br>check<br>52:19<br>chemicals<br>11:13<br>choose<br>42:17<br>chose<br>46:10,10<br>circle<br>21:20,25<br>31:3,6<br>circled<br>42:8,9,20<br>CIVIL<br>1:3<br>claims<br>4:13<br>clarify<br>51:8<br>Clarks<br>1:10 4:23<br>CLAUSEN<br>2:3<br>cleaning<br>5:9<br>clear<br>37:5<br>close<br>16:9<br>closed<br>26:12<br>closer<br>10:24<br>closest<br>17:5,5,22<br>22:13,22<br>collect<br>63:4,6<br>color<br>39:10,11,15<br>combustible<br>46:21<br>come<br>8:3 34:21<br>44:12 47:10<br>56:8 57:4 |



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmick

February 11, 2009

69

| | | | | |
|---|---|---|---|---|
| 57:16 | 4:14 34:22 | 16:13 18:14 | **DANIELLE** | **describe** |
| **comes** | 36:15 38:14 | 18:23,24 | 2:4 | 9:21 14:24 |
| 55:15 65:3 | 42:25 45:18 | 19:12,13,14 | **data** | 27:21 |
| **commencing** | 57:20 | 19:15 20:9 | 32:20 | **DESCRIPTION** |
| 1:12 | **considering** | 20:19 22:16 | **date** | 3:15 |
| **Commission** | 47:8 | 22:17 25:12 | 52:7,7 | **design** |
| 66:18 | **consistent** | 25:13,15 | **Dave** | 19:22 |
| **Commonwealth** | 31:19 | 33:23 35:19 | 4:9 | **detail** |
| 66:16 | **constructed** | 38:2 49:16 | **DAVID** | 18:15 |
| **companies** | 33:19 | 52:1,3,21 | 1:8 3:5 4:1 | **diagram** |
| 43:23 44:15 | **contacted** | 54:8,12 | **day** | 30:12 31:23 |
| **company** | 29:4 | 63:21 66:5 | 5:5 7:24 | 33:1,23 |
| 1:6 9:4 | **contained** | **cost** | 12:24 20:17 | **diagrams** |
| 23:19,24 | 36:1 66:4 | 35:17 38:5,6 | 48:23 52:14 | 41:12 |
| 26:20 44:12 | **containers** | **costing** | 54:3 65:7 | **didn't** |
| 46:3 50:3 | 11:16 12:5 | 35:22 | **days** | 11:7 14:3 |
| 55:16 57:2 | **contractor** | **couldn't** | 52:14 | 20:17 24:17 |
| 62:14,15,18 | 51:14,18 | 16:2 23:12 | **debris** | 44:20 45:6 |
| **compare** | **conversation** | 57:15 | 63:24 | 45:9 49:6 |
| 35:22 | 29:2 | **couple** | **decide** | 50:16,23 |
| **complete** | **conversat...** | 48:5 | 40:13 | 58:2,10 |
| 28:13 | 45:2 | **court** | **decided** | 59:3 61:8 |
| **completely** | **Cooper** | 1:1 4:15 | 23:20 28:11 | 61:22,24 |
| 4:18 | 2:12 3:7 4:6 | **cover** | 40:20 59:24 | 62:5 |
| **complies** | 4:10 13:19 | 19:14,16,21 | 60:8,13 | **different** |
| 22:1 | 13:23 14:18 | **covers** | **decision** | 18:23 26:14 |
| **compounding** | 17:16,20 | 59:11 | 26:21 60:12 | 26:17 32:9 |
| 5:10 7:1 9:8 | 19:4 32:10 | **custom** | 60:18 | 44:15 |
| 10:2,6,11 | 32:19 37:2 | 23:4 28:7 | **Defendant** | **digital** |
| 11:12,21 | 37:9,13 | **cut** | 1:7 2:17 | 13:11,13 |
| 13:9 15:23 | 47:6,17 | 9:4,5 | **delete** | **direct** |
| 20:22 22:6 | 51:9,16 | **cutting** | 58:9 | 9:23 |
| 23:14 24:8 | 55:2 60:3,5 | 20:18 | **deleted** | **directions** |
| 25:2,7,14 | 61:19,22 | | 58:12 | 55:17 |
| 25:21 33:2 | 62:2 64:10 | | **deletion** | **directly** |
| 35:3 46:24 | 64:15 | ___ **D** ___ | 58:13 | 9:22 21:17 |
| 53:16 60:10 | **copied** | **damage** | **department** | **discuss** |
| 60:25 61:12 | 41:21 58:4 | 8:20,21 9:19 | 8:6 20:12 | 45:3 |
| 62:23 64:4 | **copy** | 9:21,22,22 | 27:5,7 50:5 | **discussing** |
| **computer** | 13:16 35:10 | 9:23 10:15 | 50:6 55:13 | 45:20 |
| 14:1 58:4 | 66:5 | 13:9 49:13 | 55:14 | **discussion** |
| **concluded** | **corporate** | **damaged** | **departments** | 13:21 45:7 |
| 65:11 | 55:25 56:2 | 11:6,11 | 27:3 | 45:16 |
| **conditioning** | 56:15 | **damages** | **depending** | **distance** |
| 15:8 | **correct** | 62:18 | 53:25 | 16:6 |
| **configura...** | 5:22 6:3 | **danger** | **deposition** | **DISTRICT** |
| 12:15 | 9:10 10:7 | 46:19 | 1:8 4:18 | 1:1,1 |
| **connection** | 10:18 16:12 | **dangling** | | |
| | | 63:20 | | |



