# Exhibit 1

```
                                                              Page 1
 1                      VOLUME:  I
                        PAGES:   1 - 259
 2                      EXHIBITS: Per index
 3
              UNITED STATES DISTRICT COURT
 4        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 5
                  Civil Action No. 3:CV-08-47
 6
 7    METSO PAPER USA, INC.,        )
              Plaintiff             )
 8                                  )
      vs.                           )
 9                                  )
                                    )
10    GENERAL ELECTRIC COMPANY,     )
              Defendant.            )
11    *****************************
12
            DEPOSITION OF HARRI K. KYTOMAA, Ph.D.,
13
      P.E., CFEI, CFI, taken on behalf of the
14
      Plaintiff, pursuant to the applicable
15
      provisions of the Federal Rules of Civil
16
      Procedure, before Denise M. Rae, a
17
      Professional Shorthand Reporter and Notary
18
      Public within and for the Commonwealth of
19
      Massachusetts, at the Law Offices of
20
      Campbell, Campbell, Edwards & Conroy, P.C.,
21
      One Constitution Plaza, 3rd floor, Boston,
22
      Massachusetts, on Tuesday, January 25, 2011,
23
      commencing at 10:19 a.m.
24
25    Job No. CS309801
```

Page 61

1  Q. Have you ever been personally involved with
2     any experiments or tests involving High
3     Intensity Discharge lamps?
4  A. Yes.
5  Q. Okay. What experiments have you been
6     involved in or tests?
7  A. I've performed tests where I've
8     intentionally caused non-passive failures of
9     lights and lamps.
10 Q. And why were you performing those tests?
11 A. I wanted to understand the speed the
12    fragments could leave the lamp at and I
13    wanted to understand the dynamics of these
14    particular events.
15 Q. Was it a single test or more than one test?
16 A. Multiple tests.
17 Q. Were they performed all relative to the same
18    project?
19 A. I think so, to the best of my recollection.
20 Q. What project were you working on that
21    involved these tests that we're talking
22    about?
23 A. That was a project related to the Western
24    Canada case.
25           MR. COOPER: Could we take a break

Page 62

1       here?
2               (Recess.)
3   Q.  (Cont'd. By Mr. Stern)  So we were just
4       talking about the testing or multiple tests
5       that you had performed to intentionally
6       cause NPFs relative to the Western Canada
7       case; correct?
8   A.  Yes.
9   Q.  Okay, and we took a break at counsel's
10      request?
11  A.  Yes.
12  Q.  And during that break, did you speak with
13      counsel?
14  A.  I did.
15  Q.  What did you talk about?
16              MR. CAMPBELL:  Don't answer the
17      question.
18              MR. STERN:  Are you instructing the
19      witness not to answer?
20              MR. CAMPBELL:  I am, based upon the
21      conduct of Mr. Wolfe at the Rhiner
22      deposition.  So we'll use those same rules,
23      for the time being.  Mr. Rhiner was
24      repeatedly instructed not to answer
25      questions or that question that I posed to

```
 1         Mr. Rhiner.
 2              MR. STERN:  Okay.
 3    Q.   Going back to that discussion we were just
 4         having, who asked you or suggested to you to
 5         perform those tests?
 6    A.   I think I chose to do the tests myself.
 7    Q.   And did you, prior to the test, discuss your
 8         going to do the test with anyone?
 9    A.   Yes.  I mean, typically, the scope of the
10         work that I do is something that I would
11         share with whoever I am doing the work for.
12    Q.   And in that particular case, was it someone
13         from the firm of Smith & Duggan?
14    A.   Yes.
15    Q.   And as a result of those tests, did you
16         collect or gather or create any documents
17         with the data from the test?
18    A.   No.
19    Q.   Did you create any documents reflecting the
20         outcome of those tests?
21    A.   No.
22    Q.   Was there anything put in writing at all
23         relative to those tests?
24    A.   I don't think there was.
25    Q.   Did you send any written communications to
```

```
                                              Page 64

 1        Smith & Duggan about the outcome of those
 2        tests?
 3   A.   No, I wouldn't have needed to do that.
 4   Q.   Why not?
 5   A.   Because Mr. Cooper was present for those
 6        tests.
 7   Q.   Counsel was present?
 8   A.   Yes.
 9   Q.   That's Mr. Cooper that's here today?
10   A.   That's correct.
11   Q.   When you performed those tests, where did
12        you perform those tests?
13   A.   In my lab.
14   Q.   And was anyone else present when you
15        performed those tests?
16   A.   Engineers that report to me.  Yes.
17   Q.   At that time, were you with Exponent?
18   A.   Yes.
19   Q.   So people employed by Exponent?
20   A.   Correct.
21   Q.   Was the only outsider Mr. Cooper?
22   A.   Yes.
23   Q.   Okay, and were those tests being performed
24        on behalf of Mr. Cooper or the ultimate
25        client?
```

```
                                                    Page 65
 1   A.   I was a consulting expert for Mr. Cooper, as
 2        I understand it.  The relationship that Mr.
 3        Cooper has with his client is not
 4        something -- I just see the relationship
 5        between me and Mr. Cooper.
 6   Q.   And that's different than your relationship
 7        in this case; correct?
 8   A.   I was retained in this particular case as a
 9        testifying expert, which was not the
10        function that I served in this other case.
11   Q.   Did anybody that was in attendance make any
12        notes during those tests?
13   A.   I don't believe so.
14   Q.   Who else from Exponent was present?
15   A.   Vijay Somandepalli.
16   Q.   Anyone else?
17   A.   There may have been, but I don't
18        specifically recall.
19   Q.   Vijay is also involved in this litigation?
20   A.   He's been supporting me, yes.
21   Q.   Are you aware of anybody by the name of
22        Duncan Glover?
23   A.   Yes.
24   Q.   How are you aware of Duncan Glover?
25   A.   I'm not sure I understand that question.
```

