IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| METSO PAPER USA, INC., <br> 987 Griffin Pond Road <br> Clarks Summit, PA 18411 <br>        Plaintiff <br> v. <br><br> GENERAL ELECTRIC COMPANY, <br> 3155 Easton Turnpike <br> Fairfield, CT 06828-001 <br>        Defendant | : CIVIL ACTION - LAW <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : NO.: 3:CV-08-47 |

## PLAINTIFF'S CONTINUING OPPOSITION TO DEFENDANT'S USE OF HARRI KYTOMAA AND INCORPORATED MEMORANDUM OF LAW

Plaintiff Metso Paper USA, Inc. ("Metso"), hereby continues to object to Defendant General Electric Company's ("GE") use of Harri Kytomaa ("Kytomaa") as an expert regarding the design, applications and functions of the designs of the GE 750W Metal Halide Bulb, and the design in the context of an overall warehouse environment. See Proffer at 85.

As this Court is aware, Plaintiff filed a Motion to Preclude Defendant's use of Kytomaa. See Docket Entry No. 88. Plaintiff specifically and unambiguously incorporates herein that entire document, as well as its exhibits. See Docket Entry No. 88. For the Court's convenience, the Motion (without exhibits) is annexed hereto as **Exhibit** 1. Plaintiff will not specifically repeat herein the all facts or legal arguments as articulated in that Motion; however, Plaintiff does incorporate herein all the facts and legal arguments articulated in that Motion. See **Exhibit** 1.

Kytomaa allegedly specializes in "mechanical engineering and the investigation of fires and explosions" (Proffer at 1) and "thermal sciences" (Proffer at 85). He also investigates failures in "mechanical systems" (Proffer at 2); however, none of the enumerated systems in the

1

Proffer include the design, manufacture, application, etc. of the subject Bulb, metal halide lamps of any kind, the physics of non-passive failures of metal halide lamps, the physics of an explosion of a metal halide bulb, and/or the adequacy of Defendant's labels and/or warnings, or damages. He is not a professional engineer in the field of electrical engineering. See **Exhibit** 2 (Kytomaa Deposition, dated January 25, 2011, page 43, line 3). His professional profile contains no experience with high intensity discharge lights such as the Bulb at issue in this case. See Proffer at 7, and **Exhibit** 2 (Kytomaa Deposition, dated January 25, 2011, page 43, line 15).

Although he conducted multiple tests in which he created non-passive failures in lamps and lights to understand the speed that fragments could leave the lamp, and to understand the dynamics of these events (see **Exhibit** 2 (Kytomaa Deposition, dated January 25, 2011 page 61)), he collected, gathered or created no documents with respect to the tests (see **Exhibit** 2 (Kytomaa Deposition, dated January 25, 2011 page 63, line 18)), and Counsel for Defendant blocked inquiry into Kytomaa's study of non-passive failures of lamps, such as the lamp and incident at issue in this case. See **Exhibit** 2 (Kytomaa Deposition, dated January 25, 2011, pages 66-67). See Emcore Corp. v. Optium Corp., CIV.A. 06-1202, 2007 WL 4377610 *2 (W.D. Pa. 2007). In cases where an expert can be both a testifying and consulting experts, "a court may deem the party to have waived the work product protection" associated with the consulting expert." Id.; see In re Application of Chevron Corp., 633 F.3d 153, 2011 U.S. App. LEXIS 2112 (3rd Cir. 2011) (finding that the non-testifying expert privilege is not applicable in this litigation because by providing consulting expert reports to a testifying expert, the privilege is lost); In re Asbestos Prods. Liab. Litig., 256 F.R.D. 151 (E.D. Pa. 2009) (where there is no evidence of the scope and nature of the expert's services as pertaining to the litigation or work done unrelated to litigation, an individual will likely not be considered a non-testifying litigation consultant and the

consulting expert privilege will not attach).

  Here, it would impossible for Kytomaa's tests not to inform his opinion as a testifying expert. Kytomaa's tests were directly relevant to the failure of the Bulb at issue in litigation. The tests sought information necessary to understand the dynamics of non-passive failures in metal halide bulbs, which is exactly the issue in this litigation, and as such they bear relation to and will inform Kytomaa's opinion testimony about the non-passive failure of Defendant's Bulb. There is an indisputable relationship between information considered and obtained during those tests, and the failure of the Bulb. Claiming that Kytomaa would be able to ignore testing that has such direct relevance and bearing to the issue at hand in this litigation would be tantamount to ignoring "the big pink elephant in the room."

