Page 1

1          VOLUME:  I
           PAGES:  1 - 259
2          EXHIBITS:  Per index
3
              UNITED STATES DISTRICT COURT
4      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
5
                    Civil Action No. 3:CV-08-47
6
7      METSO PAPER USA, INC.,        )
                Plaintiff            )
8                                    )
       vs.                           )
9                                    )
                                     )
10     GENERAL ELECTRIC COMPANY,     )
                Defendant.           )
11     *****************************
12
              DEPOSITION OF HARRI K. KYTOMAA, Ph.D.,
13
       P.E., CFEI, CFI, taken on behalf of the
14
       Plaintiff, pursuant to the applicable
15
       provisions of the Federal Rules of Civil
16
       Procedure, before Denise M. Rae, a
17
       Professional Shorthand Reporter and Notary
18
       Public within and for the Commonwealth of
19
       Massachusetts, at the Law Offices of
20
       Campbell, Campbell, Edwards & Conroy, P.C.,
21
       One Constitution Plaza, 3rd floor, Boston,
22
       Massachusetts, on Tuesday, January 25, 2011,
23
       commencing at 10:19 a.m.
24
25     Job No. CS309801

**EXHIBIT**
**2**

```
1                    APPEARANCES:
2

3        Representing the Plaintiff:

4            ROBERT A. STERN, ESQ.
             CLAUSEN MILLER
5            One Chase Manhattan Plaza, 39th floor
             New York, New York  10005
6            Telephone No. (212) 805-3949
             rstern@clausen.com
7

8        Representing the Defendant:

9            JAMES M. CAMPBELL, ESQ.
             CAMPBELL, CAMPBELL, EDWARDS & CONROY,
10           P.C.
             One Constitution Plaza, 3rd floor
11           Boston, Massachusetts  02129
             Telephone No. (617) 241-3000
12           jmcampbell@campbell-trial-lawyers.com

13       and,

14           THOMAS G. COOPER, ESQ.
             SMITH & DUGGAN, LLP
15           Lincoln North
             55 Old Bedford Road
16           Lincoln, Massachusetts  01773-1125
             Telephone No. (617) 228-4446
17           tgcooper@smithduggan.com
18
19
20
21
22
23
24
25
```

```
1                        I N D E X
2    DEPONENT
3                                              PAGE
     HARRI K. KYTOMAA, Ph.D., P.E., CFEI, CFI
4
5      By Mr. Stern
6                                                 5
7
8                      E X H I B I T S
     No.
9                                            Page
        1   Notice of Depositon, Schedule A, and
10          Certificate of Service.
11      2   One-page document entitled            4
            "Depositions and Discovery,
12          Rule 26."
13      3   Professional Profile of Harri K.      4
            Kytomaa, Ph.D., P.E., CFEI, CFI.
14                                                4
        4   Report of H.K. Kytomaa dated
15          August 31, 2010.
16      5   Plaintiff's Supplemental Answer to    4
            Defendant's Interrogatories.
17                                                4
        6   Curriculum Vitae of Harri Kytomaa.
18                                                4
        7   Binder.
19                                               34
        8   Binder.
20                                               34
        9   Disk.
21                                               34
        10  Graph.
22                                               82
        11  Graph.
23                                               82
24      REPORTER'S NOTE:  Original exhibits attached
        to original deposition transcript.
25
```

```
 1              At the Law Offices of Campbell,
 2      Campbell, Edwards & Conroy, P.C., Boston,
 3      Massachusetts:
 4              (Notice of Deposition, Schedule A
 5              and Certificate of Service marked
 6              exhibit number 1 for
 7              identification.)
 8              (One-page document entitled
 9              "Depositions and Discovery,
10              Rule 26" marked exhibit number 2
11              for identification.)
12              (Two-page Professional Profile of
13              Harri K. Kytomaa, Ph.D., P.E.,
14              CFEI, CFI, marked exhibit number 3
15              for identification.)
16              (Report of H.K. Kytomaa dated
17              August 31, 2010 marked exhibit
18              number 4 for identification.)
19              (Plaintiff's Supplemental Answer to
20              Defendant's Interrogatories marked
21              exhibit number 5 for
22              identification.)
23              (Curriculum Vitae of Harri Kytomaa
24              marked exhibit number 6 for
25              identification.)
```

1   IT IS HEREBY STIPULATED AND AGREED

2   by and between counsel for the respective

3   parties that the Witness will read and sign

4   the deposition transcript under the pains

5   and penalties of perjury; and that the

6   reading and signing is deemed waived if not

7   accomplished within 30 days of transcript

8   delivery.

9           HARRI K. KYTOMAA, a witness called

10  for examination by counsel for the

11  Plaintiff, having been satisfactorily

12  identified by the production of his driver's

13  license, being first sworn by the Notary

14  Public, was examined and testified as

15  follows:

16          DIRECT EXAMINATION

17  by MR. STERN:

18  Q.  Good morning.  I'm Robert Stern from Clausen

19  Miller.  I'm going to avoid all the intro

20  stuff, since I know you've been through this

21  more than enough times.  Whatever applied in

22  all those other depositions will also apply

23  in this deposition.  So I'm going to get

24  right down to it.  We've got a lot to cover

25  today.  We've got a lot to about.  Tell me,

1           how did you prepare, if at all, for this
2           deposition?
3      A.   I reviewed my report and my file materials.
4      Q.   And what does your file materials consist
5           of?
6      A.   A number of documents and those documents
7           would include depositions that have been
8           taken in the case, discovery materials that
9           have been provided by the parties involved,
10          certain discovery materials from Metso,
11          discovery materials from GE, various Answers
12          to Interrogatories, reports by a number of
13          experts, inspection notes, inspection
14          photographs from experts, some
15          communications from people who were either
16          employed by Metso or provided services to
17          Metso, and this may be duplication, but
18          also, materials such as technical documents
19          provided by GE.  My file also includes
20          analyses that I have performed, and I think
21          that summarizes what is in my file.
22          Obviously, I haven't looked at my file in
23          answering the question, so there may be
24          things that I have forgotten, but I
25          certainly intended to give you a full

1      answer.

2   Q.  And did you bring all of the file materials

3      which you reviewed here with you today?

4   A.  Yes.

5   Q.  Are there any file materials which you have

6      which you did not bring with you today?

7   A.  No.

8   Q.  Did you discuss with anyone issues related

9      to your file materials prior to today's

10     deposition?

11  A.  I'm not sure I understand your question.

12  Q.  Sure.  I'll rephrase it.  Prior to today,

13     did you discuss with any attorneys involved

14     in this litigation any of your file

15     materials?

16  A.  Yes.

17  Q.  Which attorneys did you talk to?

18  A.  I met with Tom Cooper and Jim Campbell.

19  Q.  Did that occur in one sitting or more than

20     one sitting?

21  A.  I certainly met with them more than once

22     during the life of this case.

23  Q.  Okay, and let's talk about just for right

24     now just in preparation for this

25     deposition.  Did you meet with them more

1      than once or just once?

2   A.   Once.

3   Q.   And when did that take place?

4   A.   Yesterday.

5   Q.   Where did that take place?

6   A.   In this room.

7   Q.   For how long?

8   A.   Most of the morning and through the lunch
9        hour.

10  Q.   And did you meet with just Mr. Cooper or Mr.
11       Cooper and Mr. Campbell?

12  A.   Both.

13  Q.   Anyone else involved in that meeting?

14  A.   Yes.

15  Q.   Who else?

16  A.   Doctor Vijay Somandepalli.  Somandepalli,
17       S-o-m-a-n-d-e-p-a-l-l-i.

18  Q.   And where is he employed?

19  A.   Exponent.

20  Q.   And is he also a designated expert in the
21       Metso fire?

22  A.   Not that I know of.

23  Q.   And what is his specialty at Exponent?

24  A.   His background is in aeronautics and
25       astronautics and mechanical engineering.

1    Q.   Is his background similar to yours or

2         different than yours?

3    A.   It's similar to mine.

4    Q.   Okay.   Are you aware of Clausen Miller?   Are

5         you familiar with the Law Firm of Clausen

6         Miller?

7    A.   I've heard the name.

8    Q.   And are you familiar with myself?

9    A.   I've seen your name in the context of this

10        particular case.

11   Q.   Have we ever worked together?

12   A.   Perhaps, but I don't recall.

13   -Q.   And are you presently involved in litigation

14        or matters with Clausen Miller?

15   A.   It may be the case.   I haven't checked.

16   Q.   And when was the last time, if ever, that

17        you received a direct assignment where the

18        client that was paying your bills was Zurich

19        Insurance Company?

20   A.   I don't necessarily keep track of that, but

21        I certainly -- the ones that stick to mind

22        are the ones that I have trouble getting

23        paid, but -- One particular case was in the

24        late nineties, where that occurred, and so I

25        do remember specifically working then for

1    Zurich Insurance.   The insurance companies

2    that sometimes pay ultimately for the work

3    that I do present themselves in ways that I

4    don't completely either recognize or keep

5    track of.

6  Q.  How do you mean that?

7  A.  What I mean by that is that the bills, for

8    example, may be channeled through a law firm

9    and the paying insurance company or

10   insurance companies may not be known to me.

11 Q.  Okay, and for this particular matter, who

12   are you sending your bills to?   I should

13   start out, have you sent any bills for this

14   matter?

15 A.  I have sent bills.

16 Q.  Okay, and who did you send the bills to?

17 A.  Let me just check --

18 Q.  Sure.

19 A.  -- the address of the recipients.   In this

20   particular matter, the invoices have been

21   sent to Mike McWeeney, M-c-W-e-e-n-e-y, at

22   Electric Insurance Company.

23 Q.  And have your bills been paid?

24 A.  To my knowledge, yes.

25 Q.  That would go to your accounting or billing

1    department, as opposed to directly to you?

2    Exponent has individuals that are

3    responsible for collections and billings?

4  A.  I think, if you could just state that as one

5    question.

6  Q.  Oh, sure.  Exponent has individuals whose

7    job it is to be responsible for collection

8    of invoices?

9  A.  I don't believe that we have individuals

10    that are responsible for collection of

11    invoices.

12  Q.  So how would you determine whether or not

13    any of these invoices that were sent out

14    were actually paid?

15  A.  It can occur in a variety of ways,

16    generally.

17  Q.  Why don't you tell me specifically for

18    these; how would you find out for these

19    invoices if you were paid?

20  A.  I'm not sure exactly what you want me to

21    answer, so let me tell you what I will

22    answer.

23  Q.  And then I'll rephrase.

24  A.  Sure.  That's fine.  If I wanted to find out

25    whether the invoices have been paid, I can

1    make a call to our accounts receivable

2    department and get an answer or I can log on

3    to our project accounting and see what the

4    payment status is.

5    Q.   So you differentiate accounts receivable

6         from the way that I phrased the question

7         before as someone responsible for collection

8         of bills; correct?

9    A.   Yes.   I think I correctly differentiated

10        between those two functions, yes.

11   Q.   All right.   Are you presently involved in

12        any matters where you're working for Zurich

13        Insurance Company?

14   A.   I may be.   I haven't undertaken the task of

15        making that determination.

16   Q.   Are you presently involved in any matters

17        where you're working for Chartis or one of

18        the Chartis subsidiaries?

19   A.   I would say yes.

20   Q.   Are you presently involved with any matters

21        where you're working on behalf of Star

22        Tech?

23   A.   I've heard the name.   I would say that, in

24        the past, I probably have been involved with

25        them.   I haven't attempted to determine

1     whether I'm currently involved with them.

2  Q.  And that's all I'm asking right now.  I've

3     just got a couple more carriers.  Currently,

4     are you presently working on any matters for

5     Aegis?

6  A.  I may be, but I haven't tried to make that

7     determination.

8  Q.  And are you presently working on a matter

9     called Praxair or involving Praxair?

10  A.  Maybe.  Perhaps.  I've heard the name

11     Praxair and I'm personally not directly

12     involved in any case that I know of right

13     now with that name, but colleagues of mine

14     may be.

15  Q.  And are you involved in any way in a matter

16     involving Praxair down in Mexico?

17  A.  No.

18  Q.  Are you familiar with a person by the name

19     of Mark McNeely?