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

70

| | | | | |
|---|---|---|---|---|
| **divided** 33:10 **document** 30:5 34:2,12 34:14 39:24 40:1 42:24 43:8 57:19 **documented** 23:9 27:23 28:3,5,6 **documents** 23:18 36:17 37:7 41:2 52:6 60:8 **doesn't** 31:14 33:14 58:3 **doing** 23:24 27:4 28:13 35:20 39:12 51:19 **don't** 5:13 6:18 9:12 12:25 18:4 20:3 20:25 21:24 23:3 27:23 27:24 30:3 37:21 38:15 44:3 45:10 48:5 50:24 52:24 57:25 58:21 62:18 **door** 9:15,16 **doors** 9:13 **doorway** 22:7,8 **dot** 31:4 **dots** 30:9 **down** 17:6 22:13 22:14 29:21 30:17 31:22 42:12 49:11 | 52:6,15 53:3 63:23 **draw** 20:25 21:20 **drawing** 16:7 21:3,23 63:10 **drums** 15:17,20 16:3,10 **DUGGAN** 2:11 **duly** 4:2 **during** 35:4 52:23 53:9 ─── **E** ─── **each** 4:16,17 29:23 52:12 **earlier** 10:5 54:22 **economic** 38:4 **effect** 23:11 61:16 **efficiency** 24:4 **efforts** 20:14 **either** 36:13 40:19 41:20 **Electric** 1:6 4:11 29:2,4 34:6 44:17 59:12 **electrician** 59:21 **electricity** 35:21 **enclosed** 25:8,11,16 25:21 45:4 45:17 49:18 | **end** 9:2 11:3 16:10 43:11 46:16 **ended** 46:5 **energy** 34:4 35:17 **Engineering** 62:20 **enter** 8:10,13,18 **entire** 7:5 **entirely** 39:7 **equipment** 16:19 **erroneously** 41:5 **ESQUIRE** 2:4,12 **essentially** 34:18 **estimate** 38:16 52:9 53:2 **Evaluated** 8:20 62:23 **evaluating** 28:24 **event** 53:1 **eventually** 40:24 **everything** 36:23 **evidence** 63:4 66:4 **exactly** 49:6 50:25 **EXAMINATION** 4:4 64:20 **examining** 9:19 **example** 11:19 | **excuse** 24:7 **exhibit** 3:15 5:11 10:6 14:19 14:21 15:12 15:14 16:8 16:17 17:4 18:6,21,23 19:5 20:7 20:20 21:2 21:5,14,20 21:22 22:23 25:10,22 29:20 30:4 30:16 34:1 34:11 35:10 36:1 39:23 45:22,23,25 47:18 48:2 49:8 **Exhibits** 3:12 14:15 **existed** 24:5 **existing** 38:10,13 **expenditure** 40:6,14,25 46:3 **expires** 66:18 **explain** 7:3 30:7 40:1 41:9 58:17 **explained** 36:4 **exterior** 9:13,16 **e-mail** 57:21 58:3,4 58:15,20 59:8 **e-mails** 58:13 ─── **F** ─── | **facility** 55:6 57:5 **fact** 43:10 **failed** 24:16 **familiar** 30:4 64:14 **far** 14:8,9 16:18 45:6 **fax** 42:1,2,4 **February** 1:11 52:11 52:23 53:5 53:16,19 54:1 **feel** 59:3 **feet** 16:14 **few** 6:9 7:7 10:1 13:24 16:5 **figure** 62:19 **figured** 60:19,21 **file** 36:14,20,23 43:2 57:25 **film** 13:11 **final** 40:17 **find** 4:12 9:24 36:17 63:14 63:25 **finish** 4:19,20 **finishing** 27:5 **fire** 4:12,14 5:6 5:13 7:24 |



ESQUIRE
an Alexander Gallo Company

8:4,6,10
9:23,23
10:7,15
12:8,14,24
13:9 14:22
17:1,2,3
18:19 20:11
22:19 23:1
23:2 33:12
46:19 47:19
48:6,9,25
49:2,12
50:1 51:23
52:1 54:7
54:12,21
55:3,18,21
55:22 56:11
56:18,22
57:9 62:9
62:10,11
63:12,24
64:5
**firefighting**
20:14
**fire's**
64:4
**first**
4:1 9:8 10:6
18:7 22:15
22:22 28:2
30:20 41:8
**five**
52:14
**fixture**
5:21 6:15,16
19:11,22
20:6 21:12
21:21 25:11
27:10 31:11
37:18,19
41:14,17
43:11 44:8
45:4,4,18
46:9,14,24
47:11 49:18
49:23 61:4
61:16 62:6
63:10,17,18

**fixtures**
5:17,18 6:4
6:13,18 7:1
7:9,10,20
19:17,18,19
20:3 21:4,5
24:16,25
25:1,17,21
25:24 26:7
26:12,15,18
26:21 28:12
29:17 30:13
30:25 32:3
37:24 38:11
38:13,18
43:20 44:12
46:4 48:12
52:5,10
59:24 61:2
61:13
**floor**
2:6 10:4
16:8 17:6
17:11,23
20:21 22:15
22:25 23:6
63:23
**folder**
36:20 58:5
**follow**
55:17
**followed**
29:22
**follows**
4:2
**form**
58:22
**four**
26:9 32:6
**fourth**
49:8
**free**
59:3
**Friday**
64:25
**Friedman**
29:2,4 34:6
46:4