Page 66

1          How am I aware of him?
2     Q.   Yes.
3     A.   Very well.
4     Q.   What is your relationship, if any, with Mr.
5          Glover?
6     A.   It's very good.
7     Q.   Is it professional or personal?
8     A.   It's, I think, a little bit of both.  We
9          share Christmas cards.  I certainly go out
10         of my way to say hi to him if he's around
11         and I expect that he'd probably do the same
12         with me.
13    Q.   What was the outcome of those tests?
14    A.   That we were successful in creating
15         artificially induced non-passive failures.
16    Q.   And after you were successful in creating
17         NPFs, did that end that line of inquiry?
18         Was that the ultimate goal or did you then
19         do some more tests or investigation or
20         experimentation?
21              MR. COOPER:  I would object to the
22         question.  You're going into an area of
23         consulting --
24              MR. CAMPBELL:  I'll have to do it.
25         He was retained as a consulting engineer,

Page 67

1  non-testifying, that the material is
2  confidential, so he's not going to answer
3  those questions, and he's not going to rely
4  upon them in connection with this case.
5  It's not part of this case. It's not a part
6  of his reports.
7           MR. STERN: So simulating a
8  non-passive failure is not related to this
9  case?
10          MR. CAMPBELL: The work that he did
11 in that case is not related to this case.
12 It wasn't involved in this case. He's not
13 using it, he's not relying on it, et
14 cetera. You went beyond -- he described the
15 work that he did on the non-passive
16 failure. You just asked him a different
17 question, "What else did you do? How else
18 did you serve as a consulting engineer?" I
19 forget the words, but a non-testifying
20 engineer in an unrelated case, so -- he told
21 you about the non-passive failure thing he
22 did but then you just asked, "What else did
23 you do?"
24          MR. STERN: Yes. I believe in the
25 other case, you're correct about consulting

Veritext Corporate Services
800-567-8658                                973-410-4040

Page 68

```
 1    experts.  We all use them, hopefully.  In
 2    that other case, they couldn't get to him
 3    without a court order --
 4         MR. CAMPBELL:  Right.
 5         MR. STERN:  -- but that doesn't
 6    apply to this case, which is a different
 7    case.  All of his past experiences as your
 8    expert are actually available for
 9    cross-examination.
10         MR. CAMPBELL:  I disagree because
11    if that were the case then, in order to,
12    quote, get to a non-testifying expert, all
13    you'd have to do is depose him in another
14    case and then you could discover that which
15    is not directly discoverable in the primary
16    case.
17         MR. STERN:  Okay.
18  Q. Have you ever worked for Metso Paper?
19  A. Metso is a recent name for a conglomerate,
20    and I've worked for prior entities or, let's
21    say, entities that are, in essence, Metso
22    with its prior names.
23  Q. Is that the Finland communications that you
24    spoke about earlier?
25  A. Yes.
```