  Defendant's improper obstruction of Kytomaa's deposition and its refusal to disclose any information concerning Kytomaa's tests of non-passive failure in metal halide bulbs prejudices Metso's ability to challenge Kytomaa's opinion testimony, because Kytomaa has not fully disclosed all of the relevant data, facts, tests, studies, opinions, knowledge and/or experience he has pertaining to the very crux of this products liability case, namely, the dynamics of non-passive failure of a metal halide bulb. It would be impossible for Plaintiff to know if Kytomaa's testimony is reliable; furthermore, it would be nearly impossible to say that Kytomaa would completely "sequester" the results of the testing from his mind. It would be impossible to know if the tests wee reliably conducted, or it the data generated was flawed or erroneous. It would be impossible to know if Kytomaa was not using flawed or erroneous test results to support his opinion testimony. Therefore, Kytomaa should be precluded from offering testimony at trial.

  Counsel for Defendant further represented that Kytomaa will not rely upon those tests of non-passive failures in formulating his opinions in this case. See **Exhibit** 2 (Kytomaa

Deposition, dated January 25, 2011, page 67, line 3). Therefore, Kytomaa cannot offer any opinions related to non-passive failures, explosions, of the Bulb and/or any light bulb.

We cannot know if Kytomaa is using his prior test data or not. If Kytomaa disregards relevant data obtained regarding his tests of non-passive failures, his opinion is unreliable - - preclusion. If Kytomaa uses data obtained regarding non-passive failures, but his tests were flawed and we cannot know because inquiry was blocked, his opinion is unreliable - - preclusion.

Because Defendant's counsel blocked Metso's inquiry, it is impossible to discern what observations, conclusions, experience, knowledge and/or information Kytomaa obtained as the result of his multiple tests of non-passive failures in HID lamps. To ensure that absolutely none of the observations, conclusions, experience, knowledge and/or information obtained by Kytomaa as the result of his multiple tests of non-passive failures in HID lamps is expressed, contained, incorporated, influenced and/or otherwise informs or biases his opinions about metal halide HID lamps and their non-passive failures, explosions, he must not be permitted to testify. Any opinion(s) which may be expressed by Kytomaa that touch upon and/or relate to, either directly and/or indirectly, the subject of non-passive failure, explosion, of HID lamps and the associated dynamics of those events must be precluded. See Proffer at 7, 8, 9, 17, 19, 20, 39, 41, 49, 57, 70, 71, 73, 81, and 82.

Fed. R. Civ. P. 702, consistent with Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993), provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial judge is to act as a gatekeeper to make sure that all expert testimony or evidence is both relevant and reliable. Id. at 589. Expert testimony "must be supported by appropriate validation — i.e., 'good grounds,' based on what is known." Id. at 592. "Put differently, an expert opinion must be based on reliable methodology and must reliably flow from that methodology and the facts at issue-but it need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production." Heller v. Shaw Industries, Inc., 167 F.3d 146, 152 (3d Cir. 1999).

The Third Circuit has explained that, under Fed. R. Evid. 702, expert testimony "(1) must be based on sufficient facts and data; (2) must be the product of a reliable methodology; and (3) must demonstrate a relevant connection between that methodology and the facts of the case." Jaasma v. Shell Oil Co., 412 F. 3d 501, 513 (3d Cir. 2005). Kytomaa's opinion regarding non-passive failure of metal halide bulbs is unreliable in this litigation under the Daubert standard. If Kytomaa contends that he will not use information, knowledge, facts and/or data he garnered when conducting testing, and if those tests produced reliable data, his expert testimony is not "based on sufficient facts and data," as required by the first prong of the Daubert test. Kytomaa conducted testing that goes to the very heart and soul of this litigation: the non-passive failure of metal halide bulbs. Without the knowledge gained from this testing, he would not have sufficient knowledge to meet the first prong of the Daubert standard. Therefore, Kytomaa should be precluded from testifying at the trial.

Metso further objects to Kytomaa usurping the province of the Court by proffering a definition of a "safe product." See Proffer at 66, 67 and 68. The Court will charge the jury with respect to, among other things, the applicable law of product liability and failure to warn, and the jury will make that ultimate determination of what is a safe product and whether the Bulb was a

safe product.