20  A.  I am.

21  Q.  Who is Mark McNeely?

22  A.  Mark McNeely is an engineer in our Menlo

23     Park, California office.

24  Q.  Does Mr. McNeely have a specialty?

25  A.  Yes.  He has a specialty in the area of

1    electromagnetic frequency and

2    electromagnetic interference.

3  Q.  And is that specialty different than your

4    specialty?

5  A.  Yes.  I would say that I -- to the extent

6    that an engineering project requires

7    attention to electromagnetic interference, I

8    would tend to pass that work on to Mark

9    McNeely.

10  Q.  And that could involve a turbine?

11  A.  It can involve anything, really, you know,

12    to the extent that that particular expertise

13    is sort --

14  Q.  Have you ever recommended to any of your

15    clients that Mark McNeely be brought into a

16    case?  When I say "case," I don't

17    necessarily mean a litigation.  I should say

18    a file assignment.  I don't know how you

19    categorize them.

20  A.  The way we work doesn't always involve the

21    action that you imply in your question, so I

22    may not make a recommendation.  I may simply

23    talk to him or anybody else.  So there's two

24    parts to your question.  One is whether the

25    function of recommending someone to someone

1       outside of Exponent occurs, and the other is

2       who is involved in the project.

3   Q.  Okay.  Yes.  My question was specifically to

4       how you've broken it down, just to the first

5       part.  Have you recommended to somebody that

6       Mark McNeely be brought into a project that

7       you were involved with?

8   A.  Yes, yes.

9   Q.  And did that in fact happen on the Praxair

10      matter?

11  A.  So on the Praxair matter in Mexico, which

12      I'm aware of --

13  Q.  Okay.

14  A.  -- I did recommend that Mark McNeely would

15      be appropriate for the issues at hand.

16  Q.  Okay.  Before you came, we marked a whole

17      bunch of documents today to try to move us

18      along.  So we marked as the first exhibit,

19      plaintiff's exhibit 1.  If you could just

20      take a look at this and let us know what

21      when you're done.  (Indicating.)

22          MR. COOPER:  Could you describe

23      what that is?

24          MR. STERN:  It's the Notice.

25  Q.  Have you seen this Notice of Deposition

1   before I just handed it to you?

2 A. I have.

3 Q. When was the first time you saw a Notice of

4   Deposition for yourself?

5 A. My recollection is that there was an old

6   Notice of Deposition -- I can't remember

7   when -- and then only recently have I seen

8   this particular one.

9 Q. Okay.  How did you originally receive that

10   old Notice of Deposition?

11 A. I don't recall.

12 Q. How did you receive this version of the

13   Notice of Deposition?

14 A. I believe this was given to me yesterday.

15 Q. After you received the old Notice of

16   Deposition, did you have any discussions

17   with your attorneys before yesterday

18   concerning the contents of that old Notice

19   of Deposition?

20 A. I may have, but I don't recall any such

21   discussion.

22 Q. Okay.  Have you ever worked with the Law

23   Firm of Campbell, Campbell, Edwards &

24   Conroy, other than for this matter?

25 A. Yes.

1   Q.  How many times?

2   A.  I don't know.  I mean, I worked against

3       them, as well as with them, but I don't keep

4       count of that.

5   Q.  So let's just talk about with them.  Is it

6       more than five or less than five?

7   A.  I'd say, over a period of a couple of

8       decades, it's probably more than five.

9   Q.  More than ten or less than ten?

10  A.  I don't know.

11  Q.  Somewhere around ten?

12  A.  I don't know.

13  Q.  More than a hundred or less than a hundred?

14  A.  I'd say definitely less than a hundred.

15  Q.  More than fifty or less than fifty?

16  A.  I don't know.

17  Q.  Then against, how many times have you been

18      involved in matters against Campbell,

19      Campbell, Edwards & Conroy?

20  A.  Same thing.  I haven't kept a count of it.

21  Q.  Do you have a feeling of whether it was more

22      than fifty or less than fifty?

23  A.  I'd say less than fifty.

24  Q.  And for the matters that you've worked with

25      Campbell, Campbell, Edwards & Conroy, were

1       you on the plaintiffs' side or the

2       defendants' side of a litigation or both?

3   A.   I don't keep track of that, but probably

4       both.

5   Q.   Are you presently working with Campbell,

6       Campbell, Edwards & Conroy in any other

7       matter?

8   A.   I'm currently working with -- yeah.  The

9       answer is yes.

10   Q.   Okay, and when was the last time you were

11       deposed in a litigation involving Campbell,

12       Campbell, Edwards & Conroy?

13   A.   I don't know.

14   Q.   More than five years ago or less than five

15       years ago?

16   A.   I don't know.

17   Q.   And let me rephrase that question.  When I

18       asked that question, did you understand it

19       to mean you were working with the Campbell

20       law firm, or in either situation, you were

21       for them or against them, when I asked the

22       deposition question?

23   A.   I assumed that you meant that they were my

24       direct client.

25   Q.   Okay.  So now, I want to ask the followup

```
 1      question.  In the last five years, have you
 2      been deposed in a matter where Campbell,
 3      Campbell, Edwards & Conroy was not your
 4      direct client; they were on the other side?
 5  A.  So I don't know the time frame, as I sit
 6      here right now, without digging in my own
 7      testimony history.  So I'm sure that these
 8      are answers that can be determined.  I just
 9      don't know, as I sit here right now.
10  Q.  Let me move on to Marshall, Dennehey,
11      Warner, Coleman & Goggin.  I'll call them
12      "Marshall Dennehey," as we know them
13      downstate.  Have you been involved in any
14      other matters with that law firm?
15  A.  I recognize the name of the law firm, so I'd
16      say yes, probably.
17  Q.  Were you involved in matters with them or
18      against them?
19  A.  Probably both.
20  Q.  And it's my understanding that they do
21      defense work, as opposed to plaintiffs'
22      work, that law firm.  Was your involvement
23      for the plaintiffs' side or the defendants'
24      side?
25  A.  I don't know and I don't really categorize
```

1      law firms in the manner that you just did in

2      your question.

3   Q.  When you worked with Marshall Dennehey, were

4      you on the plaintiffs' side or defendants'

5      side?

6   A.  I don't remember.

7   Q.  Smith & Duggan, have you ever worked with

8      that law firm, other than for this

9      litigation?

10  A.  Yes.

11  Q.  How many times have you worked with that law

12     firm?

13  A.  I don't have a specific number again, but

14     I've worked with them before.

15  Q.  More than five or less than five times?

16  A.  I don't specifically know.  I wouldn't want

17     to guess.

18  Q.  More than fifty or less than fifty?

19  A.  I would expect less than fifty.

20  Q.  Any matters involving GE Lighting that

21     you've been involved in?

22  A.  Yes.

23  Q.  How many matters have you been involved with

24     involving GE Lighting?

25  A.  I think, two, that I can think of.

1    Q.   And as you sit here now, what are the two

2         that you recall?

3    A.   The two that I recall, one was in Western

4         Canada and one was in Wisconsin, I believe.

5    Q.   Were any of the law firms involved in this

6         litigation involved in either of those two

7         matters?

8    A.   I believe that Smith & Duggan was

9         involved --

10   Q.   In both?

11   A.   -- in both.

12   Q.   And what did the Western Canada matter

13        involve?

14   A.   It involved -- there was some uncertainty,

15        actually, as to what it involved, but it was

16        a food warehouse, a refrigerated food

17        warehouse, that had a fire.

18   Q.   How was GE Lighting involved in that

19        matter?

20   A.   There were some questions about that and I

21        don't recall exactly what the answer to

22        those questions was, but my understanding

23        was that there was some involvement from

24        both Philips and GE, and exactly what the

25        involvement were from those two companies is

1      not clear to me as I sit here right now.

2  Q.  Was the plaintiff making an allegation that

3      the fire was caused by some products of

4      Philips and/or GE?

5  A.  I don't specifically recall.  It may have

6      been either Philips/GE products and/or --

7      that is, lamps or lighting fixtures -- and I

8      don't recall exactly what the dynamic was

9      between those entities.

10  Q.  In that particular matter, sitting here

11      today, you don't recall whether the

12      allegations in that Western Canada

13      litigation involved a fixture or the lamp;

14      is that what I got?

15  A.  Well, I don't remember the exact allegations

16      and I don't remember the exact -- who the

17      allegations were directed to.  My

18      understanding was, to the best that I recall

19      right now, was that there were allegations

20      directed to GE and Philips and also

21      potentially, the fixture manufacturer, but I

22      don't recall exactly what the allegations

23      were.

24  Q.  Was GE or Philips the fixture manufacturer

25      or were they the lamp manufacturer for that

```
1        matter?
2    A.  That's hard for me to answer in part because
3        I think those entities, in certain
4        instances, owned both lamp manufacturing, as
5        well as fixture manufacturing, so I don't --
6    Q.  I mean, for that case.  I understand that
7        GE's got its hands everywhere, including
8        financial products and insurance.  I just
9        meant, for that matter, were the allegations
10       that GE had manufactured the fixture or that
11       it manufactured the lamp or that it had
12       manufactured both, for that particular
13       matter?
14            MR. CAMPBELL:  Object to the form.
15       Go ahead.
16   A.  Actually, the source of my confusion had
17       nothing to do with GE, as you suggested in
18       your question.  My confusion had to do with
19       Philips somehow owning both a fixture
20       manufacturing, as well as lamp manufacturing
21       entities.  So I'm not sure exactly how that
22       played out, and I know, around that same
23       time, there was a change of hands of fixture
24       manufacturing, where Philips purchased a
25       fixture manufacturer.  So I can't answer the
```

1       question as you had asked it because I don't

2       remember exactly the timing of those events.

3   Q.  In that particular case, with reference to

4       GE only, was GE the manufacturer of a

5       fixture or lamp that were allegedly involved

6       in that particular case?

7   A.  A lamp, as I understand it.

8   Q.  What type of lamp?

9   A.  I believe it was a High Intensity Discharge

10      Metal Halide lamp.

11  Q.  What model?

12  A.  I don't recall.

13  Q.  750?

14  A.  I don't believe it was 750.

15  Q.  What opinions, if any, did you issue in the

16      Western Canada matter?

17  A.  I don't think I issued any opinions in that

18      case.

19  Q.  Were you deposed in that matter?

20  A.  I was not.

21  Q.  Did you issue a report in that matter?

22  A.  I don't believe I did.

23  Q.  Is that matter still existing -- is your

24      file still open for that matter?

25  A.  That's actually an interesting question.  My

1      understanding is that the matter is no
2      longer existing, but we're still -- we had
3      some storage charges associated with
4      materials that are yet unresolved.
5   Q. Let's move on to the Wisconsin matter.  What
6      was that matter generally about?
7   A. The Wisconsin matter was a refrigeration or
8      refrigerator manufacturing facility and it
9      involved a fire at a work station in a
10     manufacturing facility that had been
11     allegedly caused by a HID lamp.
12  Q. What type of HID lamp?
13  A. I don't recall.
14  Q. Metal Halide?
15  A. That's my understanding.
16  Q. Do you remember the wattage?
17  A. I don't.
18  Q. All right, and in that particular matter,
19     the Wisconsin matter, were any of the law
20     firms, Campbell, Campbell, Edwards, Marshall
21     Dennehey, or Smith & Duggan, were they
22     involved in that matter, the Wisconsin
23     matter?
24  A. I believe Smith & Duggan was involved in
25     that matter.

1    Q.   Did you issue an opinion in that matter?

2    A.   I don't recall.  I don't believe I did, but

3         I don't recall specifically.

4    Q.   Did you issue a report?

5    A.   I don't recall issuing a report.

6    Q.   Were you deposed?

7    A.   I don't think I was.

8    Q.   Is that matter still open?

9    A.   I don't believe so.

10   Q.   In the Western Canada matter, how was it

11        explained to you why you were being retained

12        for that matter?

13   A.   I don't recall the specific task that was

14        assigned to me, partly because a specific

15        task is often not very clearly spelled out

16        early on.  It's more to understand the

17        circumstances associated with an event, and

18        that was my understanding of my

19        participation in that case.

20   Q.   Correct me if I phrase -- you were retained

21        in that matter to attempt to determine the

22        facts of what was alleged in that matter?

23        If there's a better way to describe it,

24        please.