**front**
15:17
**fully**
66:4

___ G ___

**G**
2:12
**gain**
61:1
**gather**
63:16
**gathering**
32:20
**gave**
34:3,5,19
44:2 46:11
57:22
**GE**
4:14 43:23
44:19,20
46:14
**gee**
58:23
**General**
1:6 4:11
44:16
**generally**
52:25 64:24
**Georgia**
56:3
**getting**
8:16 20:2
39:6
**give**
4:17 13:16
35:10,13,21
36:23 38:16
42:24 52:9
**given**
13:5 35:15
**giving**
37:4 57:24
**go**
6:24 16:8
23:17 25:10
27:2 28:24

30:11 31:2
35:3 40:15
40:21 42:19
43:18 44:1
44:16 49:1
59:25 60:9
60:19 63:23
**goes**
19:2 30:2
**going**
6:23 38:10
45:13,14
51:7 54:2
58:25 59:4
59:25 60:8
61:11
**good**
8:12 32:11
39:14,20
45:14 58:23
60:17
**gotten**
23:18 43:3
46:2
**Griffin**
1:10
**group**
27:1 54:18
**guy**
29:12 30:19
50:10 64:6
**guys**
30:14

___ H ___

**hadn't**
54:14
**half**
53:21,25
54:4
**halfway**
49:11
**halide**
6:21 24:10
26:2,4,11
31:13,15
38:18,20,25
39:2,11

42:14 45:19
55:5
**handle**
50:7
**handwriting**
41:24
**happen**
24:14
**hard**
53:3
**hazard**
55:18
**head**
38:15
**held**
13:21
**help**
29:5 52:6,9
**hereby**
66:3
**high**
26:7 37:22
37:24 42:21
43:16
**higher**
16:23 18:6
19:2
**highest**
18:7
**him**
14:10 35:10
35:13,15
36:3
**holding**
8:22
**hole**
20:9,22,23
21:1,2
**honestly**
7:15
**Hopkins**
64:13
**hosted**
47:21
**hot**
47:10
**hour**



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmick

February 11, 2009

72

| | | | | |
|---|---|---|---|---|
| **hours** | **increasing** | **involved** | **Kaminsky** | 54:17 60:14 |
| 8:12 50:22 | 54:21 | 26:20 28:22 | 3:9 17:14,18 | 61:12 |
| 52:14,16 | **INDEX** | 56:5,7 62:8 | 19:1 32:8 | |
| **Hubbell** | 3:1,12 | 62:15 | 32:12,15 | **L** |
| 37:22,23 | **indicate** | **involvement** | 37:5 47:2 | |
| 41:16 43:19 | 31:12 32:3 | 56:21 | 47:14 51:7 | 1:13 66:13 |
| 44:11,13 | **indicated** | **issue** | 51:11 54:24 | **labels** |
| **hypothetical** | 43:12 63:10 | 56:8 | 60:2 61:18 | 55:4,10 |
| 61:20,23 | **indicates** | **issued** | 61:20 64:12 | **lamp** |
| | 31:24 42:13 | 46:3 | 64:22 | 6:14,16,22 |
| **I** | **indicating** | | **keeping** | 6:23 8:22 |
| | 10:16 21:21 | **J** | 8:15 | 25:11 31:19 |
| **idea** | **individual** | | **Kevin** | 38:24 41:12 |
| 39:20 58:23 | 29:24,25 | **January** | 11:9 23:16 | 43:23,24 |
| 60:17 | 56:4 59:16 | 54:7 | **kind** | 44:1,4,6,7 |
| **identical** | **information** | **Jim** | 11:16 24:5 | 46:10,14,15 |
| 18:12 | 44:2,3 48:11 | 14:5 | 27:25 34:8 | 46:18,20 |
| **identific...** | **initially** | **job** | 36:14 | 47:9,9,25 |
| 14:16 | 9:19 | 5:1,3 28:2 | **knew** | 48:8,17,20 |
| **identified** | **initials** | **jobs** | 50:24 | 49:12,16,23 |
| 10:5 18:16 | 21:24 | 39:15 | **know** | 50:9,21 |
| 22:14 25:10 | **injury** | **joint** | 4:12 5:13 | 63:12,15,18 |
| **identify** | 49:12 | 60:18 | 9:12 12:25 | **lamps** |
| 18:17 | **installation** | **July** | 13:1,3 14:4 | 6:8,9,11,13 |
| **ignite** | 47:8 | 66:18 | 14:8,9 | 7:9 24:10 |
| 47:10 | **installed** | **just** | 17:10 18:4 | 25:4 26:2,4 |
| **illustration** | 20:1 52:5,10 | 5:11,11 6:17 | 18:8 20:2,4 | 26:25 27:14 |
| 10:18 | 54:12 59:10 | 7:2 8:22 | 22:21 23:3 | 30:10,10 |
| **immediately** | **installing** | 11:18,22 | 26:15 31:5 | 31:17 32:5 |
| 23:1,6 | 46:5 | 14:19 15:5 | 31:24 41:24 | 32:15 45:19 |
| **implication** | **instructions** | 19:22 20:17 | 42:2 45:13 | 46:4 48:11 |
| 42:21 | 49:19 | 26:17 28:6 | 48:5 49:4 | 50:4,14,17 |
| **improve** | **insurance** | 29:19 30:1 | 50:23 52:24 | 50:18,21 |
| 37:15 | 62:14,15,17 | 32:12 37:2 | 53:20 56:25 | 51:3,4 52:5 |
| **improvement** | **interested** | 37:5 39:3 | 57:13 64:10 | 52:12,18 |
| 24:4 39:16 | 39:6 48:16 | 41:12 44:4 | **knowledge** | 54:11,22 |
| **inches** | **into** | 44:11,19 | 56:21 | 55:5,23 |
| 16:5 | 6:19 8:3,24 | 48:10 50:24 | **Kopp** | **land** |
| **incident** | 9:9,12 22:7 | 52:19 56:9 | 14:5 | 46:20 |
| 56:9 | 33:11,19 | 56:25 58:7 | **Kuzmick** | **last** |
| **include** | 35:3 58:4 | 60:12 61:1 | 1:8 3:5 4:1 | 6:24 32:23 |
| 38:18,21 | **inventory** | 61:4 64:16 | 4:9,10,22 | 41:9,10,19 |
| **included** | 11:5 | 64:23 | 13:24 29:11 | 48:17 49:7 |
| 38:22 47:9 | **investiga...** | | 34:5,17 | 54:3 |
| **including** | 62:8 | **K** | 37:14 39:18 | **later** |
| 44:16 47:24 | **investiga...** | **Kalmanowicz** | 42:24 45:2 | 9:24 |
| **inconsistent** | 64:3 | 11:9 23:16 | 45:16,21 | **lawyers** |
| 49:24 | | **KAMINSKI** | 46:11 51:17 | 36:24 |
| | | 2:4 | | |