Page 6

1       how did you prepare, if at all, for this
2       deposition?
3   A.  I reviewed my report and my file materials.
4   Q.  And what does your file materials consist
5       of?
6   A.  A number of documents and those documents
7       would include depositions that have been
8       taken in the case, discovery materials that
9       have been provided by the parties involved,
10      certain discovery materials from Metso,
11      discovery materials from GE, various Answers
12      to Interrogatories, reports by a number of
13      experts, inspection notes, inspection
14      photographs from experts, some
15      communications from people who were either
16      employed by Metso or provided services to
17      Metso, and this may be duplication, but
18      also, materials such as technical documents
19      provided by GE.  My file also includes
20      analyses that I have performed, and I think
21      that summarizes what is in my file.
22      Obviously, I haven't looked at my file in
23      answering the question, so there may be
24      things that I have forgotten, but I
25      certainly intended to give you a full

Page 7

1      answer.
2  Q.  And did you bring all of the file materials
3      which you reviewed here with you today?
4  A.  Yes.
5  Q.  Are there any file materials which you have
6      which you did not bring with you today?
7  A.  No.
8  Q.  Did you discuss with anyone issues related
9      to your file materials prior to today's
10     deposition?
11 A.  I'm not sure I understand your question.
12 Q.  Sure.  I'll rephrase it.  Prior to today,
13     did you discuss with any attorneys involved
14     in this litigation any of your file
15     materials?
16 A.  Yes.
17 Q.  Which attorneys did you talk to?
18 A.  I met with Tom Cooper and Jim Campbell.
19 Q.  Did that occur in one sitting or more than
20     one sitting?
21 A.  I certainly met with them more than once
22     during the life of this case.
23 Q.  Okay, and let's talk about just for right
24     now just in preparation for this
25     deposition.  Did you meet with them more

Page 8

```
 1         than once or just once?
 2    A.   Once.
 3    Q.   And when did that take place?
 4    A.   Yesterday.
 5    Q.   Where did that take place?
 6    A.   In this room.
 7    Q.   For how long?
 8    A.   Most of the morning and through the lunch
 9         hour.
10    Q.   And did you meet with just Mr. Cooper or Mr.
11         Cooper and Mr. Campbell?
12    A.   Both.
13    Q.   Anyone else involved in that meeting?
14    A.   Yes.
15    Q.   Who else?
16    A.   Doctor Vijay Somandepalli.  Somandepalli,
17         S-o-m-a-n-d-e-p-a-l-l-i.
18    Q.   And where is he employed?
19    A.   Exponent.
20    Q.   And is he also a designated expert in the
21         Metso fire?
22    A.   Not that I know of.
23    Q.   And what is his specialty at Exponent?
24    A.   His background is in aeronautics and
25         astronautics and mechanical engineering.
```

Page 9

1  Q.  Is his background similar to yours or
2      different than yours?
3  A.  It's similar to mine.
4  Q.  Okay. Are you aware of Clausen Miller? Are
5      you familiar with the Law Firm of Clausen
6      Miller?
7  A.  I've heard the name.
8  Q.  And are you familiar with myself?
9  A.  I've seen your name in the context of this
10     particular case.
11 Q.  Have we ever worked together?
12 A.  Perhaps, but I don't recall.
13 Q.  And are you presently involved in litigation
14     or matters with Clausen Miller?
15 A.  It may be the case. I haven't checked.
16 Q.  And when was the last time, if ever, that
17     you received a direct assignment where the
18     client that was paying your bills was Zurich
19     Insurance Company?
20 A.  I don't necessarily keep track of that, but
21     I certainly -- the ones that stick to mind
22     are the ones that I have trouble getting
23     paid, but -- One particular case was in the
24     late nineties, where that occurred, and so I
25     do remember specifically working then for