     Metso also objects to the admission of any proffered testimony or exhibit concerning Metso's use of bulbs and/or fixtures subsequent to the subject fire. See Proffer at 42 and 43. Kytomaa's Proffer misleads this Court relative to this subject. The Proffer states that Metso is still using open fixtures for S rated bulbs. The Proffer annexes a photograph of an open fixture with an alleged S rated bulb. However, the Proffer does not establish that the S rated bulb is one of Defendant's bulbs. The Proffer does not indicate whether the open fixture is in the fire origin room (the only room of relevance) or the bathroom over a sink, or in the manufacturing room 30 feet over metal equipment, etc. Defendant's failure to provide these and other specifics relative to some open fixture at Metso's facility, post-fire, requires the exclusion of this testimony. The Court was very clear in its Order regarding Defendant's responsibility to make these issues clear within its Proffer; and, Defendant's failure to do so thus requires the exclusion of this testimony. On page 150 of Kytomaa's transcript (see Exhibit 2), he confirms that the open fixtures were not in the fire origin room and were over large cylinders (not shelves, cardboard boxes, plastic bags, etc). What Metso may be doing in a room with metal machinery, and/or a bathroom with porcelain and tiles, is irrelevant to the areas in the fire origin room. See Federal Rule of Evidence 403.

     Pursuant to Fed. R. Civ. P. 402, only relevant evidence is admissible. The use of bulbs and/or fixtures subsequent to the fire, in other rooms, is irrelevant and should as such, be inadmissible pursuant to Rule 402. See Conti v. Ford Motor Co., 743 F.2d 195, 197 (3d Cir. 1984). In failure to warn cases, only a plaintiff's behavior prior to the accident is relevant, as it tends to prove or disprove the existence of proximate cause. See e.g. Colgrove v. Cameron Machine Co., 172 F. Supp. 2d 611, 617 (W.D. Pa. 2001); Petree v. Victor Fluid Power, Inc., 831

F.2d 1191 (3d Cir. 1987); Pavlik v. Lane Limited/Tobacco Exports Int'l, 135 F.3d 876 (3d Cir. 1998). The use of bulbs and/or fixtures subsequently to the accident cannot inform proximate cause analysis prior the accident at issue. Furthermore, Defendant seeks to admit evidence regarding the use of bulbs and/or fixtures, subsequent to the accident, from completely different rooms, and under completely different conditions, than the room of the subject incident. The Plaintiff's use of open fixtures in rooms that do not contain shelves/cardboard boxes/plastic bags – e.g. flammable materials – is completely irrelevant to proximate cause in the fire origin room, which is the only room of relevance. Therefore, this evidence should be precluded.

Even if this Court finds that evidence of an open fixture in other rooms is relevant, pursuant to Fed. R. Civ. P. 403, it should be excluded. Under Fed. R. Civ. P. 403, even relevant evidence may be excluded if: "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." See also Diehl v. Blaw-Knox, 360 F.3d 426, 431 (3d Cir. 2004) (in products liability diversity action governed by Pennsylvania law, "assessment of the dangers of unfair prejudice and confusion of the issues are procedural matters that govern in a federal court"). Permitting Defendant to discuss an open fixture in another room, the conditions of which are very different than the room at issue, will significantly increase the risk of misleading the jury and confusing the issues, the very dangers of which Rule 403 defends. Therefore, this evidence should be precluded.

Defendant avers that Kytomaa's testimony will assist the trier of fact in understanding the design of the Bulb and thermal issues related to the design of the Bulb. See Proffer at 85. His opinion testimony thus limited cannot address the physics of non-passive failure of metal halide lamps, or the adequacy of Defendant's labels and/or warnings, or damages.

7

Defendant avers that "the opinions will also assist the trier of fact understand the design in the context of an overall warehouse environment." See Proffer at 85. There is absolutely no relevance to such opinion testimony. The Metso facility is question is not a warehouse; it is a manufacturing plant that refurbishes paper-making machinery. See **Exhibit** 3 (Terrance McDonald Deposition, dated February 11, 2009, page 5, line 13). Permitting testimony concerning warehouses and warehouse environments can serve only to confuse the jury. See Federal Rule of Evidence 403. The fire occurred in the mill room storage area where raw materials are stored, (see **Exhibit** 3 (Terrance McDonald Deposition, dated February 11, 2009, page 7, line 17)), and which contains a mixer for dry chemicals. See **Exhibit** 3 (Terrance McDonald Deposition, dated February 11, 2009, page 11, line 4). That is where materials are compounded together to go out to the mill room. See **Exhibit** 3 (Terrance McDonald Deposition, dated February 11, 2009, page 10, line 25 – page 11 line 1).