25   A.   No.  I would say I think that's a reasonable

```
 1        way.  My understanding -- as is often the
 2        case, I'm retained to understand the
 3        circumstances of a specific event both from
 4        the standpoint of what is alleged to have
 5        happened, as well as what I think, from a
 6        technical perspective, did happen.
 7   Q.   I noticed -- we'll get to it later -- your
 8        bio, you identify origin and cause
 9        activities throughout your bio, and you
10        belong and certain organizations have
11        received certain certifications that go to
12        that.  Was your assignment for that Western
13        Canada specifically as an origin and cause
14        investigator originally or something else?
15   A.   I don't think -- I mean, I think the project
16        probably went away before the task
17        definition was refined, but what I can say
18        is that I did not perform the first, let's
19        say, investigation of the file.  As is often
20        the case, my work on fires involves working
21        with materials in the form of photographs,
22        as well as exhibits, that have been
23        collected by others who were at the scene
24        before I was, and I did not visit the
25        scene.  So it's not unusual for me to
```

1    perform fire investigations with all of that

2    information.  Normally, I try to visit the

3    scene, but as is the case here in the

4    Western Canada case, the case went away

5    before I really, let's say, engaged in

6    significant work.  So --

7  Q.  Did you recommend to whomever hired you that

8    some other expert be retained in the Western

9    Canada matter?

10  A.  I don't think I did.

11  Q.  And in the Wisconsin matter, did you

12    recommend to anyone that some other expert

13    be hired?

14  A.  It's not unusual for me to recommend others

15    when I'm approached to address specific

16    cases, and I know for a fact that with Mr.

17    Cooper -- I have in the past made

18    recommendations for him to work with others,

19    specifically in instances where, at the end

20    of the day, I may have been retained to work

21    on the particular case.  As to these two

22    cases, I don't recall whether I made

23    recommendations or not.

24  Q.  How many projects have you been involved

25    with where allegations -- there were

```
 1         allegations involving HID lamps?
 2    A.   Three or four.
 3    Q.   Are two of those the Western Canada and the
 4         Wisconsin?
 5    A.   Yes.
 6    Q.   Is one of them Metso?
 7    A.   No.
 8    Q.   What are the other one or two?
 9    A.   There was a fire in Virginia Beach sometime
10         in the past involving a Philips lamp.  The
11         other case that I was involved with was the
12         New Pig fire.  That was the name of the
13         facility where the fire occurred.  That also
14         involved a Philips lamp.
15    Q.   Were they Metal Halides?
16    A.   That is my understanding.
17    Q.   Do you remember the wattage?
18    A.   I don't.
19    Q.   And that was for both of those?  They both
20         involved Metal Halides?
21    A.   That is my understanding.
22    Q.   And were you retained in those matters on
23         behalf of Philips or the party pursuing
24         Philips?
25    A.   My understanding is that I was retained by
```

1       parties representing the interests of

2       Philips.

3   Q.  In those matters, did you provide deposition

4       testimony?

5   A.  I don't -- to the best of my recollection, I

6       don't believe I did.

7   Q.  Did you issue a report in either of those

8       matters?

9   A.  I did.

10  Q.  In both or just one?

11  A.  I issued a report in the New Pig matter.

12  Q.  Just to get --

13  A.  It's two words, just like you hear it.

14  Q.  What were your opinions in the New Pig

15      matter?

16  A.  My primary role in the New Pig matter, to

17      the best of my recollection, had to do with

18      fire causation and how the fire spread.

19  Q.  That's different from your role in the Metso

20      matter; correct?

21  A.  That's correct.

22  Q.  What was your role in the Virginia Beach

23      fire?

24  A.  My role didn't really get defined during the

25      course of that project.  I performed an

1    inspection.  I made measurements of the fire

2    scene, provided that information to my

3    client, and may have had some telephone

4    conversations, but we never really defined

5    what my role was.

6    Q.  Prior to today, have you ever visited

7        Metso's Clarks Summit facility?

8    A.  Yes.

9    Q.  How many times were you there?

10   A.  I've been there once.

11   Q.  When were you there?

12   A.  I was there on April 8th, 2010.

13   Q.  And who was with you, if anyone?

14   A.  My recollection is that Mr. Campbell was

15       there and Mr. Cooper may have been there,

16       but I don't specifically remember.

17   Q.  And while you were there, was your time

18       limited or were you allowed to spend as much

19       time as you needed at the Metso facility?

20   A.  I don't have any recollection of my time

21       being limited.

22   Q.  And prior to today, have you ever spoken

23       with any former or present Metso employees?

24   A.  Yes.

25   Q.  How many times have you had conversations

1        with former or present Metso employees?

2   A.   Many times.  I haven't kept track.

3   Q.   And whom have you spoken with?

4   A.   Mostly people in Finland.

5   Q.   Have any of those conversations involved any

6        allegations or matters involving this

7        litigation?

8   A.   No.

9   Q.   What were the nature of those conversations

10       with the Metso employees in Finland?

11  A.   These were highly technical discussions

12       regarding engineering consulting and

13       scientific challenges that the company

14       faced.

15  Q.   Okay.  Did any of those involve lighting

16       technology?

17  A.   No.

18  Q.   If you could turn two pages in to the

19       second-to-last page of plaintiff's exhibit 1

20       or Kytomaa exhibit 1.  The old notice that

21       you received, did it also have a Schedule

22       A?

23  A.   It may have.

24  Q.   And did that Schedule A look similar to this

25       Schedule A?

```
 1   A.   I mean, if you were to put it in front of
 2        me, I could certainly make a comparison.  I
 3        didn't undertake the exercise of comparing.
 4   Q.   With respect to this Schedule A, where are
 5        the documents that are responsive to each of
 6        those requests?
 7   A.   In my file in front of me.
 8   Q.   And that's the two binders?
 9   A.   Yes.
10   Q.   Do these two binders that we have here make
11        up your whole file?
12   A.   Yes.
13             MR. CAMPBELL:  Just to be clear,
14        there's also a disk.
15             MR. STERN:  Okay.  We're going to
16        mark these as 7, 8, and 9.  I see that there
17        are numbered tabs.  Does one binder start
18        with 1 and then it continues through the
19        tabs to the second binder?
20             MR. CAMPBELL:  One binder is sort
21        of a document file and the second one is, I
22        think, just the plaintiff's expert reports.
23        Yes.  Plaintiff's expert reports.  So a
24        binder of documents, the disk, and
25        plaintiff's expert reports.
```

```
 1                    (Binder marked exhibit number 7 for
 2                    identification.)
 3                    (Binder marked exhibit number 8 for
 4                    identification.)
 5                    (Disk marked exhibit number 9 for
 6                    identification.)
 7                    (Discussion off the record.)
 8     Q.   Let me show you a document that's been
 9          marked as Kytomaa exhibit 2.  (Indicating.)
10          Are you familiar with the Federal Rules of
11          Evidence with respect to expert disclosures?
12     A.   Generally, yes.
13                    MR. CAMPBELL:  I think you showed
14          him the Federal Rules of Civil Procedure.
15     Q.   I'm sorry.  The Federal Rules of Civil
16          Procedure relative to expert disclosures.
17     A.   So I'm not aware of the difference between
18          your question and what Mr. Campbell said --
19     Q.   Fair enough.
20     A.   -- but generally, I am aware of the
21          expectations of experts in the context of
22          Federal Courts.
23     Q.   If I could direct your attention to the
24          bottom right section, "Disclosure of Expert
25          Testimony," number 2, and then if you go
```

1       down, you'll see there's a listing of the

2       items that the report must contain.  Do you

3       see that section?

4   A.  Yes.

5   Q.  Great.  Looking at the first point, "A

6       complete statement of all opinions the

7       witness will express and the basis for

8       them."  Does your report satisfy that

9       requirement?

10  A.  Yes.

11  Q.  And looking at number 2, "The data or other

12      information considered by the witness in

13      forming them," and "them" is referring to

14      the opinions.  Does your report satisfy that

15      requirement?

16  A.  Yes.

17  Q.  Going to number 3, "Any exhibits that will

18      be used to summarize or support them," and

19      again, "them" is being used to refer to your

20      opinions.  Does your report satisfy this

21      requirement?

22  A.  Yes.  I mean, my binder right in front of me

23      actually has a lot of that material, which

24      is an addendum, in essence, to my report.

25  Q.  So your binder, is it number 7, number 8, or

```
 1        both?

 2   A.   Number 7.  Number 8 is mostly the

 3        depositions of plaintiff's experts.  I'm

 4        sorry.  Not the depositions.  The reports of

 5        plaintiff's experts.  So binder 7.  Binder

 6        7, as well as the disk that is enclosed in

 7        binder 7.

 8   Q.   Exhibit number 9?

 9   A.   That is correct.

10   Q.   So binder number 7 and the disk, exhibit

11        number 9, serve as an addendum to your

12        report, specifically with reference to the

13        requirement number 3, any exhibits that will

14        be used to summarize or support your

15        opinions?

16             THE WITNESS:  Can you read that

17        entire question, please?

18                  (The previous question was read

19                  back by the court reporter.)

20   Q.   I should have said exhibit number 9.  The

21        disk is number 9.

22   A.   So what is the question?

23   Q.   Exhibit number 7 and exhibit number 9, you

24        said that they served as an addendum to your

25        report, and that was in my question, any
```

1    exhibits that will be used to support or

2    summarize your opinions, and I'm making sure

3    it is exhibit number 9 and exhibit number 7

4    that you're referring to as the exhibits

5    that will be used to summarize or support

6    your opinions.

7    A.   Yes, those do contain the exhibits that I

8         may use to summarize or support my opinions,

9         but I may also develop demonstrative

10        exhibits to demonstrate my opinions at a

11        later time.

12   Q.   And those are not contained within exhibits

13        7, 8 or 9?

14   A.   That's correct.  Any demonstrative exhibits

15        that I create in the form of, let's say,

16        graphics, text, such as PowerPoint slides,

17        or animations, are not included in exhibits

18        7, 8, or 9.

19   Q.   And they're also not included in your

20        report, which we haven't gotten to just yet?

21   A.   That's correct.

22   Q.   Okay.  Going to number 4 on this list, "The

23        witness's qualifications, including a list

24        of all publications authored in the previous

25        ten years."  Does your report satisfy that

1       requirement?

2   A.  Yes.

3   Q.  The next one, "A list of all other cases in

4       which, during the previous four years, the

5       witness testified as an expert at trial or

6       by deposition," and does your report satisfy

7       that requirement?

8   A.  Yes.

9   Q.  And then finally, the last, "A statement of

10      the compensation to be paid for the study

11      and testimony in the case."  Does your

12      report satisfy that requirement?

13  A.  Yes.

14  Q.  So if we review your report, your report

15      satisfies these six requirements of the

16      Federal Rules of Civil Procedure and we'd

17      have all of your opinions, the bases for

18      opinions, the data, the exhibits, your

19      publications and qualifications the last

20      ten years, your list of testimony in the

21      last four years, and your compensation;

22      correct?

23              MR. CAMPBELL:  Object to the form

24      of the question, go ahead.

25              THE WITNESS:  Would you read that

1        back, please.

2                    (The previous quesiton was read

3                    back by the court reporter.)

4    A.   Yes.  I think your question actually omitted

5         the materials that I brought here as an

6         addendum to my report, but all of the

7         materials that I brought here today satisfy

8         items 1 to 6 under Disclosure of Expert

9         Testimony, section 2(B).

10   Q.   All right.  Let me show you a document we've

11        marked as Kytomaa exhibit 3.  (Indicating.)

12        When you're ready, just let me know.

13   A.   Yes.

14   Q.   What are your job functions as a Corporate

15        Vice-president?

16   A.   So really, as a Corporate Vice-president, I

17        have, I'd say, multiple functions.  The

18        functions unique to the title of Corporate

19        Vice-president has to do with meeting with

20        my colleagues and identifying technical

21        areas that we should be consulting in.  It's

22        a business function.

23   Q.   Okay, and what are your job duties -- what

24        is a Practice Director?

25   A.   So I practice and run our group that

1          specializes in thermal sciences.

2     Q.   What is thermal sciences?

3     A.   The thermal sciences is best embodied by the

4          technical disciplines of combustion,

5          thermodynamics, heat transfer, fluid

6          mechanics, chemical kinetics.