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmick

February 11, 2009

73

layers
18:9
learn
27:12
learned
56:11
least
5:18 7:18
16:15 53:13
leave
65:7
led
47:21
left
31:22 42:8
left-hand
33:16
lens
5:19 19:14
19:16 25:12
25:17 59:11
lenses
6:1,4 7:2,2
20:3 21:8
21:10 24:25
Leonard
56:6
less
53:25
letters
31:11 42:20
let's
6:24 22:10
23:17 24:6
25:10 42:19
44:19 45:22
level
12:23 16:23
17:23 18:6
18:7 22:21
28:14 63:23
levels
12:7,18
19:11 22:16
22:19 28:20
life
46:16 50:18

50:22 51:4
52:18 53:24
54:3,10
lift
16:20
light
6:15,19,19
6:20 9:11
9:18 19:10
24:25 25:1
27:10 28:8
28:14 29:16
37:7,19
44:21 61:1
61:9 65:4
lighting
7:8 9:4
23:20 24:5
24:20 28:25
31:20 34:9
34:15 35:17
35:22 36:15
37:15 38:6
39:21 40:7
43:19 44:13
lights
8:25 9:7,24
24:23 53:9
64:24
limit
44:19
Lincoln
2:13,15
line
42:1,4
list
49:9,15
lit
5:25
literature
43:22 44:19
44:20
little
7:4 8:13
18:23 21:18
22:12 30:12
33:22 63:11
live

4:22
LLP
2:11
located
10:15 16:25
21:1,14,22
30:13 56:2
location
18:1 61:5
long
5:3 8:9
32:14 52:12
54:22
longer
8:14
look
10:7 15:16
19:1 20:20
43:18,19,22
44:1,20
45:22 48:24
49:7 52:6
61:15 63:24
looked
7:6,6 10:1
15:12 44:22
60:15
looking
13:4 16:17
17:4 19:8
20:7,9 22:2
22:6 23:18
24:4 41:19
43:10 44:18
44:24
looks
15:7 16:8,10
17:12,24,25
18:9 21:4
22:6,15
23:19 31:3
33:10 41:20
42:9
lot
15:1
low
19:18,19
28:14

lower
29:21 31:22
lumen
28:20
lumens
28:8

———————
M
———————
MA
2:15
Maghran
59:12,18
main
6:8 7:5 24:6
24:9 25:2,4
25:5 30:8
30:18,20
31:25 44:17
mainly
8:14,15 19:8
maintenance
5:2 27:7
28:2 30:14
50:5
make
4:20 24:15
30:12 34:24
39:20 44:11
44:15 51:20
59:1
making
4:15 51:11
56:5
Malkin
1:13 66:13
man
64:6,7
manager
40:10,16,19
Manhattan
2:5
many
12:7,18 21:5
21:8,9 32:2
32:4 34:24
36:7 38:13
47:20 52:22

marked
3:15 5:11
14:15 29:19
marshall
62:10,12
64:5
material
10:1,2 11:5
11:10,12
12:1 15:1
15:21 17:7
17:10 18:3
18:5,17
22:18,25
23:5 46:21
materials
8:23 11:14
11:21,22
15:23
maybe
6:15 8:13
13:4 31:17
48:5
mean
6:12,14,16
6:16 24:13
31:8 36:16
41:14 62:18
Meaning
34:5
meant
36:5
measure
28:20
measured
28:9
mechanical
28:19
meeting
36:3
meetings
36:7,12 45:1
memory
7:13 12:21
metal
6:21 12:5
15:20 24:10
26:1,4,11