Accordingly, Kytomaa is not qualified to testify as an expert on the design, manufacture, applications and/or functions of the Bulb, the physics of non-passive failures of metal halide lamps, the physics of explosions of metal halide bulbs, and/or the adequacy of Defendant's labels and/or warnings, or damages. Kytomaa's proffered opinion testimony is not based upon sufficient facts and/or data, nor is it the product of reliable principles and methods, nor can it been shown that he reliably applied principles and methods to the facts or data. Thus, it is inadmissible under FRE 702. Paragraph 85 of the Proffer, which is an attempt to satisfy the Court's directive to set forth the reasons why Kytomaa's proposed testimony is admissible under Federal Rules of Evidence 702 and 703 is deficient.

Respectfully, Plaintiff's requests that this Court review in detail both Kytomaa's CV (see **Exhibit** 4) and deposition transcript (see **Exhibit** 2). What becomes very clear is that Kytomaa

is not a specialist in the lighting field, metal halide lamps and/or electrical field. All of his proposed testimony regarding any of these subjects is beyond his education, training and/or experience; thus, must be prohibited/barred testimony. See Proffer at 2, 3, 7, 9 – 21, 23, 24, 31, 35, 36 – 40, 44 – 50, 52 – 63, 65 – 79, 81 – 84.

The following are some quotations from Kytomaa's deposition transcript (see Exhibit 2), which support Plaintiff's position that Kytomaa is not qualified to testify regarding the subjects specifically identified in his Proffer:

> A. So really, as a Corporate Vice-president, I have, I'd say, multiple functions. The functions unique to the title of Corporate Vice-president has to do with meeting with my colleagues and identifying technical areas that we should be consulting in. It's a business function.
> Q. Okay, and what are your job duties - - what is a Practice Director?
> A. So I practice and run out group that specializes in thermal sciences.
> Q. What is thermal sciences?
> A. The thermal sciences is best embodied by the technical disciplines of combustion, thermodynamics, heat transfer, fluid mechanics, chemical kinetics. (Pages 39 - 40).
>
> Q. That's exactly what I was asking you. You've clarified it for me. Thank you. Is it mentioned anywhere in your professional profile the lighting industry or anything related to the lighting industry?
> A. It does not, specifically.
> Q. Does it mention anywhere in your professional profile any experience you've had with HID lamps?
> A. No. My professional profile doesn't happen to mention my experience in HID lamps.
> Q. Does your professional profile mention anything relative to experimental psychology?
> A. No, it doesn't.
> Q. Some of them are really easy; right? Does your professional profile mention anything about psychology, in general?
> A. It does not.
> Q. Okay. Does your professional profile mention anything about human factors and the study of human factors?
> A. It does not.
> Q. Does your professional profile mention anywhere that you belong or ever belonged to the Human Factors and Ergonomics Society?
> A. No, my professional profile does not say that I belong to that particular society.

9

Q. Okay. Have you ever been a member of that society?
A. I have not.
Q. We'll take a look at that. Do you have any degrees in psychology?
A. I do not.
Q. Do you have any degrees in ergonomics?
A. To the extent that the practice of mechanical engineering slightly overlaps with ergonomics, I would say yes, but not specifically. I don't have any specific degree in the area of ergonomics.
Q. Do you have any degrees in human factors?
A. I'd say the same. To the extent that human factors overlaps slightly with the practice of mechanical engineering, I have some knowledge, but I do not have a specific degree named a degree in human factors.
Q. Do you have any degree in the lighting engineering?
A. I don't know of the existence of any degrees, so I don't know that anybody has degrees in lighting engineering. (Pages 43 – 45).

Q. I'll rephrase it. You've got this column on the right-hand side captioned "Credentials & Professional Honors," and there are a few listed here, and I'm assuming that these are all of them and that's why you've listed them here, but for the chance that they're not all listed here, I'm asking the question, do you have any professional honors, as you've used it as the caption, in psychology?
A. That clarification helps. The answer is no.
Q. Same thing. I'm going to go down a list of items. Do you have any professional honors in ergonomics?
A. To the extent that your question specifically refers to items that I would list under "Professional Honors" in my professional profile document, the answer is no.
Q. And again, do you have any professional honors in human factors?
A. To the extent that your question specifically refers to professional honors that appear on my professional profile document, no.
Q. So in light of your answer, I need to do a followup. Are there any professional honors that you have received in human factors which are not listed in your professional profile?
A. Not that I can think of. (Pages 45 – 47).