7     Q.   And I think we're going to see most of those

8          you actually mention in here in this

9          document, specifically within the wording of

10         the paragraphs; correct?

11    A.   In this document and other places, that's

12         correct.

13    Q.   Okay, and as the document says, it was

14         printed out on January 24th of 2011 from the

15         Exponent website.  Have you seen your bio

16         from the Exponent website before I handed it

17         to you?

18    A.   I would really hope so, since I wrote it.

19    Q.   That was going to be my next question.  Did

20         you write your own bio or did somebody write

21         the bio for you?

22    A.   I wrote my own bio.

23    Q.   Okay.  In reading this bio -- is it okay if

24         we call it a bio?

25    A.   We can call it professional profile, but.

1        You can call it what you'd like.

2   Q.   Okay.  "Professional profile" is fine.  This

3        professional profile, I don't see mentioned

4        in here electrical engineering.  Did I miss

5        that or is that not one of your specialties?

6   A.   I'm a mechanical engineer, and as a

7        mechanical engineer, I certainly practice in

8        areas that include electrical equipment.

9        That's fairly routine.

10  Q.   But you didn't mention in this professional

11       profile your practicing specifically in

12       electrical equipment; do you?

13  A.   I do get involved in electrical equipment

14       broadly in the context of both mechanical

15       engineering work, as well as fire

16       investigation, and so that is the case --

17       and let me just answer your question,

18       specifically.

19  Q.   Thank you.

20  A.   For example, metal smelting industries will

21       include electrical equipment and strong

22       electrical currents.  Power generation

23       equipment typically includes electricity

24       that I get involved with.

25  Q.   Maybe it was my question because we still

```
 1        haven't answered the question.  There's
 2        nowhere in this professional profile where
 3        it specifically says that you get involved
 4        with electrical equipment; does it?
 5   A.   I'm not sure I understand your question.
 6   Q.   I'll try it again.  Can you show me where in
 7        your professional profile it specifically
 8        states that you have experience with or
 9        specialize in electrical equipment?
10   A.   Okay.  So there are multiple examples in my
11        profile to that effect and I'll give you one
12        specific one.  If you look at the first
13        paragraph, five lines up from the bottom,
14        says "instrumentation."  Almost exclusively,
15        instrumentation is electrical in character.
16   Q.   Okay.
17   A.   So that's one example, but there are many
18        other specific examples of that.  Now, if
19        your question -- if I understood your
20        question correctly, you were looking for
21        specific words that you had in your
22        question.
23   Q.   Correct.
24   A.   I don't have those specific words.
25   Q.   Thank you.
```

1   A.   That is, I'm a mechanical engineer.  The

2         practice is in the area of electrical

3         systems, quite often.  I am not a

4         professional engineer in the discipline of

5         electrical engineering.

6   Q.   That's exactly what I was asking you.

7         You've clarified it for me.  Thank you.  Is

8         it mentioned anywhere in your professional

9         profile the lighting industry or anything

10        relative to the lighting industry?

11   A.   It does not, specifically.

12   Q.   Does it mention anywhere in your

13        professional profile any experience you've

14        had with HID lamps?

15   A.   No.  My professional profile doesn't happen

16        to mention my experience in HID lamps.

17   Q.   And although it doesn't, we've already

18        talked about that; is that correct?

19   A.   That's correct.

20   Q.   Does your professional profile mention

21        anything relative to experimental

22        psychology?

23   A.   No, it doesn't.

24   Q.   Some of them are really easy; right?  Does

25        your professional profile mention anything

1        about psychology, in general?

2    A.   It does not.

3    Q.   Okay.  Does your professional profile

4        mention anything about human factors and the

5        study of human factors?

6    A.   It does not.

7    Q.   Does your professional profile mention

8        anywhere that you belong or ever belonged

9        to the Human Factors and Ergonomics Society?

10   A.   No, my professional profile does not say

11       that I belong to that particular society.

12   Q.   Okay.  Have you ever been a member of that

13       society?

14   A.   I have not.

15   Q.   Okay.

16   A.   But this professional profile does not -- I

17       don't think it mentions any societies that I

18       belong to.  So even if I did, it wouldn't be

19       here.

20   Q.   Okay.  I'm with you, and I think with your

21       report, you've actually got some listings

22       accompanying your report; correct?

23   A.   I may have.

24   Q.   We'll take a look at that.  Do you have any

25       degrees in psychology?

1    A.   I do not.

2    Q.   Do you have any degrees in ergonomics?

3    A.   To the extent that the practice of

4         mechanical engineering slightly overlaps

5         with ergonomics, I would say yes, but not

6         specifically.  I don't have any specific

7         degree in the area of ergonomics.

8    Q.   Do you have any degrees in human factors?

9    A.   I'd say the same.  To the extent that human

10        factors overlaps slightly with the practice

11        of mechanical engineering, I have some

12        knowledge, but I do not have a specific

13        degree named a degree in human factors.

14   Q.   Do you have any degree in the lighting

15        engineering?

16   A.   I don't know of the existence of any

17        degrees, so I don't know that anybody has

18        degrees in lighting engineering.

19   Q.   Have you received any professional honors in

20        psychology?

21   A.   I guess that question can be interpreted a

22        number of different ways.

23   Q.   I'll rephrase it.  You've got this column on

24        the right-hand side captioned "Credentials &

25        Professional Honors," and there are a few

```
 1        listed here, and I'm assuming that these are
 2        all of them and that's why you've listed
 3        them here, but for the chance that they're
 4        not all listed here, I'm asking the
 5        question, do you have any professional
 6        honors, as you've used it as the caption, in
 7        psychology?
 8    A.  That clarification helps.  The answer is
 9        no.
10    Q.  Same thing.  I'm going to go down a list of
11        items.  Do you have any professional honors
12        in ergonomics?
13    A.  To the extent that your question
14        specifically refers to items that I would
15        list under "Professional Honors" in my
16        professional profile document, the answer is
17        no.
18    Q.  And again, do you have any professional
19        honors in human factors?
20    A.  To the extent that your question
21        specifically refers to professional honors
22        that appear on my professional profile
23        document, no.
24    Q.  So in light of your answer, I need to do a
25        followup.  Are there any professional honors
```

1      that you have received in human factors

2      which are not listed in your professional

3      profile?

4   A.  Not that I can think of.

5   Q.  The first line of your professional profile,

6      which you wrote, says "Dr. Kytomaa

7      specializes in mechanical engineering and

8      the analysis of thermal and flow

9      processes."  Does that have anything to do

10     with lighting technology?

11  A.  Sure.

12  Q.  And how does that deal with lighting

13     technology?

14  A.  Lighting technology is all about a source of

15     energy in the form of significantly heat, as

16     well as light, the absorption or emission of

17     that source of energy through structures,

18     whether they be structures of the lamp

19     itself, the fixture itself, reflection of

20     that in the form of either, let's say,

21     longer wave length or infrared radiation,

22     shorter wave length, ultraviolet or visible

23     light.  The performance of the light itself

24     and during the course of its life has all to

25     do with the mechanical engineering

1          considerations having to do with the

2          strength of materials.  The thermodynamics

3          associated with the gases and constituents

4          that are introduced into the quartz tube of

5          certain types of lamp.  It also has to do

6          with essentially the mechanisms that exist

7          associated with the changes in the optical

8          characteristics of certain structures in

9          lighting that result in a progressive, say,

10         change over the life of these lights that

11         have an influence on the mechanical

12         performance of the lights, as well as the

13         optical performance of the lights.  So I

14         could go on I think in more detail, but I

15         think that that answers your question.

16    Q.   Yes.  Thank you.  Going down, the last

17         sentence of this paragraph, you've listed a

18         number of your projects that you've been

19         involved in; correct?

20    A.   Yeah.

21    Q.   And none of the listed items here involved

22         HID lighting; correct?

23    A.   Yeah.  The ones on the list here, which

24         don't purport to be comprehensive, do not

25         include HID lighting, that's correct.

```
 1    Q.   The first sentence of the next paragraph,
 2         "Dr. Kytomaa has decades of experience in
 3         the area of dynamics and analysis of piping
 4         systems containing both liquids and gases."
 5         Is that somehow related to the HID lighting
 6         involved in this litigation?
 7    A.   I think that the reference that this
 8         particular paragraph makes is to systems
 9         that are not like HID lighting, but I think
10         the thermodynamics and the mechanical
11         engineering that is involved there has
12         significant overlap, actually, with what
13         happens in a tube, how a tube is
14         pressurized, what the stress distribution
15         might be in a tube, those kinds of things.
16    Q.   So it all relates to the actual product
17         itself, the lamp itself?
18    A.   So perhaps I'll give you a fuller answer.
19         The motivation behind the second paragraph
20         in my professional profile is for an
21         application that is different from HID
22         lighting.  The underlying fundamentals
23         associated with the work that was done there
24         overlaps significantly with the underlying
25         fundamentals associated with the mechanics
```

```
 1        of HID lamps.

 2   Q.   How they work?

 3   A.   How they work, how the gases perform, how

 4        the tube performs.  Things of that kind.

 5   Q.   So it's all related to the product itself,

 6        how it operates?

 7   A.   I'm not sure I understand the question.

 8   Q.   What you're talking about sounds to me as

 9        though your expertise, as described in here

10        and then inferenced, since it doesn't

11        mention HID, you've told us we've got to

12        take it somehow and inference it over to HID

13        lighting, that it relates to the components

14        of the lamp itself and the internal gases of

15        the lamp itself and how the lamp itself

16        operates?

17   A.   I don't think that's what I said.  I was

18        trying to be clear, but evidently, I didn't

19        succeed.

20   Q.   Yeah.

21   A.   The point I was trying to make in answer to

22        your question is that the underlying

23        engineering disciplines associated with the

24        second paragraph in my professional profile

25        are directly relevant to the underlying
```

```
 1        disciplines that help you understand how HID
 2        lights perform.   Okay?   The second paragraph
 3        in my professional profile does not describe
 4        a project associated with HID lighting; in
 5        fact, far from it, but the underlying
 6        engineering fundamentals do overlap with the
 7        engineering fundamentals associated with HID
 8        lighting.
 9   Q.   The general theories that underlie the
10        engineering involved in what's being
11        described in this second paragraph you're
12        saying could somehow be used for the
13        performance of an HID lamp?
14   A.   The fundamental engineering disciplines have
15        some commonality between those two very
16        different applications.
17   Q.   And you're basically talking about the
18        theory; not specifics.   The theory that
19        underlies this engineering discipline can be
20        applied to the theory of the HID light?
21   A.   I think I've answered that question fairly
22        clearly.   I would simply say I don't
23        understand the question that you just
24        asked.
25   Q.   So is it that the specific engineering
```

1     dynamics and analysis of the piping systems

2     containing both liquids and gases, that that

3     is specifically applicable to HID lamps, or

4     are you saying that it's the underlying

5     engineering concepts and theories that went

6     into that that apply to HID lamps?

7  A. I'm talking about the underlying engineering

8     concepts.

9  Q. Okay.  The last sentence of that paragraph

10    says, "This experience includes the

11    characterization of rapidly varying

12    pressures and forces caused by the

13    interruption of rotating equipment or the

14    sudden closing of valves and their

15    effects."  Is this all still related to what

16    is being described in the first sentence,

17    the piping systems containing both liquids

18    and gas, or is that something that maybe

19    should have been a separate paragraph?

20 A. Are you offering editorial suggestions?

21 Q. No.  I'm just trying to see if they're tied

22    in or are we speaking of something

23    completely different now?