ESQUIRE
an Alexander Gallo Company

David Szmick

February 11, 2009

74

| | N | numbers | |
|---|---|---|---|

31:13,15
32:23 38:18
38:20,25
39:2,11
42:14 45:18
55:4
**Metso**
1:3,9 5:1
29:22 30:11
33:6 37:15
40:11,12,24
41:11,23
42:4 55:20
**MH**
31:11,15
**middle**
1:1 10:16,17
10:20
**mill**
9:8 24:8
33:5 35:3
46:24 53:16
60:10
**Miller**
2:3 64:13
**minutes**
13:25
**mix**
6:24 38:25
**mixed**
26:9
**mixing**
33:13
**mixture**
26:14
**Monday**
64:25
**money**
35:17
**most**
11:24 53:1
**mostly**
12:1,2
**moved**
17:1,3
**much**
35:21 63:16

**N**

**name**
4:7,10 41:22
42:9 62:11
64:2
**names**
64:11,16
**natural**
9:11
**near**
31:22
**necessarily**
28:4
**need**
4:18 59:21
**needed**
7:7 39:14
40:20 50:11
60:19,21
**needs**
32:21 37:20
38:6
**new**
2:7 7:11,19
19:25 28:12
39:21 40:6
48:12 50:13
59:24 61:13
**nobody**
13:5
**noise**
24:15
**North**
2:13
**Notary**
66:15
**notes**
35:6 36:12
37:10 63:2
66:5
**notice**
29:20
**number**
22:11 29:24
33:6 42:2,4
50:24 60:21
**numbered**

41:3,10
**numbers**
14:19 29:22
29:23,25
32:2,3,8,11
**NY**
2:7

**O**

**object**
51:7
**objection**
47:2,14
54:24 61:18
61:19
**observing**
35:6
**occur**
8:21
**occurred**
5:13 10:8
12:8 14:22
18:18 33:12
55:21 57:9
**offer**
35:23
**office**
29:22
**officer**
14:11
**offices**
1:9
**offset**
21:18,19
63:11
**Oh**
7:16 25:5
32:10
**okay**
5:1 6:11,14
7:10,16 8:1
10:14 14:4
17:18 19:23
20:7 21:24
22:2 23:13
23:17 27:6
28:4,14
30:19 33:18

37:2 40:17
43:7 45:1
45:10,22
49:7 53:5
54:10 58:12
60:16,24
64:8,15
65:6
**old**
2:14 7:10
24:4,12,23
26:21 30:10
31:17
**ones**
7:11 19:24
19:25,25
26:11 31:14
44:18 59:13
**only**
7:15 9:18
17:24 28:16
42:14 43:7
50:15 56:25
**open**
9:15 11:17
11:22 19:24
19:25 21:9
21:10,11,21
25:4,5,24
42:20 43:16
45:4,17
46:24 47:11
49:23 61:16
62:6
**operating**
23:14
**opposed**
27:1 49:1
**optic**
43:16
**optics**
42:20
**option**
42:17
**options**
42:7 43:12
**order**
30:1 32:21

40:5 46:1,3
46:7 49:1
52:7 55:21
59:1 60:22
**original**
54:11
**other**
4:13 5:24
9:13,21
17:16 18:16
19:24 27:19
28:20 31:15
44:3 48:9
**others**
61:8
**OU**
42:20
**ought**
55:16
**outside**
23:6 51:14
51:18
**over**
16:18 26:17
33:22 34:21
36:24 38:17
42:8,19
52:15
**overall**
60:12

**P**

**package**
41:4
**page**
3:3,14 10:6
29:23,24
30:16,20,21
30:23 31:2
31:10,22
32:6,9,23
33:6,10
41:20 42:7
43:13 48:17
49:7,8
**pages**
29:25 41:8,9
41:10,16



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmich                                                    February 11, 2009