A. The point I was trying to make in answer to your question is that the underlying engineering disciplines associated with the second paragraph in my professional profile are directly relevant to the underlying disciplines that help you understand how HID lights perform. Okay? The second paragraph in my professional profile does not describe a project associated with HID lighting; in fact, far from it, but the underlying engineering fundamentals do overlap with the engineering fundamentals associated with HID lighting.
Q. The general theories that underlie the engineering involved in what's being described in this second paragraph you're saying could somehow be used for the performance of HID lamps?
A. The fundamental engineering disciplines have some commonality between

10

those two very different applications.
Q. And you're basically talking about the theory; not specifics. The theory that underlies this engineering discipline can be applied to the theory of the HID light?
A. I think I've answered that question fairly clearly. I would simply say I don't understand the question that you just asked.
Q. So is it that the specific engineering dynamics and analysis of the piping systems containing both liquids and gases, that that is specifically applicable to HID lamps, or are you saying that it's the underlying engineering concepts and theories that went into that that apply to HID lamps?
A. I'm talking about the underlying engineering concepts. (Pages 50 -52).

A. The description at the end of the second paragraph of my professional profile of the characterization of rapidly varying pressures and forces caused by the interruption of rotating equipment or the sudden closing of valves and their effects talks broadly about systems, such as valves within piping systems, some of which relates to systems quite different from that, specifically rotating equipment or turbo machinery, things like pumps, fans, compressors, turbines.
Q. And those are different that an HID lamp - - the HID lamp that's involved in that litigation?
A. Correct. (Pages 52 – 53).

Q. You mention in the next paragraph that you are an Associate Professor of Mechanical Engineering at MIT where you were head of the Fluid Mechanics Laboratory. What is that?
A. That's a lab that consists of around a half dozen professors and we did research in a number of different areas.
Q. Any involving HID lamps?
A. Specifically, HID lighting, I don't believe that there were specific lighting projects. There may have been things related to it, but I don't recall any specific HID lighting projects. (Page 54).

Q. I'm going to go to the back of your report, where you have the history. I want to go through each of those quickly with you. Do any of these cases that you've listed on these two pages involve HID lighting?
A. No. (Page 70).

Q. Okay, and have you reviewed the entire transcript of David Kuzmick?
A. I've reviewed specific parts of his transcript on the original transcript of his deposition.
Q. Did you review the whole transcript, though?
A. I don't recall. It wasn't that long. I may have reviewed the whole thing. I don't specifically recall. (Page 78).

Q. Are you aware of the fire marshall or fire investigator's conclusion as to the cause of this fire?

A. I've reviewed their materials, but I don't recall specifically what they said. (Page 86).

Q. How close was the first material that ignited to the lamp? What was the distance between those?
A. I have not attempted to quantify that. (Page 87).

Q. You created - - and this is sort of followup by the words you used. Specifically, the light, the lamp that's alleged by Metso to have exploded, did you do any determination to determine whether that lamp, on the date of the explosion, was directly above an aisle or directly above a storage rack?
A. I did not make that determination. (Pages 88 – 89).

Q. At what speed do they fall downward [referring to a metal halide bulb that has a non-passive failure]?
A. I don't know specifically what the speed is. (Page 96).

Q. Okay. And in the rare circumstance that an HID lamp has a non-passive failure, can you tell me what the size of the debris field is?
A. I mean, it would be limited by the geometry of the fixture and the location of the lamp within the fixture and the particles will drop down, mostly down. If you question asks for specific distances and such, I haven't attempted to quantify those.
Q. Yes, that was exactly what I was asking for. Specific size of a debris field that a 750 watt Metal Halide GE explodes or has a non-passive failure.
A. I would say, as a mechanical engineer, I would expect those particles to be below or in the vicinity of an area below the fixture, but I don't know what the diameter of that area would be. (Page 98).

Q. Welcome back. Getting back to paragraph 11, where we left off, the hot particles that are going to be emitted, how fast will they be traveling?
A. I don't know a specific speed.
Q. Have you done any calculations to determine speed for the hot particles that could be emitted upon the non-passive failure of a 750 watt Metal Halide lamp?
A. No. (Pages 102 – 103).