24              MR. CAMPBELL:  Objection.

25 A. The description at the end of the second

```
 1        paragraph of my professional profile of the
 2        characterization of rapidly varying
 3        pressures and forces caused by the
 4        interruption of rotating equipment or the
 5        sudden closing of valves and their effects
 6        talks broadly about systems, some of which
 7        relate to piping systems, such as valves
 8        within piping systems, some of which relates
 9        to systems quite different from that,
10        specifically rotating equipment or turbo
11        machinery, things like pumps, fans,
12        compressors, turbines.
13   Q.   And those are different than an HID lamp --
14        the HID lamp that's involved in that
15        litigation?
16   A.   Correct.
17   Q.   Do you know Professor Tom Eagar?
18   A.   Yeah.
19   Q.   Okay.  Have you ever worked with Professor
20        Tom Eagar?
21   A.   I've worked many times with him, against
22        him.  I see him fairly routinely.
23   Q.   Is that because you're an Associate
24        Professor at MIT?
25   A.   I've encountered him at MIT, but I spend all
```

```
 1          of my time doing engineering consulting
 2          full-time.  So I do not occupy an academic
 3          position today and -- but I see him in his
 4          function as an engineering consultant,
 5          because he spends a lot of time doing that
 6          sort of thing, too.
 7     Q.   You mention in the next paragraph that you
 8          are an Associate Professor of Mechanical
 9          Engineering at MIT where you were head of
10          the Fluid Mechanics Laboratory.  What is
11          that?
12     A.   That's a lab that consists of around a half
13          dozen professors and we did research in a
14          number of different areas.
15     Q.   Any involving HID lamps?
16     A.   Specifically, HID lighting, I don't believe
17          that there were specific lighting projects.
18          There may have been things related to it,
19          but I don't recall any specific HID lighting
20          projects.
21     Q.   It says that you held a Visiting
22          Professorship at Helsinki University of
23          Technology?
24     A.   Yes.
25     Q.   Was there a specific topic or topics that
```

1       you taught there as a Visiting Professor?

2   A.  That was mostly a research position and we

3       were doing research in the area of controls

4       and I was doing also work in the area of

5       control of, let's say, flow processes.

6   Q.  When you say "controls," mechanical

7       mechanisms?

8   A.  Well, what I mean by "controls" would be

9       sort of electrical control algorithms to

10      control valves and things of that kind to

11      respond to the performance of a process to

12      guide it to perform in an intended way.

13  Q.  And at the DOE Pacific Northwest Laboratory

14      in Washington, what did you do there?

15  A.  There, I spent most of my time working with

16      the DOE folks on instrumentation for

17      characterization of radioactive sludges.

18      This is electrical equipment specifically

19      designed to perform or to characterize

20      sludges without having people involved, so

21      that the people don't get exposed to

22      radioactivity.

23  Q.  Okay, and finally, it says you served as a

24      lecturer in the Mechanical Department at

25      MIT.  What did you lecture there?

```
 1   A.   That was just a continuation of my time as a

 2        Professor there.  I had the appointment of

 3        lecturer, but actually, I didn't lecture.  I

 4        became a full-time consultant.

 5   Q.   Okay.  Let me show you a document that has

 6        been marked as Kytomaa exhibit 4.  Do you

 7        recognize this document?  (Indicating.)

 8   A.   Yes, I do.

 9   Q.   Great.  And is this your report?

10   A.   It is.

11   Q.   Is this your final report for this

12        litigation?

13   A.   It is my report in this litigation.

14   Q.   Did you have any written versions of

15        opinions prior to this copy?

16   A.   Is your question intended to distinguish

17        between the report and opinions?

18   Q.   No.  Your opinions that are typed and

19        printed in this report, did you have any

20        versions of those opinions in typed format

21        before this report?

22   A.   No.  This is an evolving document that is

23        what you now have in front of you.

24   Q.   So as an evolving document, what happened to

25        the prior rounds of evolution?
```

1    A.   Well, first, I think that your question

2         seems to suggest that there were specific

3         prior rounds.  I don't recall any specific

4         prior rounds, but when you write a report --

5         I'll give you an example -- if you look at

6         the first page, first you start with Section

7         1, specifically with the word "In."  So I

8         guess, by your question, that would be a

9         prior round of the report, that first word,

10        and every word that you add contributes to

11        an evolving document that grows.  So if you

12        understand my meaning --

13   Q.   Sure.

14   A.   -- that's the way I write a report.

15   Q.   We're not communicating right now.

16   A.   Okay.

17   Q.   I've got to rephrase the question for you.

18   A.   Okay.

19   Q.   This version that I'm looking at here, is

20        this the only version you ever sent to

21        anybody to take a look at?

22   A.   That's my understanding, but I don't

23        specifically recall.

24   Q.   When did you first begin preparing this

25        version of your report?

```
 1    A.   I don't remember a date.

 2    Q.   How about a month?

 3    A.   I don't know.

 4    Q.   A year?

 5    A.   Well, the date of the report is August 31st,

 6         2010, and I may have taken weeks or months

 7         to write the report.  I don't specifically

 8         remember.  Often times, the duration that I

 9         take to write a report is related to when I

10         am asked to write a report, which typically,

11         after which I would begin to write a report

12         and the deadline of the report by which I

13         would have finished writing the report.

14    Q.   And I have experts, too, so I know about

15         this, and in fact, you're an expert for our

16         firm in a few matters.

17    A.   I am?

18    Q.   You sure are.

19    A.   Okay.

20    Q.   What attorneys have provided you with any

21         input relative to the contents or the

22         wording that we see in this report, if any?

23                   MR. CAMPBELL:  What was the

24         question?

25                   (The previous question was read
```

```
 1              back by the court reporter.)
 2              MR. CAMPBELL:  You can answer, if
 3       any, whether or not there was.
 4    A.  The file material that I receive in a case,
 5       such as this one, but most other cases that
 6       I also work on, will be provided by the
 7       attorneys and I then base my report on what
 8       they provide me in that process.  So that
 9       would include -- well, I'm not going to
10       elaborate through all of the things that are
11       in my report, but it includes everything
12       that I have in my report and the materials
13       that I brought here today, including --
14    Q.  I must not have been clear.
15    A.  Okay.
16    Q.  This has nothing to do with what I was
17       asking or intended to ask, I should say.  I
18       wasn't clear.
19    A.  Okay.
20    Q.  I want to know if any attorneys at all have
21       provided you with any commentary of any kind
22       regarding any of the words in this report at
23       any of its stages of evolution that resulted
24       in you making any changes to that report.
25    A.  During the course of my writing the report,
```

```
 1          I would have had discussions with the

 2          attorneys on what I'm writing into my

 3          report.  I don't recall any specific changes

 4          that I would have made to the report based

 5          on those discussions, but essentially, they

 6          want to know how it's going.  I commonly

 7          will have telephone discussions saying,

 8          "Okay, here is how it's going."  I may be

 9          running late in writing the report and we

10          certainly would have discussions associated

11          with, you know, what their expectation is of

12          the scope under my area of expertise that

13          should appear in the report, but I don't

14          recall specific changes, and I don't think I

15          made any specific changes.

16     Q.   So you just talked about conversations.  At

17          any point in time, did you send to your

18          attorneys a written e-mail, a written fax, a

19          written letter, a written document of any

20          kind that contains your opinions which are

21          different than what appeared in this

22          report?

23     A.   I don't believe I did.  Certainly, as I sit

24          here today, I don't recall any such

25          exchanges.
```

1    Q.   Have you ever been personally involved with

2         any experiments or tests involving High

3         Intensity Discharge lamps?

4    A.   Yes.

5    Q.   Okay.  What experiments have you been

6         involved in or tests?

7    A.   I've performed tests where I've

8         intentionally caused non-passive failures of

9         lights and lamps.

10   Q.   And why were you performing those tests?

11   A.   I wanted to understand the speed the

12        fragments could leave the lamp at and I

13        wanted to understand the dynamics of these

14        particular events.

15   Q.   Was it a single test or more than one test?

16   A.   Multiple tests.

17   Q.   Were they performed all relative to the same

18        project?

19   A.   I think so, to the best of my recollection.

20   Q.   What project were you working on that

21        involved these tests that we're talking

22        about?

23   A.   That was a project related to the Western

24        Canada case.

25             MR. COOPER:  Could we take a break

```
 1      here?

 2              (Recess.)

 3   Q.  (Cont'd. By Mr. Stern)  So we were just

 4       talking about the testing or multiple tests

 5       that you had performed to intentionally

 6       cause NPFs relative to the Western Canada

 7       case; correct?

 8   A.  Yes.

 9   Q.  Okay, and we took a break at counsel's

10       request?

11   A.  Yes.

12   Q.  And during that break, did you speak with

13       counsel?

14   A.  I did.

15   Q.  What did you talk about?

16              MR. CAMPBELL:  Don't answer the

17       question.

18              MR. STERN:  Are you instructing the

19       witness not to answer?

20              MR. CAMPBELL:  I am, based upon the

21       conduct of Mr. Wolfe at the Rhiner

22       deposition.  So we'll use those same rules,

23       for the time being.  Mr. Rhiner was

24       repeatedly instructed not to answer

25       questions or that question that I posed to
```

```
 1       Mr. Rhiner.
 2                 MR. STERN:  Okay.
 3    Q.   Going back to that discussion we were just
 4         having, who asked you or suggested to you to
 5         perform those tests?
 6    A.   I think I chose to do the tests myself.
 7    Q.   And did you, prior to the test, discuss your
 8         going to do the test with anyone?
 9    A.   Yes.  I mean, typically, the scope of the
10         work that I do is something that I would
11         share with whoever I am doing the work for.
12    Q.   And in that particular case, was it someone
13         from the firm of Smith & Duggan?
14    A.   Yes.
15    Q.   And as a result of those tests, did you
16         collect or gather or create any documents
17         with the data from the test?
18    A.   No.
19    Q.   Did you create any documents reflecting the
20         outcome of those tests?
21    A.   No.
22    Q.   Was there anything put in writing at all
23         relative to those tests?
24    A.   I don't think there was.
25    Q.   Did you send any written communications to
```

1    Smith & Duggan about the outcome of those

2    tests?

3  A.  No, I wouldn't have needed to do that.

4  Q.  Why not?

5  A.  Because Mr. Cooper was present for those

6    tests.

7  Q.  Counsel was present?

8  A.  Yes.

9  Q.  That's Mr. Cooper that's here today?

10  A.  That's correct.

11  Q.  When you performed those tests, where did

12    you perform those tests?

13  A.  In my lab.

14  Q.  And was anyone else present when you

15    performed those tests?

16  A.  Engineers that report to me.  Yes.

17  Q.  At that time, were you with Exponent?

18  A.  Yes.

19  Q.  So people employed by Exponent?

20  A.  Correct.

21  Q.  Was the only outsider Mr. Cooper?

22  A.  Yes.

23  Q.  Okay, and were those tests being performed

24    on behalf of Mr. Cooper or the ultimate

25    client?

1    A.   I was a consulting expert for Mr. Cooper, as
2         I understand it.  The relationship that Mr.
3         Cooper has with his client is not
4         something -- I just see the relationship
5         between me and Mr. Cooper.
6    Q.   And that's different than your relationship
7         in this case; correct?
8    A.   I was retained in this particular case as a
9         testifying expert, which was not the
10        function that I served in this other case.
11   Q.   Did anybody that was in attendance make any
12        notes during those tests?
13   A.   I don't believe so.
14   Q.   Who else from Exponent was present?
15   A.   Vijay Somandepalli.
16   Q.   Anyone else?
17   A.   There may have been, but I don't
18        specifically recall.
19   Q.   Vijay is also involved in this litigation?
20   A.   He's been supporting me, yes.
21   Q.   Are you aware of anybody by the name of
22        Duncan Glover?
23   A.   Yes.
24   Q.   How are you aware of Duncan Glover?
25   A.   I'm not sure I understand that question.

1     How am I aware of him?

2  Q.  Yes.

3  A.  Very well.

4  Q.  What is your relationship, if any, with Mr.

5     Glover?

6  A.  It's very good.

7  Q.  Is it professional or personal?

8  A.  It's, I think, a little bit of both.  We

9     share Christmas cards.  I certainly go out

10    of my way to say hi to him if he's around

11    and I expect that he'd probably do the same

12    with me.

13  Q.  What was the outcome of those tests?

14  A.  That we were successful in creating

15    artificially induced non-passive failures.

16  Q.  And after you were successful in creating

17    NPFs, did that end that line of inquiry?

18    Was that the ultimate goal or did you then

19    do some more tests or investigation or

20    experimentation?

21        MR. COOPER:  I would object to the

22    question.  You're going into an area of

23    consulting --

24        MR. CAMPBELL:  I'll have to do it.

25    He was retained as a consulting engineer,

1    non-testifying, that the material is

2    confidential, so he's not going to answer

3    those questions, and he's not going to rely

4    upon them in connection with this case.

5    It's not part of this case.  It's not a part

6    of his reports.

7              MR. STERN:  So simulating a

8    non-passive failure is not related to this

9    case?