75

| | | | | |
|---|---|---|---|---|
| 42:2 | periodically | 11:19 | 41:21 | proper |
| painting | 57:5 | pin | powders | 40:21 |
| 5:16 | person | 52:6 | 11:13 | property |
| pallet | 10:11 23:13 | place | powder-type | 49:13 |
| 11:19,23 | 40:13 64:3 | 27:22 48:12 | 11:25 | proposal |
| 17:7,11,25 | perspective | placed | power | 37:21,23 |
| 18:3 | 17:15 | 48:8 | 9:4,5 31:25 | provided |
| pallets | Phillips | Plaintiff | practice | 37:8 57:19 |
| 10:1 | 43:24 44:17 | 1:4 2:9 | 23:4 28:7 | Public |
| Paper | phone | plan | predominant | 66:15 |
| 1:3,9 5:1 | 45:1 | 10:4 16:8 | 38:24 39:2 | pulse |
| 40:11,12,24 | photo | 20:21 60:6 | prepared | 37:16,24 |
| 41:1,23 | 6:1 14:25 | plant | 32:13 33:1 | 42:13 43:25 |
| 42:4 55:21 | 15:3,16 | 5:2 24:6 | 33:25 34:2 | 50:21 54:11 |
| Pardon | 16:9 17:14 | 27:1 29:3 | 40:3 | purchase |
| 43:5 | 17:25 18:21 | 32:1,24 | preparing | 46:1,3,7 |
| part | 19:7 22:3 | 34:21 35:1 | 34:22 | 52:7 58:9 |
| 15:23 20:14 | 48:2 | 38:23 40:15 | presentation | purchased |
| 24:19 27:17 | photograph | 40:19 53:11 | 36:10 39:19 | 6:8,9 |
| 28:16,18 | 3:16,17,18 | 55:14 56:12 | presented | purchasing |
| 35:20 38:9 | 3:19,20,21 | plastic | 36:4 | 43:11 |
| 41:4 48:16 | 3:22 10:4 | 24:25 | pressured | purpose |
| 58:12 62:18 | photographer | Plaza | 26:7 | 19:16,21 |
| particular | 5:8 15:13 | 2:5 | printing | purposes |
| 7:19 19:22 | 47:19 48:24 | plus | 48:15 | 35:16 |
| 20:5 27:17 | photographs | 53:21 | prior | pushed |
| 44:7 48:17 | 35:8 | point | 18:18 23:1,1 | 33:21 |
| 49:23 50:21 | photos | 15:5 32:11 | 25:8,20 | put |
| particulars | 5:10 13:25 | 39:18 | 26:22,24 | 6:18 7:8 8:9 |
| 44:22 | 14:4 16:18 | pointing | 55:3 | 14:19 20:11 |
| parts | 18:15 19:6 | 10:17 15:6 | problems | 21:24 26:17 |
| 27:19 28:21 | 20:8 37:4,9 | 21:16 22:9 | 24:11 | 26:21 38:5 |
| passed | 62:25 | Pond | proceedings | 38:6 46:24 |
| 54:10 | picture | 1:10 | 65:10 66:3 | 49:4 50:13 |
| pay | 5:18 13:4 | portion | process | 54:1 60:24 |
| 55:16 | 19:11,11 | 23:21 32:1 | 40:22,23 | 61:15 |
| PC | 22:11 48:3 | 32:24 | product | p.m |
| 2:3 | 48:22 | portions | 40:10 49:19 | 65:11 |
| pen | pictures | 63:18 | 55:13 | |
| 20:25 | 13:5,6,8,14 | possibility | Professional | ——— Q ——— |
| Pennsylvania | 14:10 24:24 | 29:16 | 1:13 66:14 | quantity |
| 1:1,11 4:23 | 48:14 | possible | program | 39:3 |
| 66:16 | piece | 63:16 | 34:15 59:14 | question |
| people | 16:19 | possibly | progress | 4:19,21 45:3 |
| 26:17 39:14 | pieces | 7:18 26:9 | 8:2 | 45:15 48:21 |
| 48:9 52:22 | 47:10 63:14 | 31:16,18 | project | 51:8 58:25 |
| 53:6,12,15 | 63:20,25 | Post | 29:1 42:25 | 61:21 |
| 64:8 | piled | | | |



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Reznick

February 11, 2009

76

**questions**
4:16 45:13
64:18,24
**quick**
64:23
**quite**
64:16
**quotation**
29:3

---

**R**

**rack**
8:22,23
10:21,23
11:10,15
12:7,23
14:21 16:4
16:11 17:23
18:9,17,21
22:12,13,16
22:22 46:25
47:12 63:9
63:11
**racks**
11:1 12:10
17:5,22
21:17 23:1
23:6
**rare**
53:1
**rate**
9:7 45:11
**rated**
49:19 50:18
50:22 51:4
52:18 53:24
54:2,10
**reach**
52:18
**reached**
51:4 53:24
**read**
44:1 50:1
55:3,16
58:3
**reading**
55:9
**really**

6:23 33:21
48:16
**reason**
7:3 16:7
23:19 24:1
24:19 60:24
**recall**
13:17 28:1
28:22 41:4
44:6,18
45:10 47:22
**received**
30:1
**recognition**
39:15
**recognize**
5:13 39:23
**recommend**
37:14 51:19
54:17
**recommend...**
35:25 38:1
43:11 51:3
51:12,13,20
51:24 52:2
56:5 57:16
58:22 59:17
**recommend...**
49:16
**recommended**
20:5 37:16
37:18 39:21
43:15 55:25
58:16 59:14
60:14
**recommending**
41:17 43:25
44:12
**record**
4:7,16 13:19
13:21 45:14
48:10,11
57:11,13
**rectangle**
21:1
**reduce**
55:21
**refer**

29:24
**reference**
26:6
**reflector**
42:21 43:16
**regularly**
59:19
**related**
4:13 37:7
**relationship**
22:5
**relative**
29:7
**relit**
7:5
**remember**
5:5,6 7:17
9:6 10:14
10:20,23
11:4 12:9
16:6 27:24
28:8 29:14
31:20 34:25
35:9,14
36:8,9,11
36:13 43:1
43:21 44:9
44:24 45:5
45:6,8,16
45:20,23
49:3,6
50:25 54:19
55:7 57:10
57:24 58:18
58:21 61:11
62:11,17
63:5,8 64:1
64:2
**remind**
26:5
**remove**
38:10,13
61:2
**removed**
38:19
**repair**
28:19 32:23
**replace**

24:20 51:3
**replaced**
12:14 26:25
61:4,6
**replacement**
50:10
**replacing**
50:4,14
61:13
**report**
56:9,14
**reporter**
1:13 4:15
66:14
**REPORTER'S**
66:1
**reports**
56:10
**reprimanded**
56:17
**requirement**
58:24
**requisition**
40:2 41:5,7
**responsible**
23:23 50:3
55:9
**result**
56:17
**retrieved**
16:18 19:6
20:8
**review**
23:20 24:2
**reviewed**
27:10
**reviewing**
56:21
**re-lamp**
28:15 54:2
**re-lamping**
27:1 28:13
54:3,15,18
54:18 59:14
59:17
**rid**
39:6