Q. Okay. So they took the population of lamps, ran them for ten hours. How long did they have them off before they started running the cycle again?
A. I'm not sure.
Q. So they took a set of lamps, ran them for ten hours, off for we don't know how long, then ran them for another ten-hour cycle, continuous, and at 16,000 hours, 50 percent of those lamps had failed?
A. Yeah. No longer operated and the other half operated.
Q. No longer operated. Okay. For the other half that were still operating, how long until the last lamp stopped operating?

12

A. I don't know the answer to that question. (Page 114).

Q. Okay. So tell me what is the percentage change, if any, for the median expected life of a lamp when operated at 106 hours?
A. I don't know. (Page 122).

Q. Can you tell me what was directly below the lamp on January 21, 2006, and when I say "the lamp," I'm referring to the lamp that we're here about today?
A. Like I said, I haven't performed the geometry and the calculations to make a determination of exactly where the lamp was situated in relation to the racks, but it was in close proximity with the storage racks. (Page 142).

Q. Are you a lighting sales engineer?
A. I am not a lighting sales engineer.
Q. Are you a lighting design engineer?
A. I am not a lighting design engineer. (Pages 145 – 146).

Q. How much less does it cost to make an O-rated lamp than an S-rated lamp for the exact same wattage to GE?
A. So you're asking me what the difference in manufacturing costs to GE are.
Q. Correct.
A. I don't know that. (Page 146).

Q. In 2002, did GE manufacture an S-rated 400 watt Metal Halide PulseArc?
A. S-rated 400 watt, yes.
Q. And did they also make an O-rated 400 watt?
A. Yes.
Q. What was the manufacturing cost difference to GE for those two lamps?
A. I don't know. You'd have to ask GE. (Pages 146 -147).

Q. Had the competition already begun marketing their 750 watts as E-rated only and no longer marketing them as S-rated?
A. So that would be my interpretation of that, but what I haven't done is gone to look at Philips' catalogs and Osram Sylvania's catalogs to see what happened when. I don't know that independently. (Page 154).

Q. Have you seen any tests to determine how much shorter the median life of a lamp would be if it was run on a ten-hour cycle in an enclosed fixture?
A. I have not.
Q. Okay. Have you done any tests to that effect?
A. I have not. (Page 162).

Q. When was the 750 watt fire sold?
A. I don't know for sure.
Q. Do you have a general understanding of the time period when it was first

13

sold?
A. Not really. I have not really tried to look at that. (Page 166).

Q. Do you know why there are O-rated lamps for the 320, the 350, the 400 - - sorry. I'm looking at the wrong pages. Here we go. Why there are O-rated lamps for the 32 watt, the 50 watt, the 70 watt, the 100 watt, the 150, the 320, the 350, the 360, the 400 and the 1,000, but not for the 750 watt, as reflected in this catalog in your tab number 8?
A. I don't know. If I needed to know, I would probably look into marketing considerations, but I don't know and I haven't attempted to figure that out. (Pages 166 -167).

Q. Can you tell me about any courses that you've taken on the balancing of the costs and risks of end users for lightbulbs?
A. So you're asking me about a course, one course on the costs and risks associated with lightbulbs to end users. I don't think there is any course that I have heard of, but I certainly haven't taken any. (Pages 167 -168).

Q. For each of the fires that you identified that occurred that you quantified, you counted, and the number was a number that allowed you to state that the yearly rate of HID lamp induced fires is so low, did you also look at the severity of each of those fire?
A. You're asking me what the extent of damage might have been?
Q. Yes.
A. I have not done that. (Page 176).

Q. And it says that, "In 200, a total of about 35 million HID lights were sold in the US of which Metal Halide lamps numbered 19.5 million." How many of those lamps were S-rated?
A. I don't know.
Q. How many of those lamps were O-rated?
A. That probably a question that would be best posed to GE personnel that might be able to break it down, based on marketing information and sales information.
Q. I'm asking if you know that information.
A. I don't know.
Q. Okay, and how many of those lamps were operated in open fixtures, any of the 19.5 million?
A. I don't know the breakdown. I would expect - - I don't know. (Page 177).

Q. I've got you. So did you look to see the details of those eight fires?
A. That I have not done. I haven't investigated that.
Q. Do you know if death occurred in any of those eight fires?
A. I know nothing about those specific entries.
Q. What information do you have regarding the number of HID lamp explosions, NPFs, at facilities, other than warehouses?