10             MR. CAMPBELL:  The work that he did

11   in that case is not related to this case.

12   It wasn't involved in this case.  He's not

13   using it, he's not relying on it, et

14   cetera.  You went beyond -- he described the

15   work that he did on the non-passive

16   failure.  You just asked him a different

17   question, "What else did you do?  How else

18   did you serve as a consulting engineer?"  I

19   forget the words, but a non-testifying

20   engineer in an unrelated case, so -- he told

21   you about the non-passive failure thing he

22   did but then you just asked, "What else did

23   you do?"

24             MR. STERN:  Yes.  I believe in the

25   other case, you're correct about consulting

```
 1      experts.  We all use them, hopefully.  In
 2      that other case, they couldn't get to him
 3      without a court order --
 4                 MR. CAMPBELL:  Right.
 5                 MR. STERN:  -- but that doesn't
 6      apply to this case, which is a different
 7      case.  All of his past experiences as your
 8      expert are actually available for
 9      cross-examination.
10                 MR. CAMPBELL:  I disagree because
11      if that were the case then, in order to,
12      quote, get to a non-testifying expert, all
13      you'd have to do is depose him in another
14      case and then you could discover that which
15      is not directly discoverable in the primary
16      case.
17                 MR. STERN:  Okay.
18   Q.  Have you ever worked for Metso Paper?
19   A.  Metso is a recent name for a conglomerate,
20      and I've worked for prior entities or, let's
21      say, entities that are, in essence, Metso
22      with its prior names.
23   Q.  Is that the Finland communications that you
24      spoke about earlier?
25   A.  Yes.
```

1   Q.  Any work done for Metso Paper U.S.

2       facility?

3   A.  I don't recall.  It's possible.  There was a

4       company, a subsidiary of a company called

5       Valmet in Wisconsin, I believe, that I've

6       worked with in the past that I don't know

7       whether that's part of Metso or not.

8   Q.  What type of work did you perform on that

9       project that's coming to mind?

10  A.  It had to do with high-speed paper machines

11      and some of the, let's say, the bottlenecks

12      associated with increasing the production

13      speed of paper machines.

14  Q.  I don't think I asked you this earlier.  The

15      Wisconsin matter that you spoke about

16      involving an HID lamp, who was the

17      manufacturer of the HID lamp in that case?

18  A.  I think it was GE.

19  Q.  I had Western Canada and I had GE, and for

20      the Virginia Beach and New Pig, I had wrote

21      down Philips for each of those; is that

22      correct?

23  A.  That is my understanding.

24          THE WITNESS:  Sorry.  Could you

25      restate that question, re-read it, please?

```
 1               (The previous question was read
 2               back by the court reporter.)
 3   A.   Actually, that's not quite correct.  There's
 4        some question as to whether it was GE or
 5        Philips in the Western Canada case, and I
 6        think I had stated that already.
 7   Q.   Were you hired for Philips or for GE?
 8   A.   That was a joint retention.
 9   Q.   I'm going to go to the back of your report,
10        where you have the history.  I want to go
11        through each of those quickly with you.
12        Do any of these cases that you've listed on
13        these two pages involve HID lighting?
14   A.   No.
15   Q.   And just going down the list, I'll start
16        with the first one.  Were you for the
17        plaintiff's side or the defendant's side in
18        Provenza versus Yamaha?  This chart that you
19        created doesn't reflect whether you were for
20        the plaintiff's or defendant's side.  For
21        Provenza versus Yamaha --
22   A.   That was defendant.
23   Q.   Betsey versus Eldean?
24   A.   That was plaintiff.
25   Q.   And El Dorado versus Ingersoll-Rand?
```

1    A.    Defendant.

2    Q.    Rose Marie Holt versus Cascade Candle?

3    A.    Plaintiff.

4    Q.    Metrokane versus Built New York?

5    A.    Plaintiff.

6    Q.    Employers Insurance versus Medline?

7    A.    Defendant.  Actually, I don't recall --

8          yeah.  I don't recall whether it was

9          plaintiff or defendant on that one,

10         specifically.

11   Q.    Who was the attorney that you were reporting

12         to in that case?

13   A.    Oh, I don't remember.

14   Q.    Richard Lueders versus Key Hospitality?

15   A.    Defendants.

16   Q.    Joseph Beuregard versus Altec?

17   A.    That's defendant.

18   Q.    Colour Quest versus Total Downstream?

19   A.    I'm not sure I can break it down into

20         whether it was plaintiff or defendant.  I

21         can tell you the parties and who was pitted

22         against who, but I don't know who was the

23         named defendant or named plaintiff.

24   Q.    In this caption, as it's typed here, who was

25         the party that retained you or you were

1    working on behalf of?

2  A.  So this is a civil action in the Court of

3      Law in London and the two parties opposed to

4      one another were Total and Chevron.  Total

5      is a subsidiary of Texaco.  Sorry.  Let me

6      restate.  Total is a French oil company.

7      Chevron has a subsidiary called Texaco in

8      the UK, and the two parties were Total, on

9      the one hand, and Chevron, on the other.  I

10     worked on behalf of Chevron, but this was a

11     civil action between two large companies,

12     and I don't know from a legal structure or

13     standpoint who was plaintiff or who was

14     defendant.

15 Q.  Appelton versus George Whiting?

16 A.  Similar situation.  I think that the

17     parties, you know, whether there were

18     counterclaims and those sorts of things, I

19     don't really know -- I can't tell you, but

20     I worked on behalf of an entity that did

21     some manufacturing, so I think probably in

22     some defense capacity, but I can't be sure

23     of that.

24 Q.  Is it one of the parties that are listed

25     here or another party that falls under

1         the "et al"?

2    A.   I think that Appleton Paper were the

3         beneficial party of the work I was doing,

4         but I'd have to check back.

5    Q.   Chestnut Village versus Line Credit?

6    A.   That was defense.

7    Q.   Motor Fuel Temperature Sales Litigation

8         Practices?

9    A.   Yeah.  That was defendant.  That was a class

10        action suit.

11   Q.   Gila River versus GE?

12   A.   That was defendant.

13   Q.   Alliance Pipeline versus C.E. Franklin?

14   A.   That was similar to the London one.  That

15        was like two large companies in an

16        arbitration setting and I was working for, I

17        believe nominally, a defendant.

18   Q.   And Kay Reed versus Tyco?

19   A.   Plaintiff.

20   Q.   Were you ever designated as an expert by a

21        court?

22             MR. CAMPBELL:  I don't mean to

23        interrupt, but do you mean, approved by one

24        or designated in some form --

25   Q.   Has a court ever qualified you as an expert

1      in a court to testify?  I see you've listed
2      some trials on there.
3  A.  Yes.
4  Q.  Okay, and what was the qualification, if at
5      all, for your expertise in those cases?
6  A.  It would be as a mechanical engineer.
7  Q.  Was it in both the El Dorado and the
8      Chestnut Village and Colour Quest matters?
9      Those are the three that list "trial."  In
10     all three, were you designated by a court as
11     a qualified expert to provide expert
12     testimony?
13 A.  The first one, evidentiary hearing, was also
14     a trial setting.  I'm not sure how you
15     distinguish "trial."  So the first, the
16     third, then on the second page at the top,
17     and then the third on the second page.  Yes,
18     and I think your question was as to whether
19     I was qualified --
20 Q.  In all of those?
21 A.  -- in all of those, and that really goes to
22     whether the judge approved me as an expert
23     in the trial and the answer is yes.
24 Q.  Okay.  And what type of testimony did you
25     offer in the Provenza versus Yamaha Motor

 1      case?

 2   A.  Provenza versus Yamaha was, part of the

 3       electrical system of a motorcycle and its

 4       interaction with allegedly spilled gasoline

 5       as an ignition source, electrical system

 6       ignition source.  The third relates to a

 7       turbine.  The first at the top of the second

 8       page, page 2 of my testimony list --

 9   Q.  The Colour Quest?

10   A.  Colour Quest, yes.  -- relates to the

11       operation of a tank farm by means of, and so

12       my job really, as instructed by the Court,

13       was to analyze the data that was stored by

14       the computer that had the historical record

15       of operations of the facility for years.  So

16       I performed, I'd say, a computerized

17       analysis, data analysis, of an exact copy of

18       the computer that ran the facility.

19   Q.  Okay.  And the last one, Chestnut Village?

20   A.  Chestnut Village, that related to the

21       operation of a heating system.

22   Q.  In this particular litigation, you mentioned

23       Andrew Kuzmick in your report.  Did he work

24       for Metso Paper?

25   A.  Andrew Kuzmick, who is related to Dave

1       Kuzmick, I understand, certainly at the

2       times during which there is information that

3       relates to this case, my understanding is

4       that he did not work for Metso Paper.

5   Q.  And if I understand or get from your report,

6       it's your understanding that Mr. Kuzmick

7       proposed the use of 48 Hubbell Tribay

8       fixture with open reflectors using GE's MVR

9       750 to Metso?

10  A.  Yes.

11  Q.  Did he propose any other types of fixtures

12      to Metso?

13  A.  The only proposal that I've seen in writing

14      has been of this particular combination.  I

15      have not seen any proposal in writing for

16      others.  There may have been discussions

17      that I don't know about.

18  Q.  Did he propose any lamp, other than the GE

19      MVR 750?

20  A.  That's the only lamp that I'm aware of that

21      he proposed.

22  Q.  And you mention further down that, after the

23      lamps were installed, Metso operated these

24      lamps continuously starting Monday morning

25      to Friday afternoon when they were turned

```
 1        off at the close of business.  Where did you
 2        get that statement from?
 3    A.  That's from David Kuzmick, from his
 4        deposition.
 5    Q.  During the break, I took a look through
 6        Kytomaa exhibits 7 and 8.  I did not see Mr.
 7        Kuzmick's deposition in here.
 8    A.  It is there in two places.
 9    Q.  Where is it?
10    A.  It is as an index or summary as a hard copy,
11        and on the disk that is there.
12    Q.  Can you show me where in Exhibit 7 or 8 Andy
13        Kuzmick's -- I'm sorry -- David Kuzmick's
14        deposition transcript appeared?
15    A.  As I just stated, it's in the form of a
16        summary and I'll show it to you.  Let me
17        look again.  I thought I had it.
18        (Indicating.)
19    Q.  Now, this says it's for Andrew Kuzmick.
20    A.  Were you asking for David?  Sorry.
21    Q.  Did you get the information that Metso
22        operated the lamps continuously starting
23        from Monday morning until Friday afternoon
24        from Andrew Kuzmick or David Kuzmick?
25    A.  From David Kuzmick.
```

1   Q.  This is Andrew.

2   A.  I'm sorry.  I mis-heard your question.  So

3       which would you like?

4   Q.  I I would like the one, whoever you got this

5       information from.

6   A.  I have in front of you here David Kuzmick.

7   Q.  David.

8           MR. CAMPBELL:  Is the full

9       transcript on the CD or the disk that's

10      marked as 9?

11          THE WITNESS:  Yes.

12  Q.  Okay, and have you reviewed the entire

13      transcript of David Kuzmick?

14  A.  I've reviewed specific parts of his

15      transcript on the original transcript of his

16      deposition.

17  Q.  Did you review the whole transcript, though?

18  A.  I don't recall.  It wasn't that long.  I may

19      have reviewed the whole thing.  I don't

20      specifically recall.

21  Q.  Can you tell me what is on this disk?  This

22      is Kytomaa exhibit 9.

23  A.  Yeah.  It's got a lot of materials,

24      including the depositions.  It's got some GE

25      discovery materials.  It will have -- it may

1          duplicate some of the materials that I have

2          in the folder here, but essentially, my

3          file.  Yeah.

4     Q.   The next sentence says, "The lamps were also

5          operated over the weekend for short periods

6          of time on a regular basis."  Where did you

7          get that information from?

8     A.   From David Kuzmick's deposition.

9     Q.   Before I continue with this, while you have

10         the binder open, I see that there's a table

11         of contents in the front of your binder.

12    A.   Yes.

13    Q.   Did you create that table of contents?

14    A.   No.  I asked that it be created based on the

15         documents that are in the binder.

16    Q.   Who did you ask to create that table of

17         contents?

18    A.   May have been an administrative assistant or

19         Vijay Somandepalli.  I don't recall.

20    Q.   That table of contents lists 17 exhibit

21         tabs; correct?