**ride**
16:23
**right**
5:23 7:12
9:9 10:16
15:6 16:4
16:18 17:4
17:8 18:1
18:13 20:15
21:11,16,25
22:7,8 27:9
27:24 28:1
28:10 29:21
30:18 32:24
33:22 35:11
35:18 37:23
42:17 50:25
52:4,20
54:5 59:13
61:2 64:2
**right-hand**
42:19
**risk**
54:21 55:22
62:20
**Road**
1:10 2:14
**roof**
20:9,22 21:1
21:1
**room**
5:10,12 6:3
7:1,11,14
7:19 9:8,12
9:16 10:7
10:11,15,24
12:10 15:2
15:10,18
16:5,11
17:6,23
20:21,22
22:4,6,13
22:22 23:15
24:7 25:2,7
25:14,21
33:2,5,14
33:18,19
35:3 46:24



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmick

February 11, 2009

77

| | | | | |
|---|---|---|---|---|
| 48:19 60:10<br>60:11,25<br>61:3,12<br>62:24 64:4<br>**roughly**<br>7:13 8:9<br>52:14 53:22<br>53:24<br>**routine**<br>58:13<br>**rubber**<br>7:1 10:6,10<br>11:17,18,18<br>13:8 17:12<br>17:21 18:16<br>20:22 22:14<br>**rubbers**<br>11:12<br>**rule**<br>23:4,10<br>**running**<br>23:14<br>**rupture**<br>46:16 47:10<br>49:12<br>**ruptured**<br>46:20<br><br>**S**<br>**safety**<br>14:11 56:1,2<br>**sample**<br>49:2<br>**Saturday**<br>65:3<br>**save**<br>35:17 58:2<br>58:10 63:6<br>**saved**<br>58:7 63:21<br>**saw**<br>62:22<br>**says**<br>33:13 41:22<br>42:8 49:11<br>49:18<br>**scattered** | 38:22<br>**scene**<br>62:23<br>**schedule**<br>26:25 27:13<br>27:16,22,23<br>28:1,6<br>50:14 54:15<br>54:18<br>**Scott**<br>64:12<br>**screwed**<br>63:19<br>**second**<br>30:21 31:3<br>32:9<br>**section**<br>10:3,17,24<br>11:15 17:5<br>17:22 18:7<br>22:15 33:11<br>**sections**<br>18:12 33:11<br>**see**<br>5:19 15:2,16<br>17:24 18:6<br>19:10 21:5<br>21:21 22:12<br>25:22 26:6<br>31:3,4,11<br>32:2 34:21<br>35:16 37:21<br>37:22 41:3<br>42:7,10,14<br>42:21 48:2<br>48:9,14<br>49:8,11,19<br>49:20,25<br>**seeing**<br>14:25 15:18<br>16:19 44:6<br>44:9 45:23<br>**seen**<br>24:24 34:11<br>64:16<br>**selected**<br>43:12<br>**selection** | 46:9<br>**send**<br>56:14 58:19<br>**sense**<br>52:25<br>**separately**<br>58:10<br>**series**<br>42:8<br>**set**<br>54:14,17<br>**Seven**<br>5:4<br>**several**<br>47:24<br>**shield**<br>55:23<br>**shielding**<br>58:16<br>**shop**<br>30:8,17<br>**short**<br>50:15<br>**show**<br>14:20 19:5<br>20:17 29:19<br>34:11 39:23<br>47:18<br>**showed**<br>13:9 44:4<br>47:20,24<br>48:3,18<br>**showing**<br>30:12,25<br>**shown**<br>19:6,10,11<br>33:4,15,23<br>**shows**<br>18:21 20:20<br>30:20<br>**Shut**<br>52:15<br>**side**<br>6:10 7:6<br>16:19 17:17<br>18:22 33:16<br>42:8,19 | **sir**<br>4:8<br>**sitting**<br>11:23 17:7<br>17:11<br>**situation**<br>27:10<br>**skid**<br>11:17<br>**skylights**<br>9:13<br>**sleeve**<br>48:1,1,15,22<br>48:25 49:4<br>**Slow**<br>53:4<br>**SMITH**<br>2:11<br>**smoke**<br>8:14,15 9:22<br>**socket**<br>63:19<br>**sodium**<br>26:7,9 31:17<br>38:21,22<br>39:1,4,7<br>**sodiums**<br>26:10<br>**sold**<br>41:13<br>**somebody**<br>13:1 16:22<br>30:11 32:10<br>36:17 41:20<br>49:5 55:15<br>60:6 62:15<br>**somewhere**<br>26:6 63:9<br>**Sonar**<br>37:24<br>**soot**<br>19:8<br>**sort**<br>12:15 15:24<br>32:20 36:4<br>36:10 38:4<br>60:18 | **sound**<br>16:12 45:14<br>52:20<br>**sounds**<br>64:14<br>**source**<br>9:18 43:7<br>**South**<br>4:25<br>**specific**<br>37:18,19<br>61:5<br>**specifically**<br>41:19 44:4<br>62:19 63:7<br>**spot**<br>62:5<br>**stair**<br>48:20<br>**standing**<br>15:13,17<br>**staple**<br>41:6<br>**stapled**<br>41:2<br>**start**<br>4:19,21<br>20:17 27:6<br>37:24 42:13<br>43:25 50:21<br>54:11<br>**started**<br>5:9,16 27:9<br>27:12 28:2<br>28:25 29:15<br>**starting**<br>24:15 37:16<br>**state**<br>4:7<br>**stated**<br>64:24<br>**statement**<br>49:25<br>**STATES**<br>1:1<br>**steps**<br>56:22 |