      A. I actually haven't run that query. (Page 185).

      A. * * * I don't know whether Ed Yandek - - and to the extent that he's been deposed - - I have not reviewed his deposition - - what he meant, other than what I've just stated.
      Q. So now, the person that created the label in exhibit 4, you didn't read that person's transcript, the person that created that label wording; did you?
      A. I don't recall.
      Q. Did you ever read any transcript of any GE employees that were involved in labeling?
      A. I haven't reviewed that. I mean, I would have expected Joe Saler to review those.
      Q. But you didn't?
      A. I did not. (Pages 238 -239).

      Defendant wants us to believe that Kytomaa is somehow capable of issuing expert opinions regarding metal halide lights, electrical engineering, manufacturing plant operations, explosions of metal halide bulbs and anything dealing with the Bulb at issue. This leap of faith is unsupported and pulls into play Federal Rules of Evidence 403 and 703. As so eloquently stated by the United States Supreme Court in <u>General Electric v. Joiner</u>, 522 U.S. 136, 146, 118 S.Ct. 512 (1997) (citation omitted):

> Trained experts commonly extrapolate from existing data. But nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. That is what the District Court did here, and we hold that it did not abuse its discretion in so doing.

Defendant has truly capitalized on the Latin phrase *ipse dixit* - - "he himself said it." Just because Kytomaa says something, does not make it fact and/or true. In fact, this Court specifically recognized this issue and ordered Defendant to include in its Proffer "the reasons why such testimony is admissible under Federal Rules of Evidence 702 and 703."

      As so aptly stated by the United States Supreme Court:

> We have found no indication in the record that other experts in the industry use Carlson's two-factor test or that tire experts such as Carlson normally make the

15

> very find distinctions about, say, the symmetry of comparatively greater should tread wear that were necessary, on Carlson's own theory, to support his conclusions. Nor, despite the prevalence of tire testing, does anyone refer to any articles or papers that validate Carlson's approach. * * * Of course, Carlson himself claimed that he method was accurate, but, as we pointed out in *Joiner*, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."

Kuhmo Tire v. Carmichael, 526 U.S. 137, 157, 119 S.Ct. 1167 (1999)(citations omitted). The Supreme Court noted that:

> The District Court did not doubt Carlson's qualifications, which included a masters degree in mechanical engineering, 10 years' work at Michelin America, Inc., and testimony as a tire failure consultant in other tort cases. Rather, it excluded the testimony because, despite those qualifications, it initially doubted, and then found unreliable, "the methodology employed by the expert in analyzing the data obtained in the visual inspection, and the scientific basis, if any, for such an analysis."

Id. at 153.

An individual may have higher education, honors and experience in field A, but if field A is different than the field of study for which the expert is being proffered, the individual cannot be qualified as an expert. Further, there is no need for Kytomaa to testify to something which a document states and/or what a fact witness is going to testify on direct and/or cross examination. See Proffer at 3, 4, 5, 6, 22, 25, 29, 30, 32, 34, 35, 38, 39, 40, 41, 44, 47, 80, 81.

Kytomaa's testimony concerning the use of the Bulb, (see Proffer at 26, 27 and 32), is based upon an assumption of facts not in the record, or his assumed facts are incorrect. See **Exhibit** 5 (Plaintiff's Supplemental Interrogatory Response and relevant pages from David Kuzmick's February 9, 2011, deposition transcript). Since Kytomaa has no independent knowledge regarding this subject, and his proposed testimony is not founded upon the actual facts, his testimony must be precluded.

Not only was Kytomaa's opinion about Metso's use of the Bulb in relation to its rated life

incorrect, (see Proffer at 33), because he failed to actually calculate the actual hours the Bulb was on/off on the weekends, but the Proffer completely and intentionally misleads this Court by failing to discuss the rated life of the Bulb increasing by 50%, since Metso used the Bulb on 120 hour cycles. See **Exhibit** 6 (Defendant's documents relative to the 120 hour issue).

Further, the Proffer outlines a subject of Kytomaa's proposed testimony that actually misleads the Court and is contrary to all evidence; thus, it must be excluded. See Proffer at 41. The Proffer states that the Bulb should be put in an enclosed fixture where combustibles are present. First, not surprising, the Proffer does not cite to a single source - - because there is none. Second, Kytomaa testified:

> Q. And you mentioned that there are examples of such applications, including environments, that do not pose a risk of fire. Is a warehouse one of those examples?
> A. Yes. (Page 103).