22    A.   Yes.

23    Q.   And in fact, there are more than 17 exhibit

24         tabs in this binder; correct?

25    A.   That's correct.

1    Q.   And is there a reason why the table of

2         contents doesn't identify all the exhibit

3         tabs?

4    A.   That's a good question.  I think that these

5         are -- as you know, tab separators used in

6         ring binders of this kind will come in, you

7         know, one to 25 or one to five.  They'll

8         come in specific increments, in numbers, and

9         this particular set goes to 25, but it

10        appears that we just didn't have enough

11        documents to fill the 25.  So that's the

12        reason.

13   Q.   Fair enough.  Is there actually something

14        behind tab 18?

15   A.   There is.

16   Q.   Is there something behind tab 19?

17   A.   There is.

18   Q.   And 20?

19   A.   There is not.

20   Q.   Okay.  So 18 and 19 are not on the table of

21        contents; correct?

22   A.   That's correct.

23   Q.   Okay.  And the reason they're not on the

24        table of contents is what?

25   A.   Well, so the reason is that those documents

1    behind 18 and 19 are my notes of the April

2    8, 2010 inspection and my NFIRS data

3    analysis, which are on the disk, but I

4    specifically wanted them to be in the

5    binder, as well.  That's my understanding.

6  Q.  And that was done after the binder was

7    created?

8  A.  That's correct.

9  Q.  Was there ever anything behind tabs 20 to

10    25?

11  A.  No.  Certainly, not to my knowledge.  To be

12    complete, there is also a manila folder that

13    is not behind any of the tabs that contains

14    some materials, as well.

15       MR. STERN:  Why don't we mark that

16    folder as Kytomaa exhibit 10.

17  Q.  In this manila folder, I see a copy of your

18    report that was previously marked in a

19    deposition as exhibit 19 for a deposition

20    that took place on November 17 of 2010.  Can

21    you tell me what the other two -- there are

22    two other pieces of paper that are in the

23    manila folder.  What are those pieces of

24    paper.

25  A.  These are two graphs.  The first graph is a

1    plot of light efficiency against rated life
2    or life expectancy.  The other one is a plot
3    of correlated color temperature, versus
4    color rendering index.
5              MR. STERN:  I don't need to re-mark
6    the report.  Let's just mark these two
7    documents, the first one being the
8    Efficiency versus Rated Life, and we'll do
9    that as number 10.  Number 11 already the
10   Correlated Color Temperature against Color
11   Rendering Index.
12             (Graphs marked exhibit numbers 10
13             and 11 for identification.)
14   Q.  Exhibits 10 and 11, were these created for
15       this litigation?
16   A.  Yes.
17   Q.  Okay.  Were they created at the request of
18       counsel?
19   A.  No.
20   Q.  Did you seek authority from counsel before
21       creating these?
22   A.  No.  I considered this to be part of the
23       scope of my undertaking in this case.
24   Q.  Okay.  You mention in your report, "In 2004,
25       Metso had the ballasts on all the 750 watt

```
 1        lamp fixtures replaced after a loud buzzing
 2        was heard from some of the fixtures."  Where
 3        did you get that information from?
 4   A.   I believe that was -- I believe that was
 5        David Kuzmick's deposition.
 6   Q.   And at that point in time, were any of the
 7        750 watt lamps replaced?
 8   A.   My understanding is that, probably not.
 9   Q.   And where did you get that understanding
10        from?
11   A.   Well, the invoicing reflects only ballast
12        changes.
13   Q.   At that point in time, did Metso have any
14        lamps on its shelves, spare lamps on its
15        shelves?
16   A.   I would expect that they may have had spare
17        lamps on its shelves at that time and other
18        times.
19   Q.   If a spare lamp was replaced at that point
20        in time, would it appear in the invoicing
21        that you just discussed?
22   A.   It may or it may not.
23   Q.   Your second numbered paragraph says, "On
24        January 21, 2006, Metso personnel working at
25        the facility noticed a fire on materials
```

1      stored on a rack at their facility."  Where

2      did you get that information from?

3  A.  I've seen that in, let's say, other reports

4      and I believe David Kuzmick.  There may be

5      other sources.  I've seen it multiple

6      places, all of which I don't necessarily

7      recall right now.

8  Q.  And did that rack have multiple levels?

9  A.  Yes.

10  Q.  Where was the fire first spotted?

11  A.  This is an area that I've -- let's say that

12      really, Mr. Hoffman has focused on more than

13      I have, but my recollection is that it was

14      first spotted high up in the rack.

15  Q.  Where did you begin that knowledge from?

16  A.  I don't recall, and like I said, this is not

17      an area that I focused on.

18  Q.  Later on, you say, "Subsequent

19      investigations allege that the fire was

20      started due to the rupture of an operating

21      GE 750 watt Metal Halide lamp."  Why did you

22      use the word "allege"?

23  A.  I think that's a fair representation,

24      particularly in the context of this

25      litigation.  It is an allegation.

1   Q.  Are you aware of any other allegations

2       relative to the cause of the fire?

3   A.  I have not attempted to perform a

4       comprehensive review of potential causes in

5       this particular case, but I would say that I

6       would not be surprised if there were

7       allegations of other causes related to

8       chemicals and such.

9   Q.  Has anybody expressed to you an allegation

10      of a cause of the fire, other than the GE's

11      Metal Halide lamp?

12  A.  I don't recall of any such specific

13      allegation, but such an allegation may have

14      been made.

15  Q.  By who?

16  A.  I don't know.  Like I said, I don't know

17      specifically, but based on my own

18      investigation, I certainly identified a

19      number of chemicals that were probably

20      stored in this general area that can easily

21      burn.

22  Q.  Is any of the issues relative to chemicals

23      discussed in your report?

24  A.  No.  I mean, you've asked me the question

25      and I've told you that that's not an area of

1     my focus, but since you asked me the

2     question, I answered.

3   Q.  Are you aware of of the fire marshall or

4       fire investigator's conclusion as to the

5       cause of this fire?

6   A.  I've reviewed their materials, but I don't

7       recall specifically what they said.

8   Q.  And you're aware of what plaintiff's experts

9       conclude as the cause of this fire;

10      correct?

11  A.  Yes.

12  Q.  You state further down that, "Hot particles

13      from the lamp rupture are alleged to have

14      ignited combustible materials stored in the

15      vicinity of one of the lamps."  What did you

16      mean by "stored in the vicinity"?

17  A.  Just as it says there.

18  Q.  Well, what materials are you talking about

19      that were stored in the vicinity of one of

20      the lamps?

21  A.  The various kinds of materials that were

22      there in the compounding area, including

23      rubberized materials and various materials

24      that included cardboard, storage boxes, and

25      thin plastic material, wrappings, and things

1    of that kind.

2    Q.  How close was the first material that

3        ignited to the lamp?  What was the distance

4        between those?

5    A.  I have not attempted to quantify that.

6    Q.  You were at the facility?

7    A.  I was.

8    Q.  And I did see some drawings of yours in

9        this.

10   A.  Yes.

11   Q.  What would you estimate as the distance

12       between where you believe the point of

13       origin was and the lamp?

14   A.  Like I said, I haven't attempted to perform

15       that calculation and what I would have to do

16       to perform that calculation is to quantify

17       the elevation of the racks, on the one hand,

18       to quantify the elevation of the lighting

19       systems, the relative position of the racks

20       in relation to the lighting systems in plan

21       view, and then to invoke the Pythagorean

22       Theorem to make a calculation, and I haven't

23       done that.

24   Q.  Okay.

25   A.  And so I would have to do that and then I

1      could give you an answer.

2   Q.  Fair enough.  On the date of the fire, was

3      the lamp above the aisle or above a rack?

4   A.  I don't know and I know that Mr. Hoffman

5      actually has undertaken an exercise to make

6      that determination.  I don't have specific,

7      let's say, detailed information.  I wouldn't

8      want to guess.

9   Q.  You reviewed all --

10          MR. STERN:  Strike that.

11  Q.  You did not make a determination as to

12      whether the lamp was above an aisle or

13      above a storage rack on the date of the

14      loss?

15  A.  My understanding is that one or more lights

16      were in close proximity to the combustible

17      materials in the racks, but giving you more

18      detailed answer to, I don't have

19      dimensions.

20  Q.  You created -- and this is sort of followup

21      by the words you used.  Specifically, the

22      light, the lamp that's alleged by Metso to

23      have exploded, did you do any determination

24      to determine whether that lamp, on the date

25      of the explosion, was directly above an

1           aisle or directly above a storage rack?

2   A.   I did not make that determination.

3   Q.   Okay.  You then go on to say, "The lamp was

4           recovered from its fixture after the fire

5           and stored as evidence."  How do you know

6           the lamp was recovered from its fixture?

7   A.   I've seen photographs of it.

8   Q.   And what did you mean by, "it was recovered

9           from its fixture"?

10  A.   That certain individuals had the opportunity

11          to see the lamp, so it was somehow

12          recovered.

13  Q.   And that's from photos that you've seen?

14  A.   Yes.

15  Q.   Okay.  Any discussions with anyone about

16          that or is that knowledge just from those

17          photos?

18  A.   It's from those photos.

19  Q.   And who was present when those photos were

20          taken?

21  A.   I wasn't present, so I haven't attempted to

22          figure out who specifically was present.

23          I believe that at one time or another, Mr.

24          Rhiner had an opportunity to see the lamp.

25          I believe that Mr. Hoffman has had an

1      opportunity to see the lamp.  I would not be

2      surprised if attorneys had been present at

3      that time, and perhaps representatives from

4      Metso, but I don't know.

5  Q.  Are you aware of any post-fire testing of

6      the fixture that the GE 750 watt Metal

7      Halide lamp that plaintiff alleges

8      exploded?

9          MR. CAMPBELL:  This is after the

10     accident?

11         MR. STERN:  Yes.  Post-fire.

12 A.  I have some rough recollection, but no

13     details associated with the possibility that

14     that might have occurred, but I don't recall

15     any details.

16 Q.  Do you have any recollection that a GE

17     representatives was present for any

18     post-fire testing of the fixture at issue?

19 A.  I don't know.

20 Q.  Paragraph numbered 3, is this information in

21     this paragraph that you acquired from the

22     materials in exhibits 7, 8, and 9?

23 A.  That I think embodies what I know through my

24     experience in this area, as well as material

25     that is embodied in the materials acquired

```
 1        through this case.
 2   Q.   Can you could turn to -- unfortunately, the
 3        pages are not numbered -- the next page,
 4        which has your figure 1 and table 1.  Where
 5        did the information for table 1 come from?
 6   A.   That would have come from lighting handbook
 7        information.
 8   Q.   Is that lighting handbook somewhere in
 9        exhibit 7, 8 or 9?
10   A.   Yes.
11   Q.   And what is an incandescent lighting
12        technology?
13   A.   That's commonly known as incandescent lights
14        or lightbulbs that we use daily.
15   Q.   Okay.  This column that you have as rated
16        life hours, did that information come from
17        the same booklet that the other columns came
18        from?
19   A.   I'm not sure what you mean by "booklet," but
20        it would have come from the lighting
21        handbook and potentially also other sources,
22        such as product catalogs and the like.
23   Q.   I guess I didn't phrase the question -- in
24        this handbook that you've referred to that's
25        in the exhibits --
```

1    A.   Yes.

2    Q.   -- does this chart appear in that handbook

3         as we see this chart here in your report?

4    A.   It may.  In the process of generating this

5         report, I selected widely-used lighting

6         technologies to make a specific point that

7         I make in this report.  I don't remember

8         whether the exact format that I show here in

9         table 1 is the format from the original

10        source.

11   Q.   When was the last time you purchased an

12        incandescent lightbulb?

13   A.   I mean, I would say recently.

14   Q.   From where?

15   A.   Probably Home Depot.

16   Q.   Okay, and when was the last time you

17        actually installed an incandescent

18        lightbulb?

19   A.   The last time I did that was probably like a

20        couple of weeks ago.  In my bathroom,

21        there's a small lamp that is an incandescent

22        lightbulb that I installed there.

23   Q.   Who was the manufacturer of that lightbulb?

24   A.   I don't know.

25   Q.   Can you tell me any of the warnings that

1        were on the packaging for that lightbulb?