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

David Kuzmich

February 11, 2009

79

22:10 26:1
26:4 37:19
45:4,17
46:20 49:18
49:22
**uses**
55:14
**usually**
6:14

───────
**V**
**Valerie**
64:13
**various**
11:12 23:18
**vendor**
34:3
**verbatim**
4:16
**verification**
37:6
**verify**
37:3
**view**
18:23 22:11
**Vima**
56:6,7,25
58:15 59:1
**Vima's**
57:16 59:8
**visit**
35:4 57:4
**visits**
34:24 57:11
57:14
**vs**
1:5
**vulcanizing**
30:24

───────
**W**
**wait**
4:18
**walk**
35:1
**wall**
15:7,10 16:9

16:11 22:13
33:17
**Walter**
59:18
**want**
6:20 29:25
37:6 52:5
52:19 58:23
63:25
**wanted**
64:23
**wanting**
24:19
**warning**
46:15,19
47:9 49:24
55:4,9,15
55:16
**warnings**
49:9
**warns**
55:17
**wasn't**
27:3 64:16
**watt**
7:9 24:10
26:1 37:16
37:24 42:13
43:25 45:18
50:21 55:23
59:24
**wattage**
26:3 42:12
**way**
15:15 56:17
**wearing**
24:12,13
**Wednesday**
1:11
**week**
52:12,14,16
**weekend**
52:15 53:2
54:1
**weekends**
52:22 53:1,6
53:16 65:1

**weeks**
48:6 52:20
53:19,21
**went**
9:14 18:14
40:19,23
41:5,7,8
62:25
**weren't**
47:22
**we're**
4:11 6:17
16:19 20:9
22:6 26:9
59:4
**we've**
22:10 23:18
24:24
**whatever**
40:20
**Whereupon**
65:10
**whether**
5:24 27:13
28:6 30:2
40:14 43:23
45:3,17
**whole**
35:1 49:15
53:11
**within**
10:15 16:5
**Witness**
3:3 22:1
32:14,17
47:3,15
51:13 54:25
61:24 64:14
**witnesses**
3:1 10:5
**woman**
64:7
**wondering**
29:21
**word**
31:5,23
41:22
**work**

24:17 38:14
54:1 57:2
59:19 62:18
65:3
**worked**
14:6
**working**
29:3 52:23
53:7,13,15
**works**
14:6,7 29:7
**wrapper**
48:1
**writing**
57:17
**written**
23:8
**wrote**
41:20

───────
**Y**
**yeah**
22:8 24:12
30:14 32:10
60:20
**year**
52:22
**years**
5:4 26:9,17
53:21,22,25
54:5
**yellow**
39:10
**York**
2:7
**yourself**
43:18

───────
**Z**
**Zurich**
62:20 64:6

───────
**0**
**01773-1125**
2:15

───────
**1**

**1**
29:20 30:4
30:16 35:11
**10**
3:18 16:17
17:4 18:6
18:15,23
66:18
**10:47**
1:12
**100**
38:17
**10005**
2:7
**11**
1:11 3:19
18:16,21
**11/7/02**
52:8
**12**
3:20 19:5
**12:51**
65:11
**120**
52:16
**121**
4:25
**13**
3:21 20:7
21:5,22
**133**
52:19 53:19
**14**
3:16,17,18
3:19,20,21
3:22,22
14:15 22:11
22:23
**16,000**
50:22

───────
**2**
**2**
34:11 36:1
**2002**
7:22 23:17
23:20 25:20



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

```
  26:22,24              50            987
  27:8 29:1             37:24         1:10
  32:16 36:15           51
  37:7 47:7             33:6,7,10
  60:2                  52
2003                    33:8
 52:11,23              53
  53:6,17,19            60:7
  54:2                 55
2005                    2:14 41:3
 54:4                  56
2006                    41:3
 54:7                  57
2009                    41:3,11
 1:12                  58
2010                    41:3,11
 66:18
212                    ───── 6 ─────
 2:8                   6
228-4446                47:18 48:2
 2:16                   49:8
24                     617
 52:14                  2:16
29                     64
 53:21                  3:9

───── 3 ─────          ───── 7 ─────
3                      75
 10:6 15:12             42:12,13
  16:8 20:20           750
  21:2,15,20            7:8 37:16
3:CV-08-47              43:25 45:18
 1:4                    50:21 55:23
39th                    59:24
 2:6
                       ───── 8 ─────
───── 4 ─────          8
4                       3:16 5:11
 3:7 39:23              14:15 25:10
400                     25:22
 26:1                  805-3948
450                     2:8
 24:9
                       ───── 9 ─────
───── 5 ─────          9
5                       3:17 14:21
 45:22,23,25            18:15
```



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com





DEFENDANT'S
EXHIBIT