Either it is acceptable to use the Bulb in an open fixture in a warehouse or it is not; Kytomaa's opinion contradicts his own testimony. Third, this statement that the Bulb must be within an open fixture contradicts the testimony of Defendant's expert Tompkins (thus, it is not based upon facts). See Plaintiff's Opposition to Tompkins' Proffer, wherein Plaintiff quotes and discusses Tompkins' deposition testimony that there was no documentation advising the user to use the Bulb in an enclosed fixture, when it was operated in a vertical angle, until 2008. Fourth, the Bulb's label clearly states that if the Bulb is used in the vertical position, it can be used in an open fixture. See **Exhibit** 7 (label). There is nothing on the label stating that if the Bulb is used in a room that also has combustible materials, the Bulb must be in an enclosed fixture. The Proffer fails to advise the Court that the Bulb was used in the vertical position, and thus was appropriate to be in an open fixture. Therefore, Kytomaa's Proffer contains misleading information, information contrary to the evidence and is simply ipse dixit.

Several paragraphs of the Proffer use the phrases: "recommends," "guidelines," "recommended," "suggested" and "recommendations." See Proffer at 41, 48, 54, 79 and 84. First, Kytomaa is not a warning/labeling specialist. He cannot offer opinion testimony of this subject. Second, these phrases are not, obviously, "warn" and/or "instruct." Thus, a recommendation, suggestion and/or guideline for the purposes of this litigation is irrelevant; the issue is did Defendant warn and/or instruct - - it did not. Also, this Court will note several Proffers use of the terms "non-passive failure," "shatter," "hot particles being emitted" and "rupture." See Proffer at 18, 19, 20, 21, 39, 41, 70, 71, 73, 81 and 82, Rupture, non-passive failure, shatter and hot particles being emitted are not the same thing as an "explosion." When this Bulb failed, it exploded.

In addition to the above, Plaintiff objects to those portions of the Proffer which offer Kytomaa to testify that the burden is on Metso to search the internet (in 2002), libraries, lighting manufacturer industry sources (which no one other than a manufacturer was entitled to participate) for recommendation, suggestions and guidelines. Defendant fails to cite and/or reference a single reported case which places this burden upon Metso. Also, Kytomaa is certainly not qualified to offer opinion on this subject.

Defendant's Proffer for its origin and cause expert, Donald Hoffman, provides that Hoffman is going to offer testimony that the Bulb did not cause this fire. See Docket No. 135. As such, since all testimony proffered for Kytomaa addresses the Bulb, it is irrelevant, confusing, prejudicial, etc. See Federal Rule of Evidence 403.

According to Federal Rule of Evidence 702, "if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto...." First, Kytomaa cannot be qualified

relative to the subjects upon which his Proffer identifies he will to testify.  Second, Kytomaa cannot testify as to facts, that is for fact witnesses and evidence.  Third, Kytomaa cannot testify regarding what Plaintiff's experts did and/or did not do; that is the subject of defense counsel's cross-examination.  Fourth, opinions based upon suggestions, recommendations and guidelines, are not definitive opinions that a party failed to heed a warning and/or instruction.  Fifth, any statement without a specific reference and/or clearly articulating how a premise equals an opinion, is merely *ipse dixit*.

Finally, as stated in Plaintiff's Motion, (see **Exhibit** 1), Defendant never produced to Plaintiff Kytomaa's file materials, documents, data, etc. - - nothing.  Discovery is closed.  Therefore, Kytomaa must be precluded due to Defendant's litigation tactics.  Further, some of the documents annexed to Kytomaa's Proffer with bates stamp numbers and deposition exhibit labels were not produced in this litigation, despite Plaintiff's many requests.  Plaintiff may move to strike those documents at the time of trial.

WHEREFORE, Plaintiff Metso Paper USA, Inc., requests that this Court order that Defendant GE's expert witness Harri Kytomaa be precluded from testifying in the presence of the trier of fact at any time during the trial proceedings, and Mr. Kytomaa's opinions be precluded from the trial.

Dated: June 12, 2012

Respectfully submitted,

By: _____  
Howard A. Rothenberg, Esquire  
Herlands Rothenberg & Levine  
345 Wyoming Avenue – Suite 210  
Scranton, PA 18503

By: _____  
Robert A. Stern, Esquire (*pro hac vice*)  
Clausen Miller P.C.  
One Chase Manhattan Plaza  
New York, New York 10005

## **CERTIFICATE OF SERVICE**

I, hereby certify that I served a copy of this document on all parties of record on June 12, 2012, by filing with the ECF system, which serves all counsel of record. The document is available for viewing and downloading from the ECF system.

_____
Robert A. Stern