2    A.  My recollection of the warnings on typical

3        lightbulbs --

4    Q.  I'm sorry.  I'm talking about the lightbulb

5        that you just installed in your bathroom.

6    A.  Yeah.

7    Q.  That one, I want to know about.

8    A.  I don't specifically he been recall.

9    Q.  Can you tell me the specific directions that

10       were on the packaging for that lightbulb

11       that you installed in your bathroom?

12   A.  I don't recall specific directions on that

13       package.

14   Q.  Fair enough.  The lamp that's at issue in

15       this litigation, the Metso Paper, that falls

16       underneath, looking at your table 1, the

17       Metal Halide category; right?

18   A.  Yes.

19   Q.  And I note that you have rated life as 7500

20       to 20,000 hours; correct?

21   A.  Yes.

22   Q.  Where did you get the low of being 7500 and

23       the high being 20,000?

24   A.  My recollection is that I would have got

25       that from the same source as most of these

1     other entries.

2  Q.  Paragraph 5 of your report, you state that,

3     "In addition to their high energy

4     efficiency and good color, Metal Halide HID

5     lamps provide multiple additional

6     benefits."  Isn't it true that in this

7     report, the next paragraphs are addressing

8     what you've characterized as the multiple

9     additional benefits?

10  A.  Yes.  In part, yes.

11  Q.  You mention in paragraph 6 that "HPS lamps

12     are used widely over roadways, parking lots

13     and warehouses."  Where did you get that

14     information from, where HPS lamps are widely

15     used?

16  A.  Personal experience and also, the

17     literature.

18  Q.  And is that literature in Kytomaa exhibits

19     7, 8, or 9?

20  A.  I'd say the lighting handbook would talk

21     about that, specifically.  I may not have

22     included information in my materials here in

23     exhibits 7, 8, or 9 that are specifically

24     related to High Pressure Sodium lamps, just

25     because we're not dealing with a High

```
 1        Pressure Sodium lamp in this case.
 2   Q.   In Paragraph 9, you state, "When an HID lamp
 3        reaches the end of its operating life, in
 4        the overwelming majority of cases, it
 5        passively ceases to emit light."  What do
 6        you mean by "passively ceases"?
 7   A.   It just goes out.  It no longer works.
 8   Q.   Is there something that is non-passive?  Is
 9        there an opposite to "passively ceasing"?
10   A.   If it passively ceases, then it passively
11        ceases.  I'm not sure I understand your
12        question.
13   Q.   Is there a way that an HID lamp can react at
14        the end of its life that's something other
15        than passively ceasing to emit light?
16   A.   Yes.  I mean, there's this phenomenon of a
17        non-passive failure.
18   Q.   And that you get into in point number 10;
19        correct?
20   A.   Yes, correct.
21   Q.   And you talk about, "In rare circumstances,
22        the HID lamp can shatter during operation,
23        producing hot quartz particles."  What did
24        you mean by "shatter"?
25   A.   Break apart.
```

1   Q.   Is "explode" a synomyn for "shatter"?

2   A.   I mean, I don't use the word "explode," but

3        it comes apart and you know, loses its

4        integrity.  Essentially, the quartz tube

5        comes apart into multiple pieces.

6   Q.   So when a 750 watt Metal Halide lamp has a

7        non-passive failure, tell me what

8        specifically happens to that lamp.

9   A.   So what about will tend to happen is the

10       quartz tube will break apart and particles

11       will be ejected.  Often times, those

12       particles will then break the outer glass

13       barrier and then fall downwards, let's say,

14       from that location.

15  Q.   At what speed do they fall downward?

16  A.   I don't know specifically what the speed is.

17  Q.   What temperature do they fall downward?

18  A.   Well, the temperatures would be in the range

19       up to something like 1100 degrees C.

20  Q.   And what is that in Fahrenheit?

21  A.   That's about -- I was hoping you wouldn't

22       ask me that question.  It's a couple of

23       thousand Fahrenheit.

24  Q.   It's only because of the accent, I assumed

25       that you could do the translation.  I didn't

```
 1        learn Celcius.

 2    A.  I have had to do both, yes.

 3    Q.  So it's greater than 1100, when you do the

 4        conversion?

 5    A.  Yes, that's correct.

 6    Q.  You also talk about, in that paragraph, the

 7        rated life.  Do you see that?

 8    A.  Paragraph 10?

 9    Q.  Yes.  Again, paragraph 10.

10    A.  Yes.

11    Q.  How is rated life calculated, and

12        specifically for a 750 watt GE Metal Halide

13        lamp?

14    A.  The method of determination of rated life is

15        based on the life at which time 50 percent

16        of the lights have ceased to light and 50

17        percent of the lights continue to light,

18        based on a large population of lamps.

19    Q.  Using your words that in rare circumstances,

20        the HID lamp can have a non-passive failure,

21        is that what you're saying, or just that it

22        can shatter?

23    A.  So here, I'm using the word "shatter" in the

24        context of a non-passive failure.  So if you

25        will, under paragraph 10, I'm describing
```

1    what a non-passive failure is.

2    Q.  Okay.  And in the rare circumstance that an

3        HID lamp has a non-passive failure, can you

4        tell me what the size of the debris field

5        is?

6    A.  I mean, it would be limited by the geometry

7        of the fixture and the location of the lamp

8        within the fixture and the particles will

9        drop down, mostly down.  If your question

10       asks for specific distances and such, I

11       haven't attempted to quantify those.

12   Q.  Yes, that was exactly what I was asking

13       for.  Specific size of a debris field that a

14       750 watt Metal Halide GE explodes or has a

15       non-passive failure.

16   A.  I would say, as a mechanical engineer, I

17       would expect those particles to be below or

18       in the vicinity of an area below the

19       fixture, but I don't know what the diameter

20       of that area would be.

21   Q.  In order to determine the size of the debris

22       field, do you need to know the shape of the

23       fixture itself?

24   A.  To some extent, yes.

25   Q.  And do you need to know how far down the

1    lamp itself hangs into what I'll call the
2    cone of the fixture?
3  A.  Yes.
4  Q.  And do you need to know how far above
5      something the lamp is located?
6  A.  I mean, I'd say yes.  There are a number of
7      other considerations.  Like, for example,
8      the manner in which the tube shatters and
9      the direction of motion of the individual
10     particles which we know from photographs
11     that have been taken suggest that the
12     direction is largely radial.  So if you
13     think of the radial direction of an arc
14     tube, it is in the direction perpendicular
15     to the main access, and photographs taken by
16     Rhiner and others indicate that the
17     particles go in a radial manner, probably
18     come into contact with the fixture itself,
19     and then drop down more or less vertically,
20     I would expect.
21 Q.  In paragraph number 11, you say that,
22     "There are applications where the risks
23     posed by the small chance of hot particles
24     being emitted can be acceptable."  What do
25     you mean by the term "emitted"?

1    A.   Being released from a lamp during a

2         non-passive failure.

3    Q.   So you're talking about the lamp explodes

4         and then hot particles are projectiling

5         outward or projectiling downward or both?

6    A.   Well, I've already described to you what I

7         think would happen, all right?  What I mean

8         by "emitted" is particles being released by

9         the lamp in the context of a non-passive

10        failure.  Then the geometry of exactly where

11        they go is what we've talked about in the

12        context of the last question you asked.  I

13        think I already answered that.

14   Q.   I'm trying to understand the word

15        "emitted."  When the arc tube explodes,

16        there's gases within the arc tube; right?

17   A.   Yes.

18   Q.   What happens to those gases?

19   A.   Those are vented during the process of the

20        particles coming apart.

21   Q.   The lamp itself?

22   A.   Well, let's talk about the arc tube,

23        specifically.  What happens is that there is

24        an initial failure location within the arc

25        tube that initiates the propagation of a

1    crack.  The propogation of that crack causes

2    the particles to come loose from one

3    another.  So essentially, at that stage, the

4    arc tube is losing its structural

5    integrity.  In parallel with the crack

6    propagating, the crack pressure pushes the

7    particles outward and -- but at the same

8    time, the gap that is formed between the

9    particles is vented out in a harmless way

10   between the particles as they're moving

11   radially, and that's what I mean by

12   "emitted."

13   Q.  That's the particles are moving radially, as

14       opposed to the gas, what you just said?

15   A.  Your question was regarding the first

16       sentence of paragraph 11.

17   Q.  When you said that -- I just want to

18       clarify -- when you said "radially" was

19       referring to the way the particles were

20       moving, not the gas was moving?

21   A.  I would expect both to be moving radially,

22       but keep in mind that the particles come

23       into contact with the reflector of the

24       fixture.  So initially, they move radially,

25       as the recovered lamp indicates, but the

1     reflector of the fixture actually comes into

2     contact with the particles, but also, the

3     gas, and then essentially rain downward.

4   Q.   The particles?

5   A.   The particles.

6   Q.   Does the gas rain down?

7   A.   It would be directed and deflected also in

8     a, let's say, substantially downward

9     direction because the enclosure of a fixture

10    is typically constrained in an upward

11    direction.

12        MR. CAMPBELL:  It's one o'clock.

13    In order to get anything to eat, given the

14    weather and the like, there's a place

15    downstairs.  I know it closes at 1:30.  If

16    we need to get lunch, and I'm sure that we

17    do, we should probably break.

18        (Discussion off the record.)

19        (Lunch recess.)

20  Q.   (Cont'd. By Mr. Stern)  Welcome back.

21    Getting back to paragraph 11, where we left

22    off, the hot particles that are going to be

23    emitted, how fast will they be traveling?

24  A.   I don't know a specific speed.

25  Q.   Have you done any calculations to determine

1    speed for the hot particles that could be

2    emitted upon the non-passive failure of a

3    750 watt Metal Halide lamp?

4    A.   No.

5    Q.   And you mentioned that there are examples of

6         such applications, including environments,

7         that do not pose a risk of fire.  Is a

8         warehouse one of those examples?

9    A.   Yes.

10   Q.   Okay, and was the lamp at issue an S-rated

11        lamp?

12   A.   That is my understanding, yes.

13   Q.   At paragraph number 12, you state that, "The

14        risks associated with S-rated HID lamps are

15        substantially under the control of the

16        user."  Are they also under the control of

17        anyone else?

18   A.   The primary responsibility is with the owner

19        and operator of the facility.

20   Q.   Is that the same as a user?

21   A.   Yes.  So typically, in this particular case,

22        Metso would be the owner, operator of their

23        warehouse and they used S-rated HID lamps.

24   Q.   So would the owner of this building be

25        substantially -- it would be substantially

1      under the control of the owner of this

2      building for the lamps that a tenant puts

3      in?

4   A. I didn't understand the question.

5   Q. You said something that I don't read in your

6      report here just now, and you said that

7      owners, operators and users would be

8      substantially under control, but this only

9      says "user."  So you've thrown in owners and

10     operators, and what I'm trying to determine,

11     if in fact what you really meant to say was

12     "user," as you state in your report, or

13     this word "user" is something more than a

14     user.

15  A. It is "user."  I stated in the report --

16     under certain circumstances, the user is

17     also the owner.

18  Q. And back to the question I asked.  Is there

19     anyone else whose control the risk

20     associated with S HID lamps can be under?

21  A. As we know in this case, we had Andrew

22     Kuzmick, who specified the lighting that

23     Metso chose and also specified the fixtures

24     that were used, and so to a lesser extent,

25     some influence existed through Andrew

1    Kuzmick, through Friedman, through, let's

2    say, Hubbell, but the primary and

3    substantial control is with the user.

4  Q.  Okay, I'm with you, and I think you've now

5    said that probably three times, but that's

6    not what I care about right now.  That's not

7    the question I am asking.  You chose the

8    word "substantially," and "substantially"

9    isn't the word "totally," which means

10   there's others which this control is also

11   under.

12 A.  Yes.

13 Q.  Now, you've also told us about a seller;

14   right?  Andy Kuzmick?

15 A.  Yes.

16 Q.  Anyone else?  We've got the user, we've got

17   the seller.  Anyone else or is that now the

18   total universe?

19 A.  There are people that will make

20   recommendations in the process, as we know

21   here, and the decision is ultimately made by

22   Metso, and so the entities that I've

23   mentioned are those who participate in the

24   process about which Metso makes a decision,

25   and so all others that would